# 25-2758-cv

## In the United States Court of Appeals
## for the Second Circuit

AUBREY DRAKE GRAHAM,

*Plaintiff-Appellant,*

v.

UMG RECORDINGS, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX OF PLAINTIFF-APPELLANT**

MICHAEL J. GOTTLIEB
WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST
LOS ANGELES, CA 90067
(310) 855-3111

ERICA L. ROSS
ANNA M. GOTFRYD
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, D.C. 20006

BRADY M. SULLIVAN
WILLKIE FARR & GALLAGHER LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019

*Counsel for Appellant*
*Aubrey Drake Graham*

## TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF ISSUES ...........................................................................1

STATEMENT OF THE CASE .......................................................................2

I.    FACTUAL BACKGROUND........................................................................2

    A.    The Recording and Image ...........................................................2

    B.    Public Outcry and Violence ........................................................3

    C.    UMG's Repeated Republications.................................................5

    D.    UMG's Deceptive Business Practices..........................................8

II.    PROCEDURAL HISTORY .........................................................................9

III.    THE DISTRICT COURT'S ORDER..........................................................9

    A.    Fact vs. Opinion ........................................................................10

    B.    Mixed Opinion ..........................................................................11

    C.    Harassment ...............................................................................12

    D.    N.Y. General Business Law Section 349 ...................................13

SUMMARY OF ARGUMENT ....................................................................13

STANDARD OF REVIEW .........................................................................16

ARGUMENT .............................................................................................16

I.    THE DEFAMATION CLAIM SHOULD HAVE BEEN ALLOWED
    TO PROCEED...........................................................................................16

    A.    Drake Adequately Pleaded Defamatory Statements of Fact...............16

    B.    The District Court Erred in Concluding that No Reasonable
        Person Could Understand the Defamatory Statements as
        Asserting Facts. ........................................................................19

        1.    The District Court Improperly Considered Materials
            Outside the Amended Complaint to Rebut Drake's Well-
            Pleaded Allegations. ............................................................20

        2.    The District Court Made Multiple Errors in Defining the
            Relevant Context..................................................................27

i

a. The District Court's Context Definition Was Too Broad............................................................28

b. The District Court's Context Definition Was Too Narrow. ...........................................................35

c. The District Court's Context Definition Did Not Account for UMG's Republications.............................36

3. The District Court Created a Dangerous Categorical Rule that Rap Diss Tracks Can Never Be Actionable........................41

II. DRAKE ADEQUATELY PLEADED THAT THE DEFAMATORY STATEMENTS CONSTITUTE MIXED OPINION...................................44

III. THE DISTRICT COURT ERRED BY DISMISSING DRAKE'S HARASSMENT CLAIM. ..................................................47

IV. THE DISTRICT COURT ERRED IN DISMISSING THE DECEPTIVE BUSINESS PRACTICES CLAIM.............................................51

A. The District Court Improperly Imposed a Heightened Pleading Standard.......................................................52

B. Drake Alleged Consumer-Oriented Conduct. .....................................55

CONCLUSION ..............................................................59

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*600 W. 115th Street Corp. v. Von Gutfeld*,
    603 N.E.2d at 930 (1992)...................................................................17, 29, 38

*Albert v. Loksen*,
    239 F.3d 256 (2d Cir. 2001) ......................................................................17, 45

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010) ......................................................................53, 54

*Arts4All, Ltd. v. Hancock*,
    773 N.Y.S.2d 348 (N.Y. App. Div. 2004).........................................................47

*Asset Co IM Rest, LLC v. Katzoff*,
    2025 WL 919489 (S.D.N.Y. Mar. 26, 2025)......................................................53

*Baiqiao Tang v. Wengui Guo*,
    2019 WL 6169940 (S.D.N.Y. Nov. 20, 2019)...............................................49, 50

*Beauty Beauty USA, Inc. v. Chin Hong Luo*,
    2011 WL 4952658 (S.D.N.Y. Oct. 11, 2011)....................................................49

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................52, 54

*Biro v. Condé Nast*,
    883 F. Supp. 2d 441 (S.D.N.Y. 2012) .............................................................47

*Blasetti v. Pietropolo*,
    213 F. Supp. 2d 425 (S.D.N.Y. 2002) .............................................................49

*Blissworld, LLC v. Kovack*,
    2001 WL 940210 (N.Y. Sup. Ct. July 9, 2001)..................................................51

*Boykin v. KeyCorp*,
    521 F.3d 202 (2d Cir. 2008) .........................................................................53

*Brian v. Richardson*,
    660 N.E.2d 1126 (N.Y. 1995)........................................................................42

*Broadway Cent. Prop. Inc. v. 682 Tenant Corp.*,
   749 N.Y.S.2d 225 (N.Y. App. Div. 2002) ........................................................50

*Cablevision Sys. Corp. v. Commc'ns Workers of Am. Dist. 1*,
   16 N.Y.S. (N.Y. App. Div. 2015) ...................................................................50

*Cantu v. Flanigan*,
   705 F. Supp. 2d 220 (E.D.N.Y. 2010) ............................................................30

*Casper Sleep, Inc. v. Mitcham*,
   204 F. Supp. 3d 632 (S.D.N.Y. 2016) ............................................................55

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) .........................................................................20

*Chau v. Lewis*,
   771 F.3d 118 (2d Cir. 2014) .........................................................................44

*Chufen Chen v. Dunkin' Brands, Inc.*,
   954 F.3d 492 (2d Cir. 2020) .........................................................................52

*Colavito v. N.Y. Organ Donor Network, Inc.*,
   438 F.3d 2141 (2d Cir. 2006) .......................................................................48

*Condit v. Dunne*,
   2008 WL 2676306 (S.D.N.Y. July 8, 2008) ..................................................39

*Cook v. Conners*,
   215 N.Y. 175 (1915) ....................................................................................40

*Daniel v. Safir*,
   175 F. Supp. 2d 474 (E.D.N.Y. 2001) ..........................................................49

*David J. Gold, P.C. v. Berkin*,
   2001 WL 121940 (S.D.N.Y. Feb. 13, 2001) .................................................37

*Davis v. Boeheim*,
   22 N.E.3d 999 (N.Y. 2014) ......................................................................17, 44

*Delgado v. Sonnen*,
   2025 WL 958753 (S.D.N.Y. Mar. 31, 2025) .................................................42

*Delong v. Bell*,
2022 WL 2612434 (N.Y. Sup. Ct. July 7, 2022) ............................................49, 50

*Earsing v. Nelson*,
629 N.Y.S.2d 563 (N.Y. App. Div. 1995) ........................................................51

*Electra v. 59 Murray Enters.*,
987 F.3d 233 (2d Cir. 2021) ............................................................................56

*Fairstein v. Netflix, Inc.*,
553 F. Supp. 3d 48 (S.D.N.Y. 2021) ................................................................44

*Firth v. State*,
775 N.E.2d 463 (N.Y. 2002)......................................................................37, 40

*Galella v. Onassis*,
487 F.2d 986 (1973).................................................................................48, 49

*Giuffre v. Dershowitz*,
410 F. Supp. 3d 564 (S.D.N.Y. 2019) ............................................................39

*Global Network Commc'ns, Inc. v. City of N.Y.*,
458 F.3d 150 (2d Cir. 2006) ...................................................................*passim*

*Golden v. Diocese of Buffalo*,
125 N.Y.S.3d 813 (N.Y. App. Div. 2020)........................................................51

*Goldman v. Reddington*,
417 F. Supp. 3d 163 (E.D.N.Y. 2019) .............................................................45

*Graham v. UMG Recordings, Inc.*,
No. 1:25-cv-00399, 2025 WL 2879607 (S.D.N.Y. Oct. 9, 2025) ......................2

*Hammer v. Am. Kennel Club*,
803 N.E.2d 766 (N.Y. 2003).................................................................48, 50, 51

*Hazlewood v. Netflix, Inc.*,
2023 WL 6771506 (N.D. Tex. Oct. 11, 2023)..................................................25

*Karlin v. IVF Am., Inc.*,
712 N.E.2d 662 (N.Y. 1999)............................................................................56

v

*Kipper v. NYP Holdings Co., Inc.*,
  912 N.E.2d 26 (N.Y. 2009)...............................................39, 40

*KS Trade LLC v. Int'l Gemological Inst., Inc.*,
  141 N.Y.S.3d 452 (N.Y. App. Div. 2021)..........................................56

*Lanier v. Bats Exch., Inc.*,
  838 F.3d 139 (2d Cir. 2016) ...............................................16, 47

*Lehman v. Discovery Commc'ns, Inc.*,
  332 F. Supp. 2d 534 (E.D.N.Y. 2004)....................................37, 40

*Levin v. McPhee*,
  119 F.3d 189 (2d Cir. 1997) .............................................37

*Lindell v. Mail Media Inc.*,
  575 F. Supp. 3d 479 (S.D.N.Y. 2021) ...................................30

*Long v. Ben. Fin. Co. of N.Y.*,
  330 N.Y.S.2d 664 (N.Y. App. Div. 1972)..............................49

*Luce v. Edelstein*,
  802 F.2d 49 (2d Cir. 1986) ..............................................53

*M.K.B. v. Eggleston*,
  445 F. Supp. 2d 400 (S.D.N.Y. 2006) ...................................48

*Masic v. Town of Franklinville*,
  2025 WL 2480898 (W.D.N.Y. Aug. 27, 2025)..........................50

*In re Methyl Tertiary Butyl Ether*,
  175 F. Supp. 2d 593 (S.D.N.Y. 2001) ..................................58

*Moraes v. White*,
  571 F. Supp. 3d 77 (S.D.N.Y. 2021) .................................53, 54

*N. State Autobahn v. Progressive Ins.*,
  953 N.Y.S.2d 96 (N.Y. App. Div. 2012)..............................56, 58

*New York v. Feldman*,
  210 F. Supp. 2d 294 (S.D.N.Y. 2002) ...............................55, 56

*Niagara Mohawk Power Corp. v. Freed*,
    696 N.Y.S.2d 600 (N.Y. App. Div. 1999)...............................................51

*Oja v. Grand Chapter of Theta Chi Fraternity*,
    684 N.Y.S.2d 344 (N.Y. App. Div. 1999).............................................51

*Oswego Laborers' Local 214 v. Marine Midland Bank*,
    647 N.E. 2d 741 (N.Y. 1995)..............................................................55

*Palin v. N.Y. Times Co.*,
    113 F.4th 245 (2d Cir. 2024) ..............................................................17

*Palin v. N.Y. Times Co.*,
    940 F.3d 804 (2d Cir. 2019)...............................................................25

*Pelman ex rel. Pelman v. McDonald's Corp.*,
    396 F.3d 508 (2d Cir. 2005) ..............................................................52

*Plavin v. Grp. Health Inc.*,
    146 N.E.3d 1164 (N.Y. 2020)............................................................56

*Poulos v. City of N.Y.*,
    2016 WL 224135 (S.D.N.Y. Jan. 19, 2016) .......................................49

*Prignoli v. City of N.Y.*,
    1996 WL 340001 (S.D.N.Y. June 19, 1996) ......................................49

*Printers II, Inc. v. Pros. Publ'g, Inc.*,
    784 F.2d 141 (2d Cir. 1986) ..............................................................49

*Rapaport v. Barstool Sports, Inc.*,
    2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021),
    *aff'd*, 2024 WL 88636 (2d Cir. Jan. 9, 2024) .......................30, 31, 32

*Securitron Magnalock Corp. v. Schnabolk*,
    65 F.3d 256 (2d Cir. 1995) ................................................................58

*Sheehy v. Big Flats Cmty. Day, Inc.*,
    541 N.E.2d 18 (N.Y. 199)......................................................48, 49, 51

*Solstein v. Mirra*,
    488 F. Supp. 3d 86 (S.D.N.Y. 2020) ...........................................42, 44

*Spock v. United States*,
464 F. Supp. 510 (S.D.N.Y. 1978) ...................................................49

*Staehr v. Hartford Fin. Servs. Grp.*,
547 F.3d 406 (2d Cir. 2008) .........................................................16

*Stathatos v. William Gottlieb Mgmt.*,
2020 WL 1694366 (E.D.N.Y. Apr. 6, 2020) .....................................50

*Steinhilber v. Alphonse*,
501 N.E.2d 550 (N.Y. 1986)..........................................31, 34, 35, 38, 45

*Torain v. Liu*,
2007 WL 2331073 (S.D.N.Y. Aug. 16, 2007)....................................33

*Torain v. Liu*,
279 F. App'x 46 (2d Cir. 2008) ...........................................30, 32, 33

*Travelers Ins. Co. v. 633 Third Assocs.*,
14 F.3d 114 (2d Cir. 1994) ...........................................................48

*True v. N.Y. State Dep't of Corr. Servs.*,
613 F. Supp. 27 (W.D.N.Y. 1984)...................................................49

*United States v. Belfast*,
611 F.3d 783 (11th Cir. 2020) .......................................................43

*United States v. Herron*,
762 F. App'x 25 (2d Cir. 2019) .....................................................43

*United States v. Moore*,
639 F.3d 443 (8th Cir. 2011) ........................................................43

*United States v. Pierce*,
785 F.3d 832 (2d Cir. 2015) .........................................................43

*United States v. Strock*,
982 F.3d 51 (2d Cir. 2020) ...........................................................21

*Vitolo v. Mentor H/S, Inc.*,
213 F. App'x 16 (2d Cir. 2007) .....................................................56

viii

*Watson v. City of N.Y.*,
  92 F.3d 31 (2d Cir. 1996) ..................................................................51

*Zerangue v. TSP Newspapers, Inc.*,
  814 F.2d 1066 (5th Cir. 1987) ..........................................................40

*Zuckerbrot v. Lande*,
  167 N.Y.S.3d 313 (N.Y. Sup. Ct. 2022)............................................25

**Statutes**

28 U.S.C. 1291 .......................................................................................1

28 U.S.C. 1332(a)(3)..............................................................................1

New York General Business Law Section 349................................*passim*

New York Penal Law Section 240.26.............................................*passim*

**Other Authorities**

Federal Rule of Evidence 201(b) ..........................................................20

Federal Rule of Civil Procedure 12(b)(6) .......................................16, 20

Jon Blistein, *Drake Removes 'Taylor Made Freestyle' After Lawsuit
  Threat Over AI Tupac*, Rolling Stone (Apr. 26, 2024).....................21

Peter A. Berry, *Who Won the Drake and Kendrick Lamar Diss War?
  The Numbers Behind the Beef*, Chartmetric (May 29, 2024),
  https://hmc.chartmetric.com/kendrick-lamar-vs-drake-diss-tracks-
  streaming-success/ .....................................................................28, 29

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. 1332(a)(3). The parties are diverse because Plaintiff-Appellant Aubrey Drake Graham ("Drake") is a Texas citizen, and Defendant-Appellee UMG Recordings, Inc. ("UMG") is a Delaware and California citizen. JA-28-29 ¶¶ 26-27. The amount-in-controversy requirement is satisfied. JA-30 ¶ 28.

This Court has jurisdiction under 28 U.S.C. 1291. The District Court entered final judgment on October 9, 2025. SPA-38. On October 29, 2025, Drake timely filed a notice of appeal. JA-544.

## STATEMENT OF ISSUES

1.     Did the District Court err in concluding that the Defamatory Material constitutes nonactionable opinion?

2.     If the Defamatory Material conveyed opinion, did the Court err in concluding that the statements are not actionable mixed opinions?

3.     Did the Court err in holding that New York Penal Law Section 240.26 does not imply a private right of action?

4.     Did the Court err in holding that Drake failed to state a claim under New York General Business Law Section 349 where he plausibly alleged that UMG engaged in materially misleading consumer-oriented conduct that harmed Drake?

1

## STATEMENT OF THE CASE

Drake appeals from a decision of the United States District Court for the Southern District of New York dismissing his Amended Complaint for failure to state a claim. *See Graham v. UMG Recordings, Inc.*, No. 1:25-cv-00399, 2025 WL 2879607 (S.D.N.Y. Oct. 9, 2025) (Vargas, J.).

## I.   FACTUAL BACKGROUND

### A.   The Recording and Image

This action arises from UMG's publication and promotion of "Not Like Us" (the "Recording") by Kendrick Lamar Duckworth ("Lamar"), a song that was intended to create the impression—and states as an unambiguous matter of fact— that Drake is a "certified pedophile[]" and a "predator." JA-18-19 ¶ 7; JA-41 ¶ 61. Drake's alleged pedophilia is the Recording's core message, as evidenced in not just its lyrics, but in the Recording's ubiquitous cover art, relentless marketing, and subsequently released, viral video.

UMG, the world's largest music company, represents Drake and Lamar. JA-18 ¶ 6. UMG published the Recording on May 4, 2024. *Id.* The Recording was released with an album cover (the "Image") depicting Drake's home plastered with icons used by law enforcement and public-safety applications to denote registered sex offenders. JA-42-44 ¶¶ 65-66. The Recording set the record for the most single-day streams for a rap song in the U.S., was streamed 96 million times in the first week alone, and rose to the top spot on the Billboard Hot 100. JA-100-01 ¶ 194.

Beyond the Recording's indictment of Drake as one in a group of "certified pedophiles," UMG published lyrics such as: "Say, Drake, I hear you like 'em young," JA-40 ¶ 60, and "Tryna strike a chord and it's probably A-Minor," JA-41 ¶ 61. The Recording warns Drake's future romantic partners to "hide your lil' sister from him," states that Drake is Malibu's "most wanted," and exclaims that Drake has "gotta be registered and placed on neighborhood watch." *Id.* ¶ 60-61. It also says that Drake could and should be subjected to violence in prison. *See id.* ¶ 60 ("You better not ever go to cell block one."). The Recording does not disclose any sources or evidence supporting its indictment, instead stating expressly that its allegations are based on yet-undisclosed information: "Say, Drake, I *hear* you like 'em young," JA-40 ¶ 60 (emphasis added), and "Rabbit hole is still deep, I can go further, I promise," JA-42 ¶ 63.

### B. Public Outcry and Violence

Millions of people understood the Recording and Image to convey factual information, causing countless individuals around the globe to believe that Drake was a pedophile. JA-22 ¶ 14; JA-44-45 ¶¶ 72-74; JA-53 ¶ 84; JA-108 ¶ 219. Drake's Amended Complaint—without the benefit of any discovery—provided many examples, including listeners who said: "this [isn't] a diss, it's the truth"; "everybody believes [Drake] loves touching children cuz we have evidence everywhere"; and "[w]e would never have known Drake is a whole pedophile if this

3

information wasn't exposed." JA-45 ¶¶ 73-74. Listeners called for Drake to be investigated and imprisoned. JA-49-51 ¶ 79 (stating Drake "need[s] to be locked up" and the "CIA and FBI need to step in"). Some called for Child Protective Services to probe Drake's relationship with his son. JA-49-51 ¶¶ 79-80. People compared Drake to Harvey Weinstein, Sean "P. Diddy" Combs, Jeffrey Epstein, and R. Kelly, celebrities who were charged with or convicted of heinous sex crimes including rape, sexual assault, sex trafficking, and procuring a minor for prostitution. JA-52-53 ¶¶ 81, 84.

The Recording's effect on ordinary listeners' perceptions was immediate and pervasive, resulting in a predictable turn to vigilantism with serious consequences. JA-54-55 ¶ 88. Three days after the Recording and Image were published, an armed group of assailants descended on the house depicted in the Image—Drake's home— while he was inside. JA-17 ¶ 1. One gunman shot Drake's security guard, who required emergency life-saving surgery. JA-17 ¶¶ 1-2. In the following days, there were two more attempted break-ins—one of which involved a man tunneling under Drake's fence with his bare hands and shouting threats, while the other involved a man who physically fought Drake's security guards. JA-57 ¶¶ 98-99.

In response, Drake removed his son from school and moved him and his mother away from Toronto, Canada. JA-24-25 ¶ 18. Drake has needed increased security ever since. JA-58 ¶ 101.

4

### C. UMG's Repeated Republications

Notwithstanding its knowledge of the falsity of the allegations and the threats to Drake and his family's safety, UMG waged an unrelenting campaign to spread the Recording as widely as possible. JA-18-20 ¶¶ 6-9; JA-26-27 ¶ 21. In July 2024, UMG published a music video for the Recording (the "Video"), which shows sex-trafficking-related scenes—such as shipping containers with air-conditioning units—that reinforce the accusation that Drake is a pedophile. JA-59-62 ¶¶ 105-08. The Video also depicts Lamar playing hopscotch to lyrics referencing Drake's alleged interest in minors. JA-60-61 ¶ 107. The Video contains images of Lamar engaged in a prison push-up routine on cinderblocks while exclaiming that Drake will face violence in "cell block one." JA-19 ¶ 7 n.5; JA-61-62 ¶¶ 109-10.

The Video spread the Recording to new audiences worldwide and reinforced the Recording's core pedophilia allegations through new imagery. In the week after the Video was published, the Recording was played over 93 million times, and the Video ranked first on YouTube's Weekly Top Music Videos for over a month. *See* JA-101 ¶ 195. As a result, hundreds of thousands more people believed the allegations. *See* JA-62-65 ¶¶ 113-19; *see also, e.g.*, JA-63 ¶ 114 (referring to Drake as another "Hollywood pedo[]" and stating that the Video "Got me truly believing [Lamar] knows Drake going to prison possibly").

UMG took unprecedented steps to republish and spread the Recording, Image, and Video (collectively, the "Defamatory Material"). Violating its own rules, UMG "whitelisted" the Recording on YouTube and Twitch, which allowed users to replay and republish the Recording without running afoul of copyright restrictions or paying fees. JA-97-98 ¶¶ 189-90. This permitted content creators to republish the Recording in "reaction-videos," leading to millions more views. JA-98-99 ¶ 191.

UMG's efforts succeeded; the Recording has been played *billions* of times. JA-103 ¶ 199. By contrast, other songs by Drake and Lamar, on which the district court relied for "context," SPA-15, failed to achieve anything close to that level of cultural ubiquity, *see* JA-104 ¶ 202. Indeed, the second most popular song in the "rap battle," *e.g.*, SPA-6, "Euphoria," had just 4.1% of the Recording's streams and views. *Compare* JA-103 ¶ 199, *with* JA-104 ¶ 202 n.280.

UMG "republish[ed]" the Recording to numerous audiences that would have had no knowledge of the song's place in a rap battle. JA-115-116 ¶¶ 241, 246. Political aficionados and journalists heard the Recording at the Democratic National Convention and at Kamala Harris's presidential campaign rally. *See* JA-82 ¶¶ 161-62. Fans of entertainment and celebrity awards shows heard the Recording at the Grammy Awards, where it won Record of the Year. *See* JA-74 ¶ 142; JA-83-84 ¶ 164. Lamar performed the Recording five times back-to-back at a Juneteenth Pop Out concert in Inglewood, California, an event featuring West Coast celebrities and

6

rap artists. *See* JA-70 ¶ 131; JA-79-80 ¶ 157. Thanks to UMG's heavy promotion of the event, a live stream of that performance broke Amazon Music's streaming records, and the event sparked over 21 *million* views of the Recording in the following three days. *Id.* There is no evidence in the record that the typical or reasonable listener at any of these events would have been aware of how the Recording related, if at all, to the rap battle, let alone to specific lyrics in specific songs.

The coup de grâce came when UMG—leveraging business relationships and payments—arranged for Lamar to perform the Recording at the 2025 Super Bowl halftime show, which at 3.6 billion global views was the most widely watched halftime show in history. *See* JA-84-87 ¶¶ 165-68. The show was teased and arranged around Lamar's performance of the Recording, broadcasting to *billions* of people around the world its central contention that Drake is a criminal pedophile. *See* JA-85 ¶ 168. Millions who tuned in to the "Big Game"—including young children and people whose religious or cultural beliefs, or simply their taste in music, leave them with no interest in or exposure to rap battles—were unaware of the feud and "had *never* before heard the [Recording] or *any* of the songs that preceded it." JA-21 ¶ 11. The only "context" these viewers had were the unambiguous lyrics booming from the biggest stage afforded to artists—"Say[ing], Drake, I hear you like 'em young," accusing Drake of "[t]ryna strike a chord and it's probably A-

7

Minor," and warning people to hide their "lil' sister[s]" from Drake. *See id.*; JA-41 ¶ 61; JA-86 ¶ 168 n.213.

The Super Bowl performance excluded the word "pedophile[]"—an implicit concession (apparently forced upon UMG by the NFL) that calling someone a "certified pedophile" in front of billions of people was beyond the pale. JA-85 ¶ 167. But censoring that word did nothing to blunt the Recording's heinous and false core message that Drake was a known pedophile, as evidenced by reactions like "how many people in the world didn't know Drake was credibly accused of being a pedophile and now know" and Lamar's "message shredded pedophiles like Drake." JA-87-89 ¶¶ 170-71.

### D. UMG's Deceptive Business Practices

UMG resorted to underhanded and unlawful tactics to inflate the popularity of the Defamatory Material, including radio pay-for-play ("payola"), artificial streaming, and concealed payments to third parties for playing or promoting the Recording. JA-90-95 ¶¶ 172-85; JA-112 ¶¶ 227-28. UMG never disclosed these tactics to consumers, JA-117-18 ¶ 256, but members of the public—including podcast hosts, consumers, and third parties—discovered and exposed them, *see* JA-91-94 ¶¶ 177-84. The parties had already engaged in substantial discovery on these points when the District Court published its opinion.

## II.  PROCEDURAL HISTORY

Drake filed the Amended Complaint on April 16, 2025, raising claims under New York law for defamation/defamation *per se*, second-degree harassment, and deceptive business practices.  JA-14-120.  UMG filed a Motion to Dismiss, JA-136-67, and, in a separate motion, asked the Court to take judicial notice of 17 exhibits, including the lyrics to 11 songs, a public petition, podcast transcripts, New York Times' search results for "Drake" and "Kendrick Lamar," a "lyrical breakdown" article about the Recording, and an appellate brief from an unrelated case.  JA-169-347.  With UMG's consent, Drake moved for permission to brief the motion for judicial notice, which the District Court ***denied***.  JA-373, 382.  Although Drake agreed (in his opposition to the Motion to Dismiss or during argument on it) that the District Court could take judicial notice of certain exhibits, Drake argued that the Court could "consider only the 'existence' of [the] exhibits," JA-420, and could not rely on materials outside the pleadings, including song lyrics, to "discredit or undermine or question the allegations that have been plausibly alleged in the complaint," JA-482.

## III.  THE DISTRICT COURT'S ORDER

On October 9, 2025, the Court granted UMG's Motion to Dismiss.  SPA-1-38.  The Court took judicial notice of several exhibits that UMG had requested, including the lyrics to the songs "6:16 in L.A." and "Taylor Made Freestyle," which

9

the Amended Complaint never referenced. SPA-3-4 & n.1. And although no party requested it, the Court also "t[ook] judicial notice of the fact that Millie Bobby Brown is a well-known actress, and that she has given interviews stating that she and Drake formed a friendship when she was 14 years old and he was 32 years old," SPA-28 n.5.

## A. Fact vs. Opinion

The District Court held that Drake failed to state a defamation claim because the statements in the Defamatory Material constitute nonactionable opinion rather than actionable factual assertions. SPA-2. The Court explained that, under New York law, three factors guide this determination, whether the: (1) language at issue has a precise meaning that is readily understood; (2) statements are capable of being proven true or false; and (3) context signals to readers or listeners that the material is likely to be opinion, not fact. SPA-13. The Court agreed that the first two factors favored Drake's claim. *Id.*

Nonetheless, based on its view of the relevant context, the Court concluded that no reasonable listener could have understood the statements as conveying facts about Drake. SPA-11, 25. First, the Court summarily concluded that "Not Like Us" is a "diss track" akin to fora like "YouTube and X," and therefore, "[t]he average listener" would not believe that the Recording "convey[s] to the public fact-checked verifiable content." SPA-15. Second, the Court concluded that, because the

10

Recording is "replete with profanity, trash-talking, threats of violence, and figurative and hyperbolic language," "the reasonable listener" would not be "incline[d]" to believe that 'it "imparts verifiable facts." SPA-23-25. Third, the Court found it "essential" that "the Recording was made in the midst of a rap battle." SPA-15. In the Court's view, because the songs were "in dialogue with one another," reasonable listeners would view statements in the Recording as responding to previous songs rather than standalone assertions. *See* SPA-19-21. In doing so, the Court looked beyond the pleadings to information like the lyrics of Drake's "Taylor Made Freestyle," from which it inferred that the ordinary listener would have understood Drake as goading Lamar into a response, *id.*, and discredited Drake's allegations that actual listeners understood the Recording as asserting facts, SPA-25.

The Court also held that the Image and Video constituted opinion as "reinforce[ment] [of] the message of the Recording" that "c[ould not] reasonably be understood to convey a factual message." SPA-25-26. The Court did not address the relevant context for each subsequent republication, stating only that, "[i]f the Recording was nonactionable opinion at the time it was initially produced, its republication would not expose UMG to liability." SPA-22.

## B. Mixed Opinion

The Court also rejected Drake's argument that, even if the Recording contained opinions, it was actionable as mixed opinion. SPA-26-29. It held that,

11

based on the context and judicially noticed lyrics of other songs, "no reasonable person would listen to 'Not Like Us' and assume that Lamar had access to credible, provable facts that revealed Drake to be a pedophile." SPA-27.

The Court rejected Drake's contention that two lyrics in the Recording indicate that Lamar based his opinion on information not disclosed to listeners. First, Drake pointed to, "Rabbit hole is still deep, I can go further, I promise." JA-42 ¶ 63. But the Court found that "no reasonable listener could understand it in this way given the overall context." SPA-28-29. The Court did not address Drake's allegations that listeners interpreted the lyric this way. *See* JA-47 ¶ 76. Second, Drake pointed to, "Say Drake, I *hear* you like 'em young." JA-40 ¶ 60 (emphasis added). But the Court relied on its subjective interpretation of "Taylor Made Freestyle" to conclude that this lyric was "a response to Drake's challenge" and therefore, somehow by extension, did not "rely[] on undisclosed facts." SPA-27-28.

### C.    Harassment

The Court concluded that the Amended Complaint failed to state a claim for second-degree harassment because recognizing a private right of action in N.Y. Penal Law Section 240.26 would be inconsistent with the legislative scheme. SPA-29-33. In doing so, it disregarded cases holding that there is a private right of action for harassment under Section 240.26. *See* SPA-32.

**D.** **N.Y. General Business Law Section 349**

The Court held that the Amended Complaint failed to state a claim that UMG engaged in deceptive business practices prohibited by Section 349. SPA-33-38. Although the Court acknowledged that facts relating to UMG's covert and deceptive practices may be peculiarly within UMG's possession and control, it reasoned that Drake's assertions of UMG's unlawful conduct were improperly based "upon information and belief." SPA-34-36. Alternatively, even accepting these allegations, the Court held that Drake failed to adequately allege that the conduct was consumer-oriented. SPA-36-38.

## SUMMARY OF ARGUMENT

I. The Recording is myopically focused on the false allegation that Drake is a "certified pedophile[]"—guilty of a heinous crime—and, accordingly, belongs in prison. *See* JA-40-41 ¶¶ 60-61. Because reasonable listeners could (and did) take those allegations as factual, *see* SPA-24-25, Drake sufficiently pleaded a claim for defamation. The Court's contrary conclusion rests on numerous legal errors.

The Court overstepped the limits of judicial notice. The Court not only took notice of the *existence* of lyrics in songs like "Taylor Made Freestyle," but it drew inferences about whether the reasonable listener would have known of those lyrics and how the listener would have interpreted them—findings that directly contradicted well-pleaded factual allegations. *See* SPA-3, 5-6, 19.

13

Separately, the Court's definition of the relevant context as the rap battle between Drake and Lamar is indefensible on this record. The Amended Complaint contains numerous plausible allegations that the Recording transcended the rap battle and, given its cultural ubiquity, was far more likely to be received and understood as a standalone, factual indictment of Drake than as part of a hyperbolic back-and-forth between artists. JA-104 ¶ 202. Simultaneously, the Court either ignored or rejected the Amended Complaint's well-pleaded allegations regarding social context, including that, following the #MeToo movement, allegations of celebrity men committing sex crimes are likely to be received as truthful. *See* JA-55-56 ¶¶ 89-92. The Court also ignored that the Recording was repeatedly republished to new, broader, and more diverse audiences, and failed to explain why those republications should be understood, counterfactually, as though each new listener were a rap aficionado who had followed every word of the original rap feud. *E.g.*, JA-21 ¶ 11. Through these missteps, the Court effectively created an unprecedented and overbroad categorical rule that statements in rap diss tracks can never constitute statements of fact. *See* SPA-18, 24.

II. Even if the Recording was a statement of opinion, the Court still erred in dismissing Drake's defamation claim because Drake pleaded that the Recording is an actionable mixed opinion. The lyrics, "Rabbit hole is still deep, I can go further, I promise," and "Say Drake, I *hear* you like 'em young" give the impression that the

14

Recording's statements are based on undisclosed facts. The Court erred in substituting its subjective view of how these lyrics should be understood for how reasonable listeners could (and did) interpret them. *See* SPA-27-29. The Court also erred in relying on its interpretation of "Taylor Made Freestyle," a song not referenced in the Amended Complaint and reliant on creative artistic interpretation (including lyrics voiced through an AI-generated replica of a deceased rapper's voice), to infer that some of the Recording's lyrics were best understood as a "direct response" to Drake's earlier "challenge" to Lamar, which somehow precluded Lamar's statements from being based on undisclosed information. SPA-28-29. Simultaneously, it ignored lyrics in other judicially noticed songs, which, like those in the Recording, indicate that the pedophilia allegations are based on undisclosed information.

III. The Court dismissed Drake's harassment claim because, in its view, Section 240.26 of the New York Penal Law does not provide a private right of action. SPA-30. That holding contravened this Court's cases, brushed aside additional authority, and misunderstood the inquiry under New York law.

IV. Finally, the Court erred in dismissing Drake's claim under N.Y. General Business Law Section 349. The Court erroneously imposed a heightened pleading standard. And contrary to its holding, UMG's deceptive practices were consumer-oriented because they involved deceiving the public about the success of

15

the Recording and encouraging further consumption of it based on false pretenses. *See* JA-90-95 ¶¶ 172-85.

## STANDARD OF REVIEW

This Court reviews *de novo* the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6). *See Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 150 (2d Cir. 2016). In doing so, it accepts "all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." *Id.*

This Court "review[s] the District Court's determination of whether to take judicial notice of facts for abuse of discretion." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 424 (2d Cir. 2008). Where the District Court's erroneous consideration of judicially noticed materials "pervades the court's decision," vacatur and "remand for summary judgment conversion" is the appropriate remedy. *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006).

## ARGUMENT

I. **THE DEFAMATION CLAIM SHOULD HAVE BEEN ALLOWED TO PROCEED.**

A. **Drake Adequately Pleaded Defamatory Statements of Fact.**

Under New York law, a defamation claim requires: "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting [defamation] per se, and

16

(vii) not protected by privilege." *Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001). A "public-figure plaintiff" must also plead actual malice. *See Palin v. N.Y. Times Co.*, 113 F.4th 245, 258 (2d Cir. 2024). In this case, the District Court dismissed the Amended Complaint solely based on its determination that the Defamatory Material contained statements of opinion rather than actionable "defamatory statement[s] of fact." SPA-11.

Whether defamatory statements constitute nonactionable opinion "is a question of law for the courts." *Davis v. Boeheim*, 22 N.E.3d 999, 1004 (N.Y. 2014). In evaluating a defamation plaintiff's complaint, the relevant question is *not* whether the reviewing court's model of a reasonable observer *would* have necessarily interpreted the statement as conveying facts; rather, "the dispositive question is whether a reasonable listener . . . *could* have concluded that [the speaker] was conveying facts about the plaintiff." *600 W. 115th Street Corp. v. Von Gutfeld*, 603 N.E.2d at 930, 934 (1992) (emphasis added). The reviewing court should assess "whether any reading of the complaint supports the defamation claim." *Davis*, 22 N.E.3d at 1006. In other words, the reviewing court is not tasked with deciding the *best* interpretation of a challenged statement—rather, the court must determine only whether the complaint plausibly alleges that the statement *could have been* interpreted as factual. Even where a statement is "subject to the defendant's interpretation, the motion to dismiss must be denied if the communication at issue,

17

taking the words in their ordinary meaning and context, is also susceptible to a defamatory connotation." *Id.*

"[Courts] apply three factors in determining whether a reasonable reader would consider the statement connotes fact or nonactionable opinion": whether (1) "the specific language in issue has a precise meaning which is readily understood," (2) "the statements are capable of being proven true or false," and (3) "either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id.* at 1005.

The District Court correctly concluded that Drake adequately alleged the first two factors: the false allegations that Drake is a criminal pedophile has "a precise meaning which is readily understood" and "are capable of being proven true or false." SPA-13. Contrary to the Court's holding, the third factor is met as well. The context of the Recording—which is myopically focused on the allegation that Drake is a pedophile—*could plausibly* cause a reasonable listener to understand that allegation as a factual indictment, meant to be taken seriously, rather than mere rhetorical hyperbole. *See* JA-18-19 ¶ 7; JA-40-42 ¶¶ 59-63. That impression is not only *plausible*, it is likely. The Recording refers to Drake as a "Certified pedophile[]" and references prison, and both the Image and Video reinforce these

18

factual assertions through their use of actual sex-offender-notification symbols on Drake's Toronto home and additional sex-trafficking-related imagery that mimics real-world images associated with criminal sex-trafficking operations.  *See* JA-41 ¶ 61; JA-43-44 ¶ 66; JA-59-62 ¶¶ 105-110.  The broader social context further supports that view: in present day, allegations of pedophilia are likely to be believed, acted upon, and spread virally.  *See* JA-55-56 ¶¶ 89-92; JA-66-67 ¶ 125.

**B.**     **The District Court Erred in Concluding that No Reasonable Person Could Understand the Defamatory Statements as Asserting Facts.**

The District Court's contrary conclusion rests on a series of errors.  The Court relied on materials outside the Amended Complaint—while rejecting or ignoring allegations within the Amended Complaint—to draw inferences *against* Drake's defamation claim.  This inverted the standard at the motion-to-dismiss stage and deprived Drake of the opportunity to use evidence gained in fact and expert discovery to refute the Court's inferences and provide actual *evidence* of the relevant context for the Recording's lyrics.  The extra-record materials furnished the *only* evidence supporting the Court's articulation of an unduly broad context—the entire "rap battle"—which caused the Court to replace the reasonable-listener standard with one focused on a rap superfan.  Simultaneously, the Court ignored allegations in the Amended Complaint that informed the broader social context, including the serious weight given to allegations of pedophilia lodged against male celebrities. And the Court misconstrued the law and Drake's claims in discounting UMG's

19

republications to different audiences. At bottom, the Court effectively created a special rule that statements made in the midst of rap battles are immune from defamation claims. Whatever the merits of such a rule might be, it has not been enacted by the New York Legislature or recognized by New York's courts. This Court should reverse.

**1. The District Court Improperly Considered Materials Outside the Amended Complaint to Rebut Drake's Well-Pleaded Allegations.**

The District Court erred in reaching beyond the pleadings to draw inferences against Drake. Because Rule 12(b)(6) tests only the sufficiency of the pleadings, *see Global Network*, 458 F.3d at 155, a district court's review is confined to a narrow universe of materials: the complaint; documents attached to it or incorporated by reference, in the plaintiff's possession, or relied upon in bringing suit; and matters subject to judicial notice. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see* Fed. R. Evid. 201(b).

Even where judicial notice is appropriate, courts may notice only the fact of what a document states, not the truth of matters asserted therein. *Global Network*, 458 F.3d at 155. Nor may courts draw factual inferences based on extraneous materials. *Id.* This rule reflects that "[t]he purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits," which is "more

20

appropriately reserved for . . . summary judgment." *Id.* Thus, although judicial notice may permit recognition of the fact that a song lyric states certain words, it does *not* permit acceptance of those statements for their truth; nor does it allow the court to resolve a dispute about what a reasonable listener would understand by drawing factual inferences from judicially-noticed lyrics that contradict the complaint's well-pleaded and plausible allegations. *See id.*; *see also, e.g., United States v. Strock*, 982 F.3d 51, 62-63 (2d Cir. 2020).

The District Court did exactly that. Among other errors, *see supra* at 13-15, the Court took judicial notice of—and drew inferences adverse to Drake from—the lyrics of "Taylor Made Freestyle," an earlier Drake song that the Amended Complaint never mentions. But the Recording and "Taylor Made Freestyle" are materially different works. From its release to the present, the Recording has been disseminated broadly across major platforms and venues and has achieved record-breaking commercial success. In contrast, "Taylor Made Freestyle" was available online for only a week before being removed due to disputes about the AI voice usage, resulting in severely limited availability and constrained streaming reach. *See* Jon Blistein, *Drake Removes 'Taylor Made Freestyle' After Lawsuit Threat Over AI Tupac*, Rolling Stone (Apr. 26, 2024), https://www.rollingstone.com/music/music-news/drake-removes-taylor-made-freestyle-tupac-estate-legal-threat-1235011453/. The Court never explained, given this reality, why it was reasonable to presume that

21

a reasonable listener would have even been aware that "Taylor Made Freestyle" existed.

Making matters worse, the Court interpreted cherry-picked lyrics from "Taylor Made Freestyle" to draw inferences against Drake. In "Taylor Made Freestyle," the AI-generated voice of deceased rapper Tupac Shakur sings about Drake: "Talk about him likin' young girls, that's a gift from me. Heard it on the Budden Podcast, it's gotta be true." SPA-19. Rather than simply acknowledging the lyrics' existence, the Court relied on those lyrics as a key element of its erroneously broad understanding of the relevant context, *see infra* at 28-35, and used its subjective interpretation of the lyrics to contradict Drake's allegations. Notwithstanding the Court's obligation to make all reasonable inferences in Drake's favor, the Court never explained why—let alone established that—the *only* inference a reasonable listener could make from an artistically projected, and AI-generated, voice of Tupac was a *factual* message from *Drake* designed to "goad" Lamar into making pedophilia allegations against him. SPA-19. The Court then compounded its error by inferring that reasonable listeners would have understood the allegations in the Recording as a "callback" to that supposed goading, again without any analysis of how the reasonable listener would have been exposed to the lyrics in "Taylor Made Freestyle," let alone interpreted them in that manner. *Id.*

22

The Court further (if implicitly) reasoned that if the statements in the Recording were a response to "Taylor Made Freestyle," reasonable listeners could not understand them as factual assertions. *Id.* But that inference failed even on its own terms: it simply does not follow that if the unequivocal lyrics in the Recording are callbacks, they cannot *also* reasonably be perceived as asserting facts. The two are not mutually exclusive. Nor do the other songs on which the Court relied support its strained inference. Unlike the Recording, the other songs cover a variety of topics that have nothing to do with the scurrilous lie that Drake sexually abuses children. *See, e.g.*, JA-245 (Lamar in "Euphoria" explaining that he hates the way Drake walks and dresses); JA-248 (Lamar in "6:16 in LA" explaining that Drake's entourage is there "to hustle [him]"); JA-250 (Drake in "Family Matters" casting doubt on the paternity of Lamar's child). Ultimately, this yielded a glaring contradiction: the Court simultaneously held that *all* reasonable listeners would have understood an inauthentic, computer-generated voice (one that was not even Drake's voice) to be a personal, factual, and literal invitation to Lamar to "talk about [Drake] likin' young girls," while at the same time understanding that Lamar's personal, unequivocal, and repeated response that Drake is a criminal pedophile was nothing more than hyperbole.

The District Court's use of judicially noticed materials to make inferences against Drake is similar to the approach this Court condemned in *Global Network*,

23

458 F.3d at 156. There, the trial court dismissed a plaintiff's claim that the defendant improperly denied it the opportunity to open a franchise, reasoning that its "prior criminal activities, and its past practice of failing to deal honestly with the [defendant] . . . , constituted valid reasons for denying the franchise." *Id.* at 153. "In arriving at its conclusions, the trial court quoted from [the president of the plaintiff company's] testimony as a government witness in certain criminal proceedings and from [a] final [FCC] determination," even though "[n]one of the quoted material [was] mentioned in plaintiff's complaint." *Id.* This Court reversed, criticizing the district court for "consider[ing] external material in its ruling," and relying "on those materials to make a finding of fact that *controverted* the plaintiff's own factual assertions set out in its complaint." *Id.* at 156. The same result is warranted here.

The District Court's error here was particularly egregious given the well-pleaded allegations that due to the Recording's unique success, it was understood—and at a minimum, *could* reasonably be understood—as a discrete work making serious and alarming factual allegations about Drake. *See* JA-21 ¶ 11; JA-104 ¶ 202. Drake alleged that "millions of people . . . believed the Defamatory Material to be true" and provided over 60 examples of individuals from a cross-section of the general public who expressed the belief that the Defamatory Material conveyed the fact that Drake was a pedophile. *See supra* at 3-5, 7-8. The Court dismissed this evidence, stating that "support for almost any proposition, no matter how farfetched,

24

fantastical or unreasonable, can be found with little effort" on the Internet. SPA-25. Whatever merit there might be to such an argument at trial or summary judgment, there is no support for preemptively assigning *zero* weight at the pleadings stage to scores of public comments, especially where such comments reflect the same understanding as actual human beings who attacked Drake's home just days after the initial publication. *See* JA-17 ¶¶ 1-2. As this Court and others have explained, the fact that numerous individuals *did* interpret the statements as factual is relevant to whether it is reasonable to do so. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 816 (2d Cir. 2019) (indicating that a "social media backlash" was relevant in determining that readers "perceived the false statements as fact-based"); *Zuckerbrot v. Lande*, 167 N.Y.S.3d 313, 332 (N.Y. Sup. Ct. 2022) ("In proper context, an ordinary reader plainly could (and, Plaintiffs allege, did) understand [the] Instagram commentary as conveying facts, not merely opinion."); *accord Hazlewood v. Netflix, Inc.*, 2023 WL 6771506, at *2 (N.D. Tex. Oct. 11, 2023) (considering "sample[s] of messages from individuals" in determining that a statement was likely to be taken as fact) (applying Texas law).

In addition—and contrary to the Court's suggestion—it was not just faceless Internet users in "comment sections, chat rooms, and servers" who viewed the Defamatory Material as stating facts. SPA-25. Entertainment industry insiders and media experts on Hollywood affairs also interpreted the Recording as a factual

25

indictment of Drake that could lead to legal or other real-world consequences. *See* JA-53-54 ¶¶ 84-85 (participants in NPR program indicating that they took the allegations seriously and believed they could be true); JA-54 ¶ 87 (actor and comedian Seth Rogen framing the Recording as accusing Drake of pedophilia). Although fact and expert discovery would shed further light, *see infra* at 27, these allegations were more than sufficient at the pleading stage.

The District Court further erred in applying judicial notice in an uneven manner. The Court took judicial notice of materials that supported Drake's allegations that a reasonable person could take the assertions as fact, yet failed to give them any weight or draw any inferences from them. *See* JA-188 (NPR reporter stating society treats pedophilia accusations "far more seriously than . . . physical abuse[s] of women"); JA-239 (news article discussing how the Recording "accuses Drake of having inappropriate sexual relationships with minors"). It is blackletter law that, at the pleadings stage, a court is not permitted to use judicially-noticed materials to *rebut* a complaint's well-pleaded allegations while simultaneously ignoring judicially-noticed materials that *support* those same allegations.

The Court's disregard of Drake's allegations and selective reliance on extrinsic materials deprived Drake of the procedural protections of Rule 12(d), which requires converting a motion to dismiss to a motion for summary judgment when a courts considers matters outside the pleadings. *Global Network*, 458 F.3d at

26

155. This "mandatory" rule "deters trial courts from engaging in fact-finding when ruling on a motion to dismiss and ensures that when a trial judge considers evidence dehors the complaint, a plaintiff will have an opportunity to contest defendant's relied-upon evidence by submitting material that controverts it." *Id.*

The District Court's actions here deprived Drake of that opportunity. Had the Court converted the motion to dismiss to one for summary judgment, Drake would have disputed that any meaningful audience (much less all reasonable listeners) heard "Taylor Made Freestyle" or took it seriously, challenging the Court's extra-pleadings inferences and explaining why those lyrics do not reflect *Drake* saying anything factual or "goading." Drake also would have offered expert testimony and survey evidence to inform the Court about the relevant audiences for each publication. Drake also could have provided evidence of how others, such as UMG executives and Lamar's team, expected the public to understand the Recording's allegations. The Court's decision to consider extra-complaint materials proffered by UMG while depriving Drake of an opportunity to introduce his own evidence contravenes Rule 12(d) and mandates reversal.

### 2. The District Court Made Multiple Errors in Defining the Relevant Context.

Reversal is further warranted because the Court's definition of the relevant context was simultaneously too broad (looking to additional songs that were nowhere near as popular as the Recording); too narrow (ignoring the societal context

27

in which allegations of pedophilia are taken seriously); and disregarded repeat publications (by failing to account for their different contexts and audiences).

### a. The District Court's Context Definition Was Too Broad.

The Court defined the relevant context too broadly—namely, as the entire "rap battle" between Drake and Lamar, including six songs that preceded the Recording. *See* SPA-15-16, 19-20. In doing so, it impermissibly relied on information outside the Amended Complaint, *see supra* at 20-27, and replaced the reasonable listener with a rap superfan.

Drake's well-pleaded allegations make clear that the Recording's audience is exponentially larger than the rap-battle audience. JA-104 ¶ 202; JA-103 ¶ 199. Indeed, the next-most-popular song, "Euphoria," had only 4.1% of the Recording's streams and views. *Compare* JA-103 ¶ 199, *with* JA-104 ¶ 202 n.280. The other songs in the rap battle had even less: "Push Ups" had 2.4%; "Family Matters" had 2.1%; and "Meet the Grahams" had 2.2%. *Compare* JA-103 ¶ 199, *with* JA-104 ¶ 202 n.280.[1] These statistics show exactly what Drake alleged, and what the

---

[1] This analysis excludes the other songs in the rap battle because (1) "Taylor Made Freestyle" was removed from streaming services and was never mentioned in the Amended Complaint; (2) there was no available streaming data for "6:16 in L.A.," possibly because it, too, was never available on certain streaming services, *see* Peter A. Berry, *Who Won the Drake and Kendrick Lamar Diss War? The Numbers Behind the Beef*, Chartmetric (May 29, 2024) (assessing the popularity of songs as of May 28, 2024), https://hmc.chartmetric.com/kendrick-lamar-vs-drake-diss-tracks-streaming-success/, and the song was never mentioned in the Amended

District Court was required to—but failed to—credit: that "[o]f all the songs published during the rap beef, the Recording is the only one that 'broke through the noise' and achieved cultural ubiquity." JA-104 ¶ 202. The reasonable listener of the Recording is therefore someone who heard the Recording, but had surely not heard *all* of the other songs in the rap battle.

The District Court's overly broad context definition contravenes New York law. The relevant "question" is "What circumstances, in addition to the literal text of the communication, *would the reasonable reader or listener perceive or use* in determining whether or not a factual assertion was being made?" *Von Gutfeld*, 603 N.E.2d at 935 (emphasis added). Nothing suggests that the reasonable person had been exposed to, or would separately seek out and listen to, all six additional, far less popular songs before forming a view as to whether Lamar was truly alleging, as a matter of fact, that Drake is a pedophile. The Court's own reasoning shows this absurdity: despite acknowledging the unprecedented reach of the Recording, SPA-1, it nevertheless concluded that a reasonable listener is one who (1) knew the Recording was initially published in a rap battle, (2) was aware of all six preceding songs, (3) had not only listened to the far-less-popular "Taylor Made Freestyle," but was quite familiar with its lyrics; (4) interpreted those lyrics—including the AI-

_____

Complaint; and (3) "the Heart: Part 6" post-dated "Not Like Us" and was released only on YouTube, not Spotify, *see id.*

generated voice of the rapper Tupac—as Drake making allegations about himself and goading Lamar into doing the same; *and* (5) therefore concluded that the allegations could not *also* be statements of fact. SPA-19. The District Court committed legal error when it determined that the relevant audience was not "the public at large," but rather a subset of the population that brought specialized knowledge of extraneous material to (and made illogical inferences regarding) the defamatory statements. *See Lindell v. Mail Media Inc.*, 575 F. Supp. 3d 479, 488-89 (S.D.N.Y. 2021) (concluding that the relevant audience was "the public at large" rather than "an amorphous subset of evangelical Christian readers" who would be familiar with details of the plaintiff's faith and story of redemption).[2]

As support for its view that the relevant context should be defined as the entire "war of words" between Drake and Lamar, the District Court relied on three cases: *Rapaport v. Barstool Sports, Inc.*, 2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021), *aff'd*, 2024 WL 88636 (2d Cir. Jan. 9, 2024); *Torain v. Liu*, 279 F. App'x 46 (2d Cir.

---

[2] The Court's inquiry—how a listener immersed in the feud and familiar with all the lyrics would interpret the Recording—may have a place in this case, but it is not in determining liability at the pleadings stage. By defining the relevant audience as rap superfans, the Court selected the cohort most likely to support the Court's interpretation of the lyrics. Questions about how different segments of the public at large perceived the words go to damages, not liability, and are addressed through evidence of reputational harm at summary judgment or trial. *See, e.g., Cantu v. Flanigan*, 705 F. Supp. 2d 220, 231 (E.D.N.Y. 2010).

2008) ("*Torain II*"); and *Steinhilber v. Alphonse*, 501 N.E.2d 550 (N.Y. 1986). None supports its conclusion.

In *Rapaport*, Barstool Sports (a sports and pop culture website) terminated actor Michael Rapaport's contract after a public disintegration of their relationship. *See* 2021 WL 1178240, at *1-2. Barstool Sports then published the "Fire Rap Video" making a variety of "[e]xaggerated" and "vitriolic" claims about Rapaport. *See id.* at *15-16. On summary judgment, the court concluded that no reasonable person could have viewed the Fire Rap Video as alleging facts. *See id.* at *15. The court relied on the video's clearly hyperbolic statements like Rapaport being a "10 gallon drum of curdled milk"; its "obviously doctored" images like Rapaport depicted as a cartoon cracker walking down the street; its vulgarity, *e.g.*, the video referred to Rapaport as a "walking blob of jizz"; and the way the video "attack[ed] all aspects of Rapaport's life." *Id.* at *15-16. Crucially, the court emphasized that the video itself "describe[d] the recent history of the acrimonious dispute that resulted in Rapaport's termination just days before the video's publication." *Id.* at *15. That "background contextualize[d] for the audience that the statements in the video [were] being offered in the midst of a hostile public feud between Rapaport and Barstool," which made it less likely that the assertions in the video would be taken seriously. *Id.*

31

*Rapaport* is a far cry from this case. For starters, the court in *Rapaport* ruled on summary judgment after fulsome discovery that afforded the opportunity to submit and test evidence relevant to the social context informing the defamation claim, *id.* at *3-4, 9 n.5, whereas the Court here dismissed the claim at the pleading stage without any opportunity for Drake to submit evidence to counter the inferences the Court drew from its misapplication of judicial notice, *see supra* at 20-27. Beyond this dispositive procedural distinction, those who viewed the Fire Rap Video, which did not achieve cultural ubiquity, were likely to be familiar with the prior mudslinging between Rapaport and Barstool Sports—which the video itself laid out. In contrast, the global listeners of the Recording would not necessarily have known about the rap battle between Lamar and Drake (let alone the details of the previous songs), which the Recording does not recount. Additionally, the Recording, coupled with the Image's use of real sex-offender warning symbols, makes a serious allegation, in contrast with the Fire Rap Video's images of Rapaport photoshopped to be, for example, a walking saltine cracker. *See* 2021 WL 1178240, at *16. The Recording accuses Drake of one crime—raping children—whereas the Fire Rap Video "attack[ed] all aspects of Rapaport's life." *See id.*

The Court's reliance on the unpublished decision in *Torain II* fares no better. There, the plaintiff, a radio DJ, was engaged in an on-air "war of words" with a rival DJ. The plaintiff stated that he wanted to sexually abuse his rival's four-year-old

32

daughter. 279 F. App'x at 46-47. The defendant, a local politician, responded at a press conference, stating that the plaintiff was a "sick racist pedophile" that "must be put behind bars." *Id.* at 46; *see also Torain v. Liu*, 2007 WL 2331073, at *2 (S.D.N.Y. Aug. 16, 2007) ("*Torain I*"). *Torain II* concluded that the defendant's press-conference statements were nonactionable opinion because he was "clearly expressing his disdain for [the plaintiff's] comments on the radio," not accusing the plaintiff of "committing actual acts of pedophilia." *Torain II*, 279 F. App'x at 47.

Although *Torain II* rejected the argument that the trial court should not have considered the plaintiff's prior on-air comments, its analysis does not apply here. *See id.* at 47 & n.1. The court reasoned that the plaintiff "himself introduced this context in his complaint," *id.*, whereas here, Drake did not plead that the Recording's pedophilia allegations were comments on his prior songs, nor does the Recording reference those songs. Instead, Drake pleaded that the vast majority of the Recording's listeners were unaware of the lyrics of the prior songs. Consequently, reasonable listeners could—and did—understand the Recording as asserting, as a factual matter, that Drake sexually abused children. By contrast, in *Torain*, the defendant expressly tied his editorial statements to Torain's on-air comments and never alleged that Torain had actually committed any acts of pedophilia. *See* 279 F. App'x at 47. And here, unlike in *Torain*, the statements in the Recording are reinforced by the Image and Video.

33

Finally, the District Court relied on *Steinhilber*, but that case illustrates why Drake's claims should survive the pleading stage. *See* SPA-16. There, the plaintiff continued to work during a labor union strike. *Steinhilber*, 501 N.E. at 551. The defendants, members of the striking labor union, created a tape-recorded message that played "to anyone dialing the private telephone number provided to union members." *Id.* The message made various jabs at the plaintiff, mocking her weight, age, lack of talent, and status as a dishonorable "scab." *Id.* During "picketing activity," the defendants also raised a banner saying that the plaintiff was a "scab" and "suck[ed]." *Id.* at 551, 556. *Steinhilber* held that reasonable listeners—those who had "the special number of the [union] information line" and those who picketed—would have understood the defendants' statements as a "tasteless effort to lampoon plaintiffs for her activities as a 'scab.'" *Id.* at 555-56.

This case is not *Steinhilber*. Most importantly, the audiences are vastly different in scope. The message in *Steinhilber* was played only to union members who were steeped in the context of the ongoing labor dispute and given access to the number. *See id.* at 551. The Recording was not published exclusively to rap lovers or those familiar with the rap battle; instead, it was a worldwide phenomenon played billions of times, including to teenagers at school dances and bar mitzvahs, parents driving carpools in minivans, and football fans watching the Super Bowl, most of whom had never heard of the rap battle or listened to the prior songs. While some

34

subset of listeners may have understood the context on which the District Court relied, the overwhelming majority of listeners would not have. And regardless of which interpretation of the lyrics was most reasonable, it is indisputable that reasonable listeners ***could have*** understood the Recording as a standalone entity asserting facts. Moreover, as in *Rapaport*, the defamatory statements in *Steinhilber* attacked many aspects of the plaintiff's character, *see id.* at 551, whereas the Recording is myopically focused on one indictment: Drake being a "certified pedophile[]."

### b. The District Court's Context Definition Was Too Narrow.

As the Amended Complaint alleges, the reasonable listener would understand the defamatory statements in the broader social context of modern attitudes towards allegations of pedophilia and sexual abuse. *See* JA-25 ¶ 19; JA-55-56 ¶¶ 89-92; JA-66-67 ¶ 125. Unlike the District Court's theorizing about a parochial understanding that may have been common to rap aficionados, the Amended Complaint describes how the general public, including not just rap fans but most consumers of modern music and entertainment, are primed to believe and even act upon allegations of pedophilia when lodged against powerful or famous figures. *See* JA-25 ¶ 19; JA-55 ¶¶ 89-92; JA-111 ¶¶ 222-23. The Recording came in the wake of a serious reckoning that led to the downfall of famous figures, including rappers like R. Kelly and Sean "Diddy" Combs. Outside the rap world, film producer Harvey Weinstein was

35

convicted of rape, and financier Jeffrey Epstein was charged with sex trafficking minors but died before trial.

This background primed the average, reasonable listener to interpret the Recording's allegations against Drake as literal and factual allegations of abuse, compare Drake with sex criminals, and call for similar punishment. *See* JA-45 ¶ 73; JA-52 ¶ 81; JA-63 ¶ 114; JA-50 ¶ 79 ("Drake just need[s] to be locked up."); JA-88 ¶ 171 ("THEY SHOULD START AN INVESTIGATION ON DRAKE ?!!!!! LOOK HOW DIDDY AND JEFFREY EPSTEIN TURNED OUT."). This is unsurprising given Drake's well-pleaded allegations about how conspiracy theories involving child sex abuse spread rapidly and can induce mob mentality and vigilantism. JA-56 ¶ 92. There is no other way to interpret—especially at the pleadings stage in the absence of any contrary evidence—the immediate violence launched against Drake at his home (depicted in the Image) alongside the viral online backlash that followed. Even entertainment media figures viewed the Recording through the lens of the #MeToo movement, suggesting it could be a potential "tipping point" in the movement. JA-53 ¶ 84. In sum, the social context would have caused a reasonable listener to believe that the allegations in the Recording are true.

### c. The District Court's Context Definition Did Not Account for UMG's Republications.

UMG repeatedly republished the defamatory statements in the Recording (or, at a minimum, authorized republication) in altered forms and to new audiences far

afield from the context of the rap battle, including when it (1) released the Video, which reinforced the Recording's allegations through pedophilia-related imagery; (2) permitted the Recording to be played to a crowd of potential voters and political enthusiasts at the Democratic National Convention and a Kamala Harris rally; (3) allowed Lamar to play the Recording five times to record-breaking numbers of fans and social media users of all stripes on TikTok and Instagram during the Juneteenth Pop Out concert and aggressively publicized the performance; (4) authorized and advocated for the Recording to be played at the Grammy Awards; and (5) arranged for the Recording to be performed at the largest Super Bowl halftime show in history. Yet the District Court held that the context for *each* of these republications was necessarily the same—the entire rap battle. SPA-22.

That was error. Under New York law, republication of defamatory material gives rise to a "new cause of action" for defamation because a republication "is intended to and actually reaches a new audience." *Firth v. State*, 775 N.E.2d 463, 466 (N.Y. 2002); *see David J. Gold, P.C. v. Berkin*, 2001 WL 121940, at *3 (S.D.N.Y. Feb. 13, 2001); *Lehman v. Discovery Commc'ns, Inc.*, 332 F. Supp. 2d 534, 538-39 (E.D.N.Y. 2004). For each publication, "[i]nstead of parsing out and evaluating the challenged statements in isolation, New York courts look to the immediate context and to the broader social context of the statement" to determine whether a reasonable person would construe it as making a factual allegation. *Levin*

37

*v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997). Determining the context is not easy: "The infinite variety of meanings conveyed by words—depending on the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used—rules out . . . a formulistic approach." *Steinhilber*, 501 N.E.2d at 554. The question is "what circumstances, in addition to the literal text of the communication, . . . the reasonable reader or listener [would] perceive or use in determining whether or not a factual assertion was being made?" *Von Gutfeld*, 603 N.E.2d at 935.

Because the audience and the context are necessarily different for each publication, it would be illogical, and contrary to the approach described in the authorities cited above, to define a republication's context by reference *only* to what the audience to the *original publication* would have understood. That is, however, exactly what the District Court did. *See* SPA-22. Although the Court erred with respect to each republication, its error is particularly obvious as to the Super Bowl and the political events. It is utterly implausible that the millions of football fans, non-fans of all ages who nonetheless watched the Super Bowl halftime show, and political junkies who tuned into a political convention, would have been familiar with the entire rap battle—much less the specific lyrics of prior songs. At minimum, the reasonable listener at these events *could have* understood the Recording's accusations of pedophilia as standalone assertions to be taken seriously, *see* JA-21

38

¶ 11; JA-103-04 ¶¶ 199-202, and there is no reason to hold as a matter of law that their interpretation of the Recording is bound by however the first audience exposed would have understood it. *See Giuffre v. Dershowitz*, 410 F. Supp. 3d 564, 573 (S.D.N.Y. 2019); *Condit v. Dunne*, 2008 WL 2676306, at *5 (S.D.N.Y. July 8, 2008).

The District Court's contrary conclusion rests on a fundamental misunderstanding of both the Amended Complaint and the law. As to the former, the Court reasoned that recognizing different contexts for different publications would be "impermissibly retroactive" because, when Lamar "released 'Not Like Us,' he could not have been aware that it would . . . be featured at the Super Bowl Halftime Show." SPA-22. But Lamar's mental state is entirely irrelevant, as is the timeframe of the song's release: the Amended Complaint alleges defamation based on *UMG*'s publication and republications of the Defamatory Material, not on any of *Lamar's* actions, and the timeframe that is relevant with respect UMG's republications must be the time of each republication. *Cf. Kipper v. NYP Holdings Co., Inc.*, 912 N.E.2d 26, 29 (N.Y. 2009) ("The [actual malice] inquiry . . . focus[es] upon the state of mind of the publisher of the allegedly libelous statements at the time of publication.").

As to the latter, the Court erred in reasoning that "[w]hether publications constitute actionable fact or protected opinion cannot vary based on the popularity

39

they achieve," and concluding that "[i]f the Recording was nonactionable opinion at the time it was initially produced, then its republication would not expose UMG to liability." *Id.* To the contrary, republications can and do give rise to new defamation claims; the relevant context at the moment of alleged publication (not just initial publication) determines liability; where there are republications, that context is not static; and the breadth of the audience for a particular republication absolutely informs the context in which it should be assessed, and ultimately, whether the re-publisher will be liable. *See, e.g.*, *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1074 (5th Cir. 1987) (holding that initial publication was not defamatory because plaintiffs "failed to produce evidence of actual malice in printing of" initial news story, but that plaintiffs "raised a genuine issue as to actual malice" related to the re-publication of the story about a month later because defendant had been put on notice of the falsity yet re-published the statement); *Cook v. Conners*, 215 N.Y. 175, 179 (1915) (holding that communication of libel "on two independent occasions by means of two separate writings or newspapers" constituted two separate potential libels because "[p]ersons would read or acquire knowledge of [the material] from or through either paper who would not do so through the other.").[3] The District Court's

_____

[3] *See also Firth*, 775 N.E.2d at 466 ("[R]epetition of a defamatory statement in a later edition of a book, magazine or newspaper may give rise to a new cause of action."); *Lehman*, 332 F. Supp. 2d at 539 ("A rebroadcast has renewed impact with each viewing and creates a new opportunity for injury, thereby justifying a new cause of action.").

40

effort to create a one-time-only rule for analyzing the context of multiple republications is at war with the reasons for considering context in the first place and is particularly inappropriate as a device to resolve disputed claims at the motion-to-dismiss stage.

In any event, any "impermissible" inconsistency the District Court perceived was of its own making. SPA-22. Had the Court correctly viewed the context through the eyes (or ears) of the reasonable listener (as alleged in the Amended Complaint), rather than a rap superfan, that context would remain largely the same whether a reasonable listener heard the Recording when first released, at a political rally, or during the Superbowl. Defining the context as the entire rap battle was erroneous as to the initial publication, *see supra* at 27-36, and it makes even less sense for subsequent republications to much broader audiences. This requires reversal.

### 3. The District Court Created a Dangerous Categorical Rule that Rap Diss Tracks Can Never Be Actionable.

In considering the "forum" of the Recording, the Court broadly stated that "[t]he average listener is not under the impression that a diss track is the product of a thoughtful or disinterested investigation" that can convey factual content. SPA-15. Similarly, in evaluating the Recording's and the "rap battle's" "tone and language," the Court found that the songs included "incendiary language and offensive accusations," which "would not incline the reasonable listener to believe that 'Not Like Us' imparts verifiable facts" about Drake. SPA-25. Under the

41

Court's logic, defamation in rap cannot give rise to a cause of action so long as the rap also includes profanity or threats of violence. The message would appear to be that so long as a song includes profanity and threats, it is immune from defamation liability no matter how damaging and false its factual allegations. *See* SPA 15, 24-25.

The Court's categorical rule is problematic in multiple ways. To start, it simply does not follow that if a song contains "fiery rhetoric," "profanity," and "trash-talking," SPA-24, no reasonable person could view it as conveying verifiable facts. Even in informal fora, statements need to be assessed case-by-case, and their content can be indicative of fact rather than opinion. *See, e.g.*, *Delgado v. Sonnen*, 2025 WL 958753, at *2 (S.D.N.Y. Mar. 31, 2025); *Solstein v. Mirra*, 488 F. Supp. 3d 86, 100-01 (S.D.N.Y. 2020); *see also Brian v. Richardson*, 660 N.E.2d 1126, 1130 (N.Y. 1995).

The Court's categorical rule has substantial consequences. If rap diss tracks cannot contain statements of fact, then they are inoculated from any liability for defamation—no matter how direct and damaging the defamatory statements they contain. This case illustrates that. It is hard to imagine a statement more damaging to one's reputation and safety than being labeled a "certified pedophile," which elicits intense vitriol, and can spur violent retaliation. The Court's rule brushes aside

42

the risk of concrete reputational harms that can—and here, did—spill over into violence.

The Court's rule ignores that rap music can convey factual assertions just like any other form of expression. And it is irreconcilable with the fact that rap lyrics are regularly used as evidence in criminal cases with a higher standard of proof. *See, e.g.*, *United States v. Pierce*, 785 F.3d 832, 840-41 (2d Cir. 2015); *United States v. Herron*, 762 F. App'x 25, 30 (2d Cir. 2019); *United States v. Moore*, 639 F.3d 443, 447-48 (8th Cir. 2011); *United States v. Belfast*, 611 F.3d 783, 820 (11th Cir. 2020). If rap lyrics can be understood to contain statements of fact in the criminal context, then it must follow that reasonable listeners could understand them similarly for purposes of defamation.[4]

\*\*\*

A proper analysis of the statements and their relevant context shows that Drake adequately pleaded that a reasonable listener *could* view the Defamatory Material as asserting statements of fact. Because no more was required, this Court should reverse the dismissal of Drake's defamation claim.

---

[4] UMG asked the District Court to take judicial notice of a petition purportedly signed by Drake protesting the use of rap lyrics as evidence in criminal proceedings. *See* JA-169; JA-175-76. Because the Court did not do so, it is not in the record. *See* JA-508-09. Moreover, Drake's personal views on the dangers of using rap lyrics against artists in criminal trials are irrelevant to the legal questions of whether the Amended Complaint states a civil claim for defamation and whether, generally, rap lyrics can constitute defamation.

43

## II. DRAKE ADEQUATELY PLEADED THAT THE DEFAMATORY STATEMENTS CONSTITUTE MIXED OPINION.

In the alternative, even if the Recording's statements constituted opinion rather than verifiable facts, the statements are actionable mixed opinion. "While a pure opinion cannot be the subject of a defamation claim, an opinion that 'implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, is a 'mixed opinion' and is actionable." *Davis*, 22 N.E.3d at 269 (citation modified); *see also Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014). Accordingly, the key inquiry is whether the statement *could* reasonably be understood as implying that it is based on undisclosed facts. *See Davis*, 22 N.E.3d at 272; *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 74 (S.D.N.Y. 2021); *Solstein*, 488 F. Supp. 3d at 100.

At minimum, the Recording constitutes actionable mixed opinion. The Recording contains lyrics expressly accusing Drake of being a pedophile, without disclosing a factual basis for the allegation. Its lyrics indicate that Lamar, a Hollywood insider and Drake's contemporary, has pertinent information that listeners do not.

The statement, "[r]abbit hole is still deep, I can go further, I promise" is alone sufficient to hold that the Recording implies facts unknown to the audience that support Lamar's "opinion" that Drake is a pedophile. JA-42 ¶ 63. This lyric plainly suggests that Lamar has insider knowledge of Drake's alleged sexual misconduct—

44

a "rabbit hole," or a deep well of information—and that he can "go further" into it, revealing the details to which the reasonable listener does not have access. *See id.* It can also imply that Lamar has investigated Drake's conduct, and that he can "go further" to uncover more. *See id.* These are not just plausible understandings of the lyric; the Amended Complaint alleges that audiences actually believed that this line implied Lamar had additional information about Drake's alleged pedophilia. JA-47 ¶ 76. Others, including entertainment industry commentators, stated that they believed Lamar had information warranting an investigation into Drake. *See* JA-46 ¶ 75; JA-53 ¶ 84; JA-63 ¶ 114.

The Court found that "[i]t is not at all clear" these allegations represent "a natural reading of the lyric." SPA-28. But even if the lyric could also be understood differently, dismissal was inappropriate because this lyric "may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion." *Steinhilber*, 501 N.E.2d at 553; *see Albert*, 239 F.3d at 267 ("If any defamatory construction is possible, it is a question of fact for the jury whether the statements were understood as defamatory." (quotation omitted)); *Goldman v. Reddington*, 417 F. Supp. 3d 163, 174 (E.D.N.Y. 2019) (holding that, when multiple inferences are possible, the inference most favorable to the plaintiff controls).

Additionally, the lyric, "Say Drake, I *hear* you like 'em young," suggests Lamar has undisclosed information—he *hears*—about Drake's purported

45

pedophilia. JA-40 ¶ 60. The Court attempted to avoid the obvious implication of these words by concluding that reasonable listeners would see them as responding to Drake's "goad[ing]" in "Taylor Made Freestyle." SPA-27-28. This approach fails for the reasons discussed above. *See supra* at 20-27.

Moreover, the District Court compounded its error by drawing inferences against Drake from other judicially noticed songs (actually mentioned in the Amended Complaint), even though these lyrics could lead reasonable listeners to believe that Lamar has undisclosed information. SPA-29. For example, in "Euphoria," Lamar raps, "I know some shit" and warns, "[b]ut don't tell no lie about me and I won't tell truths 'bout you." JA-48 ¶ 77; JA-243. Furthermore, in "Meet the Grahams," Lamar raps:

> And we gotta raise our daughters knowing' there's predators like him lurkin'/ F*** a rap battle, he should die so all of these women can live with a purpose/**I been in this industry twelve years, I'ma tell y'all one lil' secret**/It's been some weird shit goin' on and some of these artists be here to police it.

JA-254 (emphasis added). In that same song, Lamar raps, "Katt Williams said, 'Get you the truth,' so I'ma get mines/The Embassy 'bout to get raided too, it's only a matter of time." *Id.* These lyrics suggest that Lamar has undisclosed information about Drake's alleged pedophilia because he claims that "The Embassy," Drake's home, would imminently be "raided," or searched, by law enforcement. Nonetheless, the Court inexplicably drew inferences *against* Drake, concluding that

46

"hyperbolic threatening language" in these songs would not lead listeners to understand the Recording as asserting facts. SPA-29. But, at the pleading stage, the District Court was required to draw all inferences in Drake's favor. *See Lanier*, 838 F.3d at 150.

Courts have found actionable mixed opinion in far weaker circumstances. For example, in *Biro v. Condé Nast*, calling a plaintiff a "classic con man" was a mixed opinion when coupled with statements like "after a while you catch him in different lies" and "you realize that the guy is a phony," because these allegations suggested that the speaker's opinion was based on additional undisclosed facts. *See* 883 F. Supp. 2d 441, 461-62 (S.D.N.Y. 2012). Similarly, in *Arts4All, Ltd. v. Hancock*, a former employee's statement that the listener "would be extremely upset if he knew how [Arts4All] is really run" indicated that the former employee's opinion was based on undisclosed facts. 773 N.Y.S.2d 348, 352 (N.Y. App. Div. 2004). The Recording here goes even further: Its lyrics expressly indicate that the pedophilia allegations are based on undisclosed facts.

## III. THE DISTRICT COURT ERRED BY DISMISSING DRAKE'S HARASSMENT CLAIM.

The District Court dismissed Drake's second-degree harassment claim because it concluded that Section 240.26 of the New York Penal Law, the criminal statute prohibiting harassment, "does not provide a private right of action." SPA-29-30. This Court should reverse or, alternatively, certify the question to the New

York Court of Appeals, as discussed in Drake's concurrent Motion for Certification.

Because no New York Court of Appeals decision addresses whether Section 240.26 creates a private right of action, this Court must "predict how the highest court of the forum state would resolve the uncertainty." *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994). This Court has *already* addressed the question, recognizing an implied right of action under the materially similar New York first-degree harassment statute. *See Galella v. Onassis*, 487 F.2d 986, 994 n.11 (1973).

Although Drake cited *Galella* below, *see* JA-432, the District Court did not even cite—much less discuss—it. *Galella* remains good law: subsequent cases recognize that, in contrast with federal law, New York law sets out "a very permissive standard to determine whether a private right of action is implied in a statute." *M.K.B. v. Eggleston*, 445 F. Supp. 2d 400, 429 (S.D.N.Y. 2006); *see Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 230-31 (2d Cir. 2006). The test is whether (1) "the plaintiff is one of the class for whose particular benefit the statute was enacted"; (2) "recognition of a private right of action would promote the legislative purpose"; and (3) "creation of such a right would be consistent with the legislative scheme." *Sheehy v. Big Flats Comty. Day, Inc.*, 541 N.E.2d 18, 20 (N.Y. 1989); *see also Hammer v. Am. Kennel Club*, 803 N.E.2d 766, 768 (N.Y. 2003).

The District Court did not question that the first two factors are met; the Court based its decision on *Sheehy*'s third factor. *See* SPA-30-33. But that factor is met as well: Recognizing a private right of action for harassment would be consistent with the legislative scheme, which nowhere suggests that the statute itself creates a comprehensive framework or that criminal enforcement is exclusive. *See infra* at 50-51.

Indeed, numerous courts, including this Court, have recognized a civil cause of action for harassment under New York law for decades. *See, e.g.*, *Galella*, 487 F.2d at 994 n.11; *Delong v. Bell*, 2022 WL 2612434, at *2 (N.Y. Sup. Ct. July 7, 2022); *Baiqiao Tang v. Wengui Guo*, 2019 WL 6169940, at *6 (S.D.N.Y. Nov. 20, 2019); *Poulos v. City of N.Y.*, 2016 WL 224135, at *3 (S.D.N.Y. Jan. 19, 2016); *Blasetti v. Pietropolo*, 213 F. Supp. 2d 425, 428 (S.D.N.Y. 2002); *Daniel v. Safir*, 175 F. Supp. 2d 474, 481 (E.D.N.Y. 2001); *Prignoli v. City of N.Y.*, 1996 WL 340001 (S.D.N.Y. June 19, 1996); *True v. N.Y. State Dep't of Corr. Servs.*, 613 F. Supp. 27, 33 (W.D.N.Y. 1984); *Spock v. United States*, 464 F. Supp. 510, 516 (S.D.N.Y. 1978); *Long v. Ben. Fin. Co. of N.Y.*, 330 N.Y.S.2d 664, 665 (N.Y. App. Div. 1972); *cf. Printers II, Inc. v. Pros. Publ'g, Inc.*, 784 F.2d 141, 148 (2d Cir. 1986); *Beauty Beauty USA, Inc. v. Chin Hong Luo*, 2011 WL 4952658, at *1 (S.D.N.Y. Oct. 11, 2011).

Contrary to the District Court's suggestion, several of the cases recognizing a

49

cause of action post-date *Hammer*; some are quite recent. *See Delong*, 2022 WL 2612434, at *2; *Baiqiao Tang*, 2019 WL 6169940, at *6. That other cases were decided before *Hammer* is immaterial. *Hammer* did not address the harassment statute. *See* 803 N.E.2d at 768. It merely applied *Sheehy*'s preexisting standard for implying a private right of action in a penal statute to an anti-animal-cruelty statute without purporting to overrule or change that standard. *Id.*

The District Court cited different cases holding that there is no implied private right of action under New York's harassment statute. But those decisions are unpersuasive. Some provide no reasoning whatsoever, *see Broadway Cent. Prop. Inc. v. 682 Tenant Corp.*, 749 N.Y.S.2d 225, 227 (N.Y. App. Div. 2002), while others effectively and incorrectly assume that New York penal statutes can never imply a private right of action, *see Stathatos v. William Gottlieb Mgmt.*, 2020 WL 1694366, at *4 (E.D.N.Y. Apr. 6, 2020); *Cablevision Sys. Corp. v. Commc'ns Workers of Am. Dist. 1*, 16 N.Y.S. at 753, 754 (N.Y. App. Div. 2015). Still others relied on the mistaken view that no authority supported the finding a private right of action under Section 240.26. *See Masic v. Town of Franklinville*, 2025 WL 2480898, at *17 (W.D.N.Y. Aug. 27, 2025).

The District Court cited cases outside the harassment context that declined to recognize an implied right of action under other criminal statutes. *See* SPA-30. But unlike Section 240.26, those statutes included "comprehensive" enforcement

50

schemes—such as alternative enforcement mechanisms, regulatory frameworks, and specific civil remedies—that went beyond authorizing police and prosecutors to enforce them. *See Hammer*, 803 N.E.2d at 768; *Sheehy*, 541 N.E.2d at 21-22; *Golden v. Diocese of Buffalo*, 125 N.Y.S.3d 813, 815-16 (N.Y. App. Div. 2020); *cf. Watson v. City of N.Y.*, 92 F.3d 31, 37 (2d Cir. 1996).

Section 240.26 is more similar to criminal statutes that courts have found to imply rights of action. For example, in *Oja v. Grand Chapter of Theta Chi Fraternity*, the court recognized a private right of action for criminal hazing because there was no evidence that the Legislature intended to bar recovery by hazing victims, and such a right would not "contravene the 'overall statutory scheme' that the Legislature has adopted to effectuate its goal of deterring hazing." 684 N.Y.S.2d 344, 346 (N.Y. App. Div. 1999). Many other cases recognize implied private rights of action from criminal statutes where—as here—there is no comprehensive enforcement scheme. *See Blissworld, LLC v. Kovack*, 2001 WL 940210, at *5 (N.Y. Sup. Ct. July 9, 2001); *Niagara Mohawk Power Corp. v. Freed*, 696 N.Y.S.2d 600, 602 (N.Y. App. Div. 1999); *Earsing v. Nelson*, 629 N.Y.S.2d 563, 565 (N.Y. App. Div. 1995). The District Court's contrary determination with respect to Section 240.26 should be reversed.

## IV. THE DISTRICT COURT ERRED IN DISMISSING THE DECEPTIVE BUSINESS PRACTICES CLAIM.

To state a claim under Section 349, "a plaintiff must demonstrate that (1) the

51

defendant's acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020). The Amended Complaint alleges that UMG engaged in covert and misleading marketing and promotional schemes to boost the Recording's popularity, including by paying third parties—music platforms, artificial streamers, social media influencers, and radio promoters—to play, stream, and promote the Recording without disclosing the payments to music consumers. JA-90-97 ¶¶ 172-87; JA-112-13 ¶¶ 227-29. UMG publicly touted the Recording's success while knowing that millions of streams were fraudulent. JA-72-75 ¶¶ 137-46; JA-118 ¶ 257. These allegations state a claim that UMG's deceptive practices were aimed at music consumers and likely to materially mislead them, and this harmed Drake both as an artist (a competitor to artists like Lamar) and a consumer. JA-90-97 ¶¶ 172-88; JA-112-13 ¶ 229; JA-117-19 ¶¶ 256-63. The District Court nonetheless dismissed the claim, erroneously reasoning that (1) "information and belief" allegations were insufficient, and (2) Drake failed to sufficiently allege consumer-oriented deceptive practices.

## A. The District Court Improperly Imposed a Heightened Pleading Standard.

The Section 349 claim is governed by Rule 8(a)(2). *See Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005). A plaintiff must plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl.*

52

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). This standard "does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant *or* where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records*, 604 F.3d at 120 (citation modified). Either circumstance is sufficient.

The District Court concluded that Drake's information-and-belief allegations were inadequate because they "d[id] not form a 'sufficient factual basis such that there is a 'reasonable expectation that discovery will reveal evidence of illegality.'" SPA-36. But information-and-belief pleading is permitted, as Drake pleaded that UMG concealed its promotional scheme through indirect and surreptitious payments to unknown entities. JA-90-95 ¶¶ 172-85. The Court *acknowledged* that these "may be facts that are 'peculiarly within the possession and control of' UMG." SPA-36. The inquiry should have stopped there. *See Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008); *Moraes v. White*, 571 F. Supp. 3d 77, 103-04 (S.D.N.Y. 2021).

Instead, the District Court held that, where allegations are made on information and belief, they "must be accompanied by a statement of the facts upon which the belief is founded." SPA-34. But such a "statement" is typically required only under Rule 9(b)'s heightened pleading standard, which is inapplicable here. *See Luce v. Edelstein*, 802 F.2d 49, 54 n.1 (2d Cir. 1986); *Asset Co IM Rest, LLC v.*

53

*Katzoff*, 2025 WL 919489, at *11 (S.D.N.Y. Mar. 26, 2025). Regardless, Drake *did* include factual information showing the foundation for his belief.

The Court also required Drake to show that it was "highly plausible" that UMG used unlawful business tactics. SPA-36. But the Supreme Court has expressly rejected that type of heightened, "probability" standard. *Twombly*, 550 U.S. at 556. Nor did the case the District Court cited, *Moraes v. White*, purport to set a "highly plausible" standard for information-and-belief pleading, which would be at odds with Rule 8. 571 F. Supp. 3d at 103-04.

In any event, the information-and-belief allegations were "based on factual information that makes the inference of culpability plausible." *Arista Records*, 604 F.3d at 120. In addition to facts purely within UMG's control, Drake also pleaded: comments from a rapper with industry knowledge that UMG used artificial streaming to spread the Recording, *see* JA-91-92 ¶ 176; accusations from social media users that UMG engaged in artificial streaming and other illicit conduct in marketing the Recording, *see* JA-92 ¶ 177; video evidence demonstrating how the artificial streaming service allegedly used by UMG works, *see* JA-92 ¶ 178; evidence of oddities related to streaming the Recording, *see* JA-93-94 ¶¶ 180, 183; past governmental enforcement actions against UMG for pay-for-play practices, *see* JA-95 ¶ 186; and discussions of the continued problems with pay-for-play and artificial streaming. *See e.g.*, JA-90-91 ¶¶ 174-75.

54

The District Court dismissed this support as "Tweets by individual users and reporting from fans" that "boils down to unreliable online commentary." SPA-35-36. But as the above list makes clear, Drake relied on more. And while the Court cited two out-of-circuit decisions in support of its analysis, each case addressed *only* anonymous internet commentary, and neither concerned the Rule 8 plausibility standard. *See id.* (citing *Castaneda v. Amazon.com, Inc.*, 679 F. Supp. 3d 739 (N.D. Ill. 2023), and *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Est.*, 2008 WL 5423191, at *3 (D. Haw. Dec. 31, 2008)). The District Court thus erred in imposing a heightened pleading standard.

## B. Drake Alleged Consumer-Oriented Conduct.

The Court also incorrectly stated that, even if it accepted the information-and-belief allegations, Drake failed to "sufficiently allege[] deceptive practices that are consumer oriented." SPA-36. The consumer-orientation element requires a plaintiff to "demonstrate that the acts or practices have a broad[] impact on consumers at large." *Oswego Laborers' Local 214 v. Marine Midland Bank*, 647 N.E. 2d 741, 744 (N.Y. 1995). This requirement "has been construed liberally." *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002). Section 349 "'applies to virtually all economic activity,'" and its "'reach . . . provides needed authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers in New York.'" *Casper Sleep, Inc. v. Mitcham*,

55

204 F. Supp. 3d 632, 643 (S.D.N.Y. 2016) (citation modified).

Accordingly, courts have not focused "on the magnitude of the public interest at stake or the identity of the claimant, but rather on whether the complained-of acts represented a one-off, 'single shot transaction,' on the one hand, or a way of doing business, on the other." *Id.* at 644; *see also KS Trade LLC v. Int'l Gemological Inst., Inc.*, 141 N.Y.S.3d 452, 557 (N.Y. App. Div. 2021). A claim is not sufficiently consumer-oriented if it is based on harm only to the plaintiff. *See, e.g.*, *Electra v. 59 Murray Enters.*, 987 F.3d 233, 259 (2d Cir. 2021); *Vitolo v. Mentor H/S, Inc.*, 213 F. App'x 16, 17-18 (2d Cir. 2007). But courts have found allegations sufficient to satisfy Section 349 where the conduct involved "repeated acts of deception directed at a broad group of individuals," *Feldman*, 210 F. Supp. 2d at 301, "an extensive marketing scheme," or "a standard or routine practice that was consumer-oriented in the sense that it potentially affected similarly situated consumers," *N. State Autobahn v. Progressive Ins.*, 953 N.Y.S.2d 96, 101 (N.Y. App. Div. 2012) (citation modified); *see Plavin v. Grp. Health Inc.*, 146 N.E.3d 1164, 1170 (N.Y. 2020); *Karlin v. IVF Am., Inc.*, 712 N.E.2d 662, 667 (N.Y. 1999). "Simply put, the defendant's acts or practices must have a broad impact on consumers at large." *N. State Autobahn*, 953 N.Y.S.2d at 101 (citation modified).

Drake's allegations meet this standard. UMG's deceptive acts and practices "were consumer-oriented because they were disseminated to the general music-

consuming public and marketplace and had a broad impact on consumers at large." JA-118 ¶ 260; *see also* JA-90-96 ¶¶ 173-86. In the digital age, "[r]ecommended songs, search results, and promoted playlists play a role in determining which music listeners will be exposed to." JA-93-94 ¶ 181. Reasonable consumers who pay for music subscription or streaming services expect that when a song is recommended by an algorithm on Spotify, played on the radio, or promoted on podcasts, there is some legitimate rationale—*e.g.*, it is "uniquely aligned to that listener's tastes or the playlist mood" or an "expert curator has judged the song to possess artistic excellence." *Id.* They do not expect that such promotion is the result of a label's secret payments. Reasonable consumers also expect that when a label promotes a song for reaching 300 million streams on Spotify in just 35 days, those statistics represent real listeners, not bots. As the New York Attorney General explained when UMG previously settled payola claims: "Consumers have a right not to be misled about the way in which the music they hear on the radio is selected. . . . Pay-for-play makes a mockery of claims that only the 'best' or 'most popular' music is broadcast." JA-95-96 ¶ 186. Accordingly, this case involves harm to consumers at large, not private harm that falls outside the scope of Section 349.

Rather than crediting these allegations, the Court questioned "what products, goods, or services [consumers] are purchasing," and whether UMG's deception caused them pecuniary harm. SPA-37. But music streaming service customers pay

57

for those services and assume that recommended music is based on some assessment of its merits or fit. Yet, because of UMG's deceptive practices, these consumers are not getting what they paid for: They instead received recommendations based on artificially inflated data.

More fundamentally, Section 349 "declares deceptive conduct unlawful without reference to whether it has actually caused specific pecuniary harm to consumers in general." *N. State Autobahn*, 953 N.Y.S.2d at 102; *see In re Methyl Tertiary Butyl Ether*, 175 F. Supp. 2d 593, 630-31 (S.D.N.Y. 2001). A plaintiff need not show "specific quantifiable harm." *N. State Autobahn*, 953 N.Y.S.2d at 102-03. "[T]he deception itself is the harm that the statute seeks to remedy: consumers have the right to an honest marketplace." *Id.* at 102 (citation modified). Accordingly, this Court has recognized that a competitor could seek relief under Section 349 based on the defendant's dissemination of false information about the competitor's products even absent any direct harm to consumers because "the harm to the public interest was manifest." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264-65 (2d Cir. 1995). Likewise, Drake has adequately alleged that UMG's "redirection of Spotify users who are searching for other unrelated songs and artists to the Recording," SPA-37, and its "practices to make 'Not Like Us' seem more popular than it actually was," SPA-38, were "contrary" and "detrimental" to the interests of consumers and the public interest, *Securitron*, 65 F.3d at 264-65, and harmed Drake

58

as a competitor. This Court should therefore reverse the dismissal of Drake's Section 349 claim.

## **CONCLUSION**

This Court should reverse the dismissal of the Amended Complaint.

Dated: January 21, 2026

<div style="margin-left:45%">

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP

*/s/ Michael J. Gottlieb*
Michael J. Gottlieb
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067
mgottlieb@willkie.com
(310) 855-3111

Erica L. Ross
Anna M. Gotfryd
1875 K Street NW
Washington, D.C. 20006
eross@willkie.com
agotfryd@willkie.com

Brady M. Sullivan
787 Seventh Avenue
New York, New York 10019
bsullivan@willkie.com

*Counsel for Appellant Aubrey Drake Graham*

</div>

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

Pursuant to Fed. R. App. P. 32(g)(1), I certify the following:

1.      This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, as modified by Second Circuit Local Rule 32.1(a)(4)(A), because, excluding the parts of the brief exempted Rule 32(f) of the Federal Rules of Appellate Procedure, this document contains 13,970 words.

2.      This document complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this document has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: January 21, 2026

/s/ *Michael J. Gottlieb*
Michael J. Gottlieb
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067

*Counsel for Appellant Aubrey Drake Graham*

SPECIAL APPENDIX

i

# TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Jeanette A.
Vargas, dated October 9, 2025, Appealed From ....   SPA-1

New York Penal Law § 240.26 ..................................   SPA-39

New York General Business Law § 349 ....................   SPA-44

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                                         :
AUBREY DRAKE GRAHAM,                                      :
                                                         :
                                    Plaintiff,           :        25-CV-0399 (JAV)
                                                         :
                    -v-                                  :        OPINION AND ORDER
                                                         :
UMG RECORDINGS, INC.,                                    :
                                                         :
                                    Defendant.           :
--------------------------------------------------------------------X

JEANNETTE A. VARGAS, United States District Judge:

This case arises from perhaps the most infamous rap battle in the genre's history, the vitriolic war of words that erupted between superstar recording artists Aubrey Drake Graham ("Drake") and Kendrick Lamar Duckworth ("Lamar" or "Kendrick Lamar") in the spring of 2024. Over the course of 16 days, the two artists released eight so-called "diss tracks," with increasingly heated rhetoric, loaded accusations, and violent imagery. The penultimate song of this feud, "Not Like Us" by Kendrick Lamar, dealt the metaphorical killing blow. The song contains lyrics explicitly accusing Drake of being a pedophile, set to a catchy beat and propulsive bassline. "Not Like Us" went on to become a cultural sensation, achieving immense commercial success and critical acclaim.

Both Drake and Kendrick Lamar have recording contracts with Defendant UMG Recordings, Inc. ("UMG" or "Defendant"). Drake alleges that UMG intentionally published and promoted "Not Like Us" while knowing that the song's insinuations that he has sexual relations with minors were false and defamatory.

SPA-2

Drake has brought this action against UMG for defamation, harassment in the second degree, and violation of section 349 of the New York General Business Law. Before the Court is Defendant's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because the Court concludes that the allegedly defamatory statements in "Not Like Us" are nonactionable opinion, the motion to dismiss is GRANTED.

### LEGAL STANDARDS

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff may not simply allege facts that are consistent with liability; the complaint must "nudge plaintiff's claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (cleaned up); *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

When ruling on a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded allegations and draws all reasonable inferences in favor of the non-moving party. *Romanova v. Amilus Inc.*, 138 F.4th 104, 108 (2d Cir. 2025). The Court need not credit "legal conclusions couched as factual allegations," however. *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (quotation marks omitted).

2

SPA-3

The Court may also consider "documents incorporated in the complaint by reference[ ] and matters of which judicial notice may be taken." *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 243 (S.D.N.Y. 2025) (citation omitted). Judicial notice is appropriate when a matter is not subject to reasonable dispute because it "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2).

## BACKGROUND

The following background is largely taken from the allegations in the Amended Complaint, which are assumed true for purposes of this motion. ECF No. 41 ("Am. Compl."). Additionally, Defendant requests the Court take judicial notice of certain extrinsic evidence pursuant to Rule 201 of the Federal Rules of Evidence. *See* ECF No. 44 ("Req. J. Not."). These exhibits include the lyrics of the songs released as part of Drake and Kendrick Lamar's rap battle. The dates on which these songs were released and the lyrics of these songs are not reasonably subject to dispute, *see Pickett v. Migos Touring, Inc.*, 420 F. Supp. 3d 197, 207 (S.D.N.Y. 2019), and the songs themselves are (with one exception) all referenced in the Amended Complaint. Accordingly, the Court will take judicial notice of Exhibits H through I and Exhibits K through O to the Request for Judicial Notice to understand Defendant's alleged statements in their "necessary and proper context." *Ganske v. Mensch*, 480 F. Supp. 3d 542, 545 (S.D.N.Y. 2020) (cleaned up); *see also Condit v. Dunne*, 317 F. Supp. 2d 344, 356-57 (S.D.N.Y. 2004) (taking

3

judicial notice of submissions that place defendant's comments "in the broader social context" to "aid the Court['s]" determination of the adequacy of plaintiff's defamation claims).

Exhibits B, J, and P are directly referenced and relied upon in Plaintiff's Amended Complaint, Req. J. Not. at 1-4, so those documents are likewise properly before the Court. *See Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003).[1] And because the document "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), the Court also takes judicial notice of the search results from the *New York Times* website in Exhibit C. The Court takes judicial notice of the existence of the listed articles, but not the truth of their contents. *See Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*, No. 11 Civ. 8921, 2013 WL 6670584, at *1 n.1 (S.D.N.Y. Mar. 29, 2013) (taking judicial notice of four websites on motion to dismiss because courts in this Circuit "generally ha[ve] the discretion to take judicial notice of internet material"); *see also Patsy's Italian Restaurant, Inc. v. Banas*, 575 F. Supp. 2d 427, 443 n.18 (E.D.N.Y.2008) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet.").

**A. Factual Allegations**

Drake is a prominent recording artist and songwriter, among other public-facing endeavors. Am. Compl., ¶ 26. Drake has had a successful music career

---

[1] During oral argument, Plaintiff agreed that these exhibits were properly before the Court in its consideration of the motion to dismiss. ECF No. 64 ("Hr'g Tr.") at 39:11-41:16.

under Defendant UMG for at least 20 years. *Id.*, ¶¶ 26-27. UMG uses its brands and imprints, or labels, to provide its music artists with the means to create, promote, and distribute their music commercially. *Id.*, ¶ 27. Defendant, through Universal Music Publishing Group ("UMPG"), holds exclusive publishing and distribution rights to Drake's music as well as that of artist Kendrick Lamar. *Id.*

On April 19, 2024, Drake released a diss track directed at Kendrick Lamar called "Push Ups." Req. J. Not., Ex. H. In "Push Ups," Drake mocks Lamar's height and shoe size, Req. J. Not., Ex. H ("How the f*** you big steppin' with a size-seven men's on/. . . Pipsqueak, pipe down"), and questions Lamar's success, *id.* ("You ain't in no big three/. . . I'm at the top of the mountain, so you tight now/Just to have this talk with your a**, I had to hike down.").

A few days later, Drake released "Taylor Made Freestyle," in which he used artificial intelligence-generated voices of deceased rapper 2Pac and of rapper Snoop Dogg to goad Lamar. Req. J. Not. at 2. In the track, "2Pac" and "Snoop Dogg" share their disappointment that Lamar had not yet responded to "Push Ups." *See id.*, Ex. I ("Kendrick, we need ya, the West Coast savior/. . . You seem a little nervous about all the publicity/. . . you gotta show this f***in' owl[2] who's boss on the West."). Drake, in his own voice, further taunts Kendrick for failing to come up with a satisfactory response, saying, "I know you're in that NY apartment, you strugglin' right now, I know it/In the notepad doing lyrical gymnastics, my boy." *Id.* Drake

---

[2] Drake's clothing brand is October's Very Own, or OVO, which is represented by an owl. Am. Compl., ¶ 36.

also surmises that Kendrick was purposefully delaying his response because artist Taylor Swift had just released a new album. *Id.* ("[S]hout out to Taylor Swift/Biggest gangster in the music game right now/. . . She got the whole pgLang on mute like that Beyoncé challenge, y'all boys quiet for the weekend.").

Lamar fired back at Drake in "Euphoria," which was released on April 30, 2024. Req. J. Not. at 3. In the track, Lamar claims, "I make music that electrify 'em, you make music that pacify 'em" and that he would "spare [Drake] this time, that's random acts of kindness." Req. J. Not., Ex. K. He accuses Drake of fabricating his claims: "Know you a master manipulator and habitual liar too/But don't tell no lie about me and I won't tell truths 'bout you." *Id*; *see also* Am. Compl., ¶¶ 14, 77. He insults Drake's fashion sense, Req. J. Not., Ex. K ("I hate the way that you walk, the way that you talk, I hate the way that you dress"), further raps "I believe you don't like women, it's real competition, you might pop a** with 'em," and taunts Drake for being a coward with his responses, *id.* ("I hate the way that you sneak diss, if I catch flight, it's gon' be direct.").

On May 3, 2024, the feud between Drake and Lamar escalated, as they lobbed increasingly vicious, personal accusations at each other over the course of the day. First, Lamar released "6:16 in LA," Req. J. Not. at 3, in which he calls Drake a "terrible person." *Id.*, Ex. L. Lamar accuses Drake of "playin' dirty with propaganda" and raps that if Drake was "street-smart" then he would have "caught [on] that [his] entourage is only [there] to hustle" him." *Id.*

6

Drake's next response arrived later that day in "Family Matters."  Drake jabs at Lamar's relationship with his partner, Req. J. Not., Ex. M ("You the Black messiah wifin' up a mixed queen/And hit vanilla cream to help out with your self-esteem/On some Bobby sh**, I wanna know what Whitney need") and implies that Lamar physically abused her, *id.* ("You a dog and you know it, you just play sweet/Your baby mama captions always screamin', 'Save me'/You did her dirty all your life, you tryna make peace.").  Moreover, Drake calls into question whether Lamar is the biological father of one of his children.  *Id.* ("I heard that one of 'em little kids might be Dave Free/Don't make it Dave Free's").

Almost immediately after the release of "Family Matters," Lamar unleashed the scathing "Meet the Grahams," Req. J. Not. at 3, in which he accuses Drake of being a "deadbeat" father and of hiding the existence of other children.  Req. J. Not., Ex. N ("You lied about your son, you lied about your daughter, huh/You lied about them other kids that's out there hopin' that you come.").  Lamar also alleges that Drake has "gamblin' problems, drinkin' problems, pill-poppin' and spendin' problems/Bad with money, wh***house/Solicitin' women problems, therapy's a lovely start." *Id.*  He further insinuates that Drake was a "predator" and that Drake "should die so all of these women can live with a purpose." *Id.*

The next day, on May 4, 2024, Lamar released "Not Like Us."  Am. Compl., ¶¶ 6-7.  "Not Like Us" explicitly names Drake and his associates as pedophiles.  *Id.*, ¶¶ 60-62.  Specifically, the track contains the following lyrics:

> Say, Drake, I hear you like 'em young
> You better not ever go to cell block one

7

> To any b\*\*\*\* that talk to him and they in love
> Just make sure you hide your lil' sister from him
> They tell me Chubbs the only one that get your hand-me-downs
> And PARTY at the party, playin' with his nose now
> And Baka got a weird case, why is he around?
> Certified Lover Boy? Certified pedophiles
>
> Wop, wop, wop, wop, wop, Dot, f\*\*\* 'em up
> Wop, wop, wop, wop, wop, I'ma do my stuff
> Why you trollin' like a b\*\*\*\*? Ain't you tired?
> Tryna strike a chord and it's probably A-Minor

Am. Compl., Ex. A.[3]

On May 5, 2025, Drake responded in "The Heart Part 6," Req. J. Not. at 3, directly denying Lamar's allegations of pedophilia, *id.*, Ex. O ("I never been with no one underage, but now I understand why this the angle that you really mess with/Just for clarity, I feel disgusted, I'm too respected/If I was f\*\*\*ing young girls, I promise I'd have been arrested/I'm way too famous for this s\*\*\* you just suggested/. . . Drake is not a name that you gon' see on no sex offender list."); *see also* Am. Compl., ¶ 102.  In the track, Drake further sneers that "[t]his Epstein angle was the s\*\*\* I expected" and accused Lamar of wanting to "misdirect."  Req. J. Not., Ex. O.  Drake also alleges that he had planted some of the information Lamar has used against him.  *Id.* ("We plotted for a week, and then we fed you the information/. . . But you so thirsty, you not concerned with investigation/. . . You gotta learn to fact-check things and be less impatient.").

---

[3] Chubbs, Party, and Baka are associates of Drake's, while K. Dot is a nickname for Kendrick Lamar.  Req. J. Not., Ex. J at 3-4.

"Not Like Us" was a huge commercial success.  It has gained immense popularity on streaming and social media platforms; it has been streamed globally more than 1.4 billion times on Spotify alone as of April 2025.  Am. Compl., ¶¶ 7, 10, 58.  On November 8, 2024, the Recording Academy nominated "Not Like Us" for several Grammy Awards, *id.*, ¶ 142, and in February 2025, it won Record of the Year, *id.*, ¶ 164.  A week later, on February 9, 2025, Kendrick Lamar performed "Not Like Us" live during the Apple Music Super Bowl LIX Halftime Show.  *Id.*, ¶ 165.  The performance is alleged to be the most-watched Super Bowl Halftime Show of all time with over 133.5 million views.  *Id.*, ¶ 168.

### B. Procedural History

Plaintiff brings claims for defamation, harassment in the second degree, and violation of New York General Business Law Section 349 based upon UMG's publication and promotion of "Not Like Us" (the "Recording").  Defendant has filed a motion to dismiss the Amended Complaint.  ECF No. 42.  On June 30, 2025, the Court heard oral argument from both parties concerning the motion to dismiss and the request for judicial notice.

Plaintiff contends that he was defamed when Defendant "decided to publish, promote, exploit, and monetize allegations that it understood were not only false, but dangerous."  Am. Compl., ¶ 8.  Plaintiff alleges that "[t]he Recording repeatedly accuses Drake of engaging in criminal acts, including pedophilia and/or other acts that would require registering as a sex offender and of being registered as a sex offender."  *Id.*, ¶ 59.

9

The Amended Complaint alleges that the song implies that Lamar has "*heard* (albeit from undisclosed sources and concerning undisclosed individuals) that Drake has a predilection for underage women." *Id.*, ¶ 60. According to the Amended Complaint, the reference to "cell block one" is "a thinly veiled threat that Drake should be careful that he never ends up in prison, a place where child predators are notoriously the targets of violence." *Id.* The line "Certified Lover Boy? Certified pedophiles" is a "perverse reference to Drake's 2021 album 'Certified Lover Boy.'" *Id.*, ¶ 61. Plaintiff argues that the use of the term "certified" "communicates that Drake has been ***found*** to be a pedophile." ECF No. 58 ("Opp'n Br.") at 9. And the final line of this passage plays on the "dual meaning of minor—a person under the age of 18 and a musical scale." Am. Compl.,. ¶ 61.

 Plaintiff further cites as defamatory the Recording's descriptions of Drake as "Malibu most wanted" and a "predator," and that his name "gotta be registered and placed on neighborhood watch." *Id.*

The associated music video (the "Video") shows "images associated with sex trafficking" to reinforce the pedophilia accusation. *Id.*, ¶ 7. The Recording is also accompanied by an album image of Drake's home in Toronto (the "Image"), which is plastered in icons used by law enforcement and public safety applications to denote the residences of registered sex offenders. *Id.*, ¶¶ 65-66.

## DISCUSSION

### I.   Defamation Claims

"Under New York law, the elements of a defamation claim are (1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that is false, (5) made with the applicable level of fault, (6) causing injury, and (7) not protected by privilege." *Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*, No. 15 CV 4779-LTS-SN, 2016 WL 1717218, at *2 (S.D.N.Y. Apr. 28, 2016).  A defamatory statement is one that "exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society." *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 690 (S.D.N.Y. 2022).

The issue in this case is whether "Not Like Us" can reasonably be understood to convey as a factual matter that Drake is a pedophile or that he has engaged in sexual relations with minors.  In light of the overall context in which the statements in the Recording were made, the Court holds that it cannot.

### A. Fact vs. Opinion

"Under the First Amendment, there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974).  [O]nly assertions of facts are capable of being proven false." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 460 (S.D.N.Y. 2012) (citation omitted).  Moreover, "the New York Constitution provides for absolute protection of opinions." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 178 (2d Cir.

11

2000).  Thus, courts must "distinguish[] between statements of fact, which may be defamatory and expressions of opinion, which 'are not defamatory'" and have the full protection of the New York Constitution.  *Live Face on Web, LLC*, 2016 WL 1717218, at *2 (quoting *Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 597 (S.D.N.Y. 2014)).

Whether a challenged statement is fact or opinion is a legal question.  *Celle*, 209 F.3d at 178.  Plaintiff argues that it is inappropriate for the Court to determine, at the pleading stage, whether a reasonable listener would perceive the Recording as fact or opinion.  Opp'n Br. at 13-14; Hr'g Tr. at 24:11-26:8.  Yet, because this is a question of law, New York courts routinely resolve this question at the motion to dismiss stage.  *See, e.g.*, *Brian v. Richardson*, 87 N.Y.2d 46, 52 (1995) (holding, on a motion to dismiss, that challenged statement constitutes opinion); *Dfinity Found. v. New York Times Co.*, 702 F. Supp. 3d 167, 174 (S.D.N.Y. 2023), *aff'd*, No. 23-7838-cv, 2024 WL 3565762 (2d Cir. July 29, 2024) ("Whether a statement is a "fact [or] opinion is 'a question of law for the courts, to be decided based on what the average person hearing or reading the communication would take it to mean' and is appropriately raised at the motion to dismiss stage."); *Greenberg v. Spitzer*, 62 N.Y.S.3d 372, 385-86 (2d Dep't 2017) (holding that, because whether a statement is defamatory "presents a legal issue to be resolved by the court," defamation actions are particularly suitable for resolution on a motion to dismiss).  "There is particular value in resolving defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of

constitutionally protected freedoms." *Dfinity Found.*, 702 F. Supp. 3d at 173

(cleaned up); *accord Biro*, 963 F. Supp. 2d at 279.

In distinguishing between facts and opinion, three factors guide the Court's

consideration:

> (1) whether the specific language in issue has a precise
> meaning which is readily understood;
>
> (2) whether the statements are capable of being proven
> true or false; and
>
> (3) whether either the full context of the communication
> in which the statement appears or the broader social
> context and surrounding circumstances are such as to
> signal readers or listeners that what is being read or
> heard is likely to be opinion, not fact.

*Brian*, 87 N.Y.2d at 51 (cleaned up).  The Court conducts this inquiry through the

lens of a "reasonable" listener.  *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997).

Plaintiff's suit is focused on a single factual message conveyed by the

Recording, "the false allegation that Drake is a pedophile."  Hr'g Tr. at 36:16-19; *see*

*also* Opp'n Br. at 9 ("[T]he Recording is myopically focused on ensuring that

listeners take one message away from the song: Drake is a pedophile.").  This

statement has a readily understandable meaning, and it is capable of being proven

true or false.  But "even accusations of criminal behavior are not actionable if,

understood in context, they are opinion rather than fact." *Hayashi v. Ozawa*, No.

17-CV-2558 (AJN), 2019 WL 1409389, at *2 (S.D.N.Y. Mar. 28, 2019).

Thus, the Court will focus its analysis on the third factor.  This inquiry is a

holistic one, which looks "to the over-all context in which the assertions were made,"

*Brian*, 87 N.Y.2d at 51, in order to assess "the impact that the statements would have on a reasonable [listener]," *Levin*, 119 F.3d at 197. Context includes the forum in which the communication was published, the surrounding circumstances, the tone and language of the communication, and its apparent purpose. *See Brian*, 87 N.Y.2d 51-52; *see also Hayashi*, 2019 WL 1409389, at *2.

      **1.**     **Forum**

To start, the Court considers the forum in which the allegedly defamatory statements appear, as that is a "useful gauge" for determining whether the reasonable reader will treat it more readily as opinion than fact. *Brian*, 87 N.Y.2d at 52. For example, the average listener is more likely to understand statements made on a news program or in a journalistic piece to be factual, while statements made in the opinion page of a newspaper or on an internet comment page are generally perceived as opinion. *See, e.g.*, *Millus v. Newsday, Inc.*, 89 N.Y.2d 840, 842 (1996) (appearance of statement on editorial page indicative of opinion); *Brian*, 87 N.Y.2d at 52 ("[T]he common expectation is that the columns and articles published on a newspaper's Op Ed sections will represent the viewpoints of their authors and, as such, contain considerable hyperbole, speculation, diversified forms of expression and opinion."); *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 415 (1st Dep't 2011) ("The culture of Internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a 'freewheeling, anything-goes writing style.'"); *Ganske*, 480 F. Supp. 3d at 553 ("[T]he fact that [the] allegedly defamatory statement . . . appeared on

Twitter conveys a strong signal to a reasonable reader that this was [d]efendant's opinion."); *Live Face on Web, LLC*, 2016 WL 1717218, at *3 ("[T]he media vehicles used to disseminate the [alleged defamation]—a Wordpress blog, social media posts, and an unsigned press release complaining about litigation tactics—suggest to readers that they contain opinions, not facts, and they are written in an amateurish fashion."). The forum in which a statement appears is not dispositive of the fact versus opinion inquiry, but it does provide contextual indicia that can inform the Court's analysis.

The forum here is a music recording, in particular a rap "diss track," with accompanying video and album art. Diss tracks are much more akin to forums like YouTube and X, which "encourag[e] a freewheeling, anything-goes writing style," than journalistic reporting. *Sandals Resorts*, 86 A.D.3d at 43 (quotation marks omitted). The average listener is not under the impression that a diss track is the product of a thoughtful or disinterested investigation, conveying to the public fact-checked verifiable content.

### 2.    Surrounding Circumstances

Next, the Court considers the "full context of the communication in which the statement appears," including the "setting surrounding the communication." *Steinhilber v. Alphone*, 68 N.Y.2d 283, 294 (1986). The fact that the Recording was made in the midst of a rap battle is essential to assessing its impact on a reasonable listener. "Even apparent statements of fact may assume the character of statements of opinion . . . when made in public debate, heated labor dispute, or

other circumstances in which an audience may anticipate the use of epithets, fiery rhetoric or hyperbole." *Id.* (cleaned up); *see also Jacobus v. Trump*, 51 N.Y.S.3d 330, 336 (N.Y. Sup. Ct.), *aff'd*, 64 N.Y.S.3d 889 (1st Dep't 2017) ("As context is key, defamatory statements advanced during the course of a heated public debate, during which an audience would reasonably anticipate the use of epithets, fiery rhetoric or hyperbole, are not actionable." (cleaned up)).

The decision by the New York Court of Appeals in *Steinhilber* is instructive in this regard. In *Steinhilber*, the allegedly defamatory statements were published in a tape-recorded telephone message that was played automatically to anyone dialing the private phone number that was given to labor union members. 68 N.Y.2d at 287. The union had assessed a fine against Plaintiff after she had defied a strike order, and the phone message appeared after she had failed to pay the fine. *Id.* at 294. The New York Court of Appeals found that "the most significant circumstance" was "that the message was prepared and played as part of the union's effort to punish a former member." *Id.* The court highlighted that, in "the emotional aftermath of a strike when animosity would be expected to persist— particularly against a former member who was seen as a 'traitor' to the cause," that a listener would not expect that any insults lobbed would be factual in nature. *Id.*

Similarly, in *Torain v. Liu*, the Second Circuit affirmed the dismissal of a complaint at the pleading stage, holding that as a matter of law, comments that the plaintiff was a "sick racist pedophile," a "loser pedophile," a "broadcaster pedophile," a "child predator," a "lunatic," and that he "must be put behind bars" were

16

expressions of opinion. 279 F. App'x 46, 46 (2d Cir. 2008). In reaching this conclusion, the Second Circuit relied upon the context in which these statements were made. Specifically, the comments were part of a "war of words" between disk-jockeys at rival radio stations that received "extensive media coverage and commentary." *Id.* at 47. As part of that feud, the plaintiff made comments on air suggesting that he would sexually abuse the minor daughter of the defendant. *Id.* The Second Circuit concluded that, in this context, no reasonable listener could have perceived the defendant's responses to "state or imply assertions of objective fact." *Id.*

In *Rapaport v. Barstool Sports, Inc.*, the district court found that an audience would not reasonably conclude that statements suggesting that the plaintiff had herpes and had abused his ex-girlfriend constituted assertions of facts when published in a six-minute diss track music video. No. 18-CV-8783 (NRB), 2021 WL 1178240, at *15 (S.D.N.Y. Mar. 29, 2021), *aff'd*, No. 22-2080-CV, 2024 WL 88636 (2d Cir. Jan. 9, 2024). The district court observed that the statements were "delivered in the midst of a public and very acrimonious dispute between [the parties] that would have been obvious to even the most casual observer." *Id.* The video in question reviewed the "recent history of the acrimonious dispute that resulted in Rapaport's termination just days before the video's publication," and also included a photoshopped photo of the defendant in a derogatory manner. *Id.* That clear background "contextualize[d] for the audience that the statements in the video are

17

being offered in the midst of a hostile public feud between Rapaport and Barstool."
*Id.*

Just as in *Steinhilber*, *Rapaport*, and *Torain*, the Recording was published as part of a heated public feud, in which both participants exchanged progressively caustic, inflammatory insults and accusations. This is precisely the type of context in which an audience may anticipate the use of "epithets, fiery rhetoric or hyperbole" rather than factual assertions. A rap diss track would not create *more* of an expectation in the average listener that the lyrics state sober facts instead of opinion than the statements at issue in those cases.

For example, in "Euphoria" Lamar calls Drake a "master manipulator and habitual liar" and "a scam artist." Req. J. Not., Ex. K. Drake responds in "Family Matters" by heavily implying that Lamar is a domestic abuser. *See id.*, Ex. M. He also raps that he "heard" that one of Lamar's sons may not be biologically his. *Id.* ("Why you never hold your son and tell him, 'Say cheese'?/We could've left the kids out of this, don't blame me/. . . I heard that one of 'em little kids might be Dave Free").

In "Meet the Grahams," Lamar takes issue with Drake involving his family members in their feud. Req. J. Not., Ex. N ("Dear Aubrey/I know you probably thinkin' I wanted to crash your party/But truthfully, I don't have a hatin' bone in my body/This supposed to be a good exhibition within the game/But you f***ed up the moment you called out my family's name/Why you had to stoop so low to discredit some decent people?"). In that same track, Lamar alleges that Drake uses

the weight loss drug Ozempic.  *Id.* ("Don't cut them corners like your daddy did, f*** what Ozempic did/Don't pay to play with them Brazilians, get a gym membership.").  Lamar also insinuates that Drake knowingly hires sexual offenders.  *See id.* ("Grew facial hair because he understood bein' a beard just fit him better/He got sex offenders on ho-VO that he keep on a monthly allowance.").

Of particular relevance, in "Taylor Made Freestyle," Drake challenged Lamar to make the pedophilia accusations at issue.  Using the artificially generated voice of deceased rapper 2Pac, Drake goads Lamar:

> Kendrick, we need ya, the West Coast savior
> Engraving your name in some hip-hop history
> If you deal with this viciously
> You seem a little nervous about all the publicity
> F*** this Canadian lightskin, Dot
> We need a no-debated West Coast victory, man
> Call him a b**** for me
> Talk about him likin' young girls, that's a gift from me
> Heard it on the Budden Podcast, it's gotta be true

*Id.*, Ex. I.  It is in this context in which such lyrics as "Say, Drake, I hear you like 'em young" from the Recording must be assessed.  The similarity in the wording suggests strongly that this line is a direct callback to Drake's lyrics in the prior song.

Plaintiff argues that the Court should ignore the songs that came before and assess "Not Like Us" as a "singular entity."  Hr'g Tr. at 39:14-15; *see also* Opp'n Br. at 15-17.  Plaintiff argues that the average listener is not someone who is familiar with every track released as part of the rap battle before listening to the Recording.  Hr'g Tr. at 32:17-33:2; 35:9-19.  Because the Recording has achieved a

level of "cultural ubiquity" far beyond the other seven songs, Plaintiff contends that Court should not consider those other tracks in assessing how the average listener of the Recording would perceive the allegations regarding Drake.  Hr'g Tr. at 36:10-19; *id.* at 39:11-17; *see also* Opp'n Br. at 15.

There are a number of flaws with this argument.  "Not Like Us" cannot be viewed in isolation but must be placed in its appropriate factual context.  *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991) ("[S]tatements must first be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying *any* facts.").  Here, that factual context is the insults and trash talking that took place via these diss tracks in the days and weeks leading up to the publication of "Not Like Us."  The songs released during this rap battle are in dialogue with one another.  They reference prior songs and then respond to insults and accusations made by the rival artist.  *See, e.g.*, Am. Compl., ¶ 63.  The songs thus must be read together to fully assess how the general audience would perceive the statements in the Recording.  *See, e.g.*, *Celle*, 209 F.3d at 187 (holding that two newspaper articles had to be read together to understand full context).

Notably, the Second Circuit rejected a similar argument in *Torain*.  There, the plaintiff argued "that the district court improperly considered the statements that he made during his 'war of words' because they were not included in his complaint."  279 F. App'x at 47 n.1.  The Second Circuit held that, because the court must look at the overall context in which a statement was made in order to

determine if it is actionable, the district court properly considered all statements made during the feud between the disk jockeys, regardless of whether they were included in the complaint. *Id.*

Moreover, while Plaintiff is correct that the intended audience for the Recording is the general public, and not a subset of rap devotees or Kendrick Lamar fans, Opp'n Br. at 15, the recordings in the rap battle were likewise released to the general public. These were not songs accessible to a select niche few, but tracks released by commercially successful artists. While "Not Like Us" may be the most popular of the diss tracks, the other songs were hits in their own right, with streams in the tens of millions or hundreds of millions. Am. Compl., ¶ 202 n.280.

Additionally, it was not just the Recording which gained a cultural ubiquity, but the rap battle itself. In deciding this motion to dismiss, the Court need not blind itself to the public attention garnered by this particular rap battle. The Court takes judicial notice of the extensive mainstream media reporting that surrounded the release of "Not Like Us" and the associated feud between Drake and Lamar. *See, e.g.*, Req. J. Not., Exs. B, C, P.[4] Accordingly, the Court must consider the entire

---

[4] *See also* Mark Savage, *Drake and Kendrick Lamar beef explained—what has happened and why?*,  BBC NEWS (May 9, 2024), accessed at https://www.bbc.com/news/entertainment-arts-68739398 [https://perma.cc/AT4M-S3GH]; Dani Di Placido, *Drake vs. Kendrick Lamar—Who Won?*, FORBES (May 6, 2024), accessed at https://www.forbes.com/sites/danidiplacido/2024/05/06/drake-vs-kendrick-lamar---who-won/ [https://perma.cc/668W-3YVL]; Janay Kingsberry and Herb Scribner, *Kendrick Lamar and Drake's feud got heated and ugly.  Here's what happened.*, WASHINGTON POST (May 6, 2024), accessed at https://www.washingtonpost.com/style/2024/05/06/drake-kendrick-beef-diss-tracks/ [https://perma.cc/GD95-2CJ4]; Neil Shah, *Kendrick Lamar vs. Drake:  A New Rap Beef for the Streaming Era*, WALL ST. J. (May 7, 2024), accessed at

rap battle to assess whether the average listener would take Lamar's statements as objective fact or opinion.

Perhaps most fatally for Plaintiff's argument, it would render protection for artistic expression dependent upon an impermissible retroactive analysis. At the time he released "Not Like Us," Kendrick Lamar could not have been aware that it would break streaming records, win Record of the Year at the Grammys, or be featured at the Super Bowl Halftime Show. Yet Plaintiff would have the Court divorce the Recording from the context in which it was created because of these subsequent events. Whether publications constitute actionable fact or protected opinion cannot vary based upon the popularity they achieve. Constitutional guarantees do not rest on such a flimsy foundation.

Plaintiff counters that, even if the Recording was protected opinion at the time of its initial publication, UMG's republication of "Not Like Us" in the months following, after it achieved unprecedented levels of commercial success, exposes it to liability. Hr'g Tr. at 37:20-38:17. This argument is logically incoherent. If the Recording was nonactionable opinion at the time it was initially produced, then its republication would not expose UMG to liability. Republication cannot transform Lamar's statement of opinion into UMG's statement of fact.

---

https://www.wsj.com/arts-culture/music/kendrick-lamar-vs-drake-rap-beef-diss-tracks-e346839d?mod=Searchresults&pos=5&page=1 [https://perma.cc/77XG-9EX6].

### 3. Tone and Language

That the Recording can only reasonably be understood as opinion is reinforced by the language employed in the song. *Steinhilber*, 68 N.Y.2d at 293 (The Court examines the "tone and its apparent purpose."). "Loose, figurative or hyperbolic statements, even if deprecating the plaintiff," *Brahms v. Carver*, 33 F. Supp. 3d 192, 198 (E.D.N.Y. 2014) (cleaned up), and "imaginative expression," *Levin*, 119 F.3d at 196, cannot constitute actionable defamation. *See Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000) ("A court may also consider whether the 'general tenor' of the publication negates the impression that challenged statements imply defamatory facts about the plaintiff.").

In *Rapaport*, for example, the court concluded that the "tone and apparent purpose of the diss track," especially considering its use of hyperbolic and vitriolic words and imagery, further "reinforce[d] for the audience that the video is not intended to reflect an accurate factual assessment of Rapaport." 2021 WL 1178240, at *16. The district court faced "no difficulty concluding that the context of this 'diss track' video reasonably signals to viewers that the challenged statements are the prejudiced, opinionated viewpoints of the Barstool Defendants." *Id.* The Second Circuit affirmed the district court's analysis, concluding that "[t]he nature and tone of the surrounding language can function as a strong indicator to the reasonable reader that the statement is not expressing or implying any facts." 2024 WL 88636, at *4.

23

"Not Like Us" is replete with profanity, trash-talking, threats of violence, and figurative and hyperbolic language, all of which are indicia of opinion. A reasonable listener would not equate a song that contains lyrics such as, "Ain't no law, boy, you ball boy, fetch Gatorade or somethin', since 2009 I had this b**** jumpin'," with accurate factual reporting. Accordingly, the reasonable listener of "Not Like Us" would conclude that Lamar is rapping hyperbolic vituperations.

Plaintiff contends that, in determining if the lyrics in "Not Like Us" express fact or opinion, the Court must consider the subjective views of listeners, "as well as commentators in the rap industry and the press," who understood the Recording, Video and Image as an attempt to "convey a precise factual message (pedophilia) about Drake." Opp'n Br. at 7, 9; *see also* Am. Compl., ¶ 219. The Amended Complaint cites extensively to comments and posts from YouTube and Instagram that expressed the belief that the Recording had exposed the truth and that Drake truly was engaged in "pedophilia and sexual violence against children." Am. Compl., ¶ 219; *see also id.*, ¶¶ 73-76, 78-82, 220.

But "distinguishing between fact and opinion is a question of law for the courts, to be decided based on 'what the average person hearing or reading the communication would take it to mean.'" *Davis v. Boeheim*, 24 N.Y.3d 262, 269 (2014) (citation omitted). "The dispositive inquiry is whether a reasonable [listener] could have concluded that the statements were conveying facts about the plaintiff." *Id.* at 269-70 (citation omitted). Courts make that determination by looking at the

full context and surrounding circumstances of the challenged communication. *Id.* at 270.

The Court holds, based upon a full consideration of the context in which "Not Like Us" was published, that a reasonable listener could not have concluded that "Not Like Us" was conveying objective facts about Drake. The views expressed by users @kaioken8026, @mrright8439, and @ZxZNebula, and the other YouTube and Instagram commentators quoted in the Complaint, Am. Compl., ¶¶ 73-74, do not alter the Court's analysis. In a world in which billions of people are active online, support for almost any proposition, no matter how farfetched, fantastical or unreasonable, can be found with little effort in any number of comment sections, chat rooms, and servers. "[T]hat some readers may infer a defamatory meaning from a statement does not necessarily render the inference reasonable under the circumstances." *Jacobus*, 51 N.Y.S.3d at 336.

The artists' seven-track rap battle was a "war of words" that was the subject of substantial media scrutiny and online discourse. Although the accusation that Plaintiff is a pedophile is certainly a serious one, the broader context of a heated rap battle, with incendiary language and offensive accusations hurled by both participants, would not incline the reasonable listener to believe that "Not Like Us" imparts verifiable facts about Plaintiff.

### 4.   Image and Video

To the extent that Plaintiff alleges that the Image and Video are independently actionable, Am. Compl., ¶¶ 7, 8, 65-66, 105-112, the Court holds that

they too constitute opinion. The Image is the album cover art for "Not Like Us." It thus shares the same overall context as the Recording itself. The Image is "designed to reinforce" the message of the Recording. Am. Compl., ¶ 7. And as the Court has already found, that message is protected opinion. Additionally, the Image itself, with its overlay of more than a dozen sex offender markers, is obviously exaggerated and doctored. No reasonable person would view the Image and believe that in fact law enforcement had designated thirteen residents in Drake's home as sex offenders.

The figurative imagery accompanying the music video also constitutes protected opinion. Plaintiff alleges, for example, that the "Video depicts a prolonged shot of a live owl in a cage," projecting the message that "Drake belongs behind bars." Am. Compl. ¶ 110. An image of a caged owl cannot reasonably be understood to convey a factual message. Similarly, depicting Kendrick Lamar playing hopscotch while singing the "A-minor" lyric is not suggestive of objective reporting. *Id.* ¶ 107.

## B.   Mixed Opinion

Although pure opinion cannot constitute actionable defamation, "mixed opinion," which is an opinion that "implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it," is actionable. *Steinhilber*, 68 N.Y.2d at 289; *see also Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014). "Mixed opinion" holds "the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the

person about whom he is speaking." *Steinhilber*, 68 NY.2d at 290. Whether statements constitute mixed opinion presents a legal question, "which must be answered by considering, in the context of the entire communication and of the circumstances in which they were spoken or written, whether the average listener would reasonably understand the opinion as implying the assertion of undisclosed facts justifying the opinion." *Cooper v. Templeton*, 629 F. Supp. 3d 223, 235-36 (S.D.N.Y. 2022) (citation omitted).

Just as the overall context of "Not Like Us" forecloses the argument that its lyrics can be read as factual assertions, that same context negates any implication that Lamar's lyrics are based upon undisclosed facts. *See LaNasa v. Stiene*, No. 24-1325, 2025 WL 893456, at *3 (2d Cir. Mar. 24, 2025) (holding that, where statements are made in circumstances "where an audience may anticipate the use of epithets, fiery rhetoric or hyperbole," inference could not reasonably be drawn that assertions were based on undisclosed facts). In the context of this rap diss battle, no reasonable person would listen to "Not Like Us" and assume that Lamar uniquely had access to credible, provable facts that revealed Drake to be a pedophile.

Plaintiff's arguments that the lyrics to "Not Like Us" can be read to suggest Lamar's reliance upon undisclosed facts is unavailing. Plaintiff first posits that the line, "Say Drake, I **hear** you like 'em young," indicates that Lamar had "heard" from outside sources evidence confirming that Drake is a pedophile. Opp'n Br. at 17. As discussed *infra*, however, that ignores that this line is reasonably understood to be

a direct response to Drake's challenge to Lamar in "Taylor Made Freestyle" to

"[t]alk about [Drake] likin' young girls/. . . Heard it on the Budden Podcast, it's gotta

be true." Req. J. Not., Ex. I. This lyric clearly prods Lamar to discuss preexisting

rumors about Drake's interest in minors.[5] Lamar's responsive lyrics are thus akin

to the accusation of pedophilia in *Torain* that the Second Circuit concluded

constituted pure opinion. There, the Second Circuit concluded that a reasonable

person would understand based on the context that the defendant disk jockey was

using the term "pedophile" in response to directly pertinent comments made by

plaintiff during their "war of words," and was not relying upon undisclosed facts.

279 F. App'x at 47.

Plaintiff next points to the lyrics, "Rabbit hole is still deep, I can go further, I

promise." Opp'n Br. at 17. Plaintiff argues that a reasonable listener could view

this lyric as suggesting that Lamar has specific evidence to back up his assertions of

pedophilia. *Id.* It is not at all clear that this is a natural reading of this lyric. Even

---

[5] Plaintiff claims that this interpretation is "disputed" and that the Court would require "vital witness testimony" in order to properly understand this lyric's meaning. Opp'n Br. at 18. Yet at oral argument, Plaintiff's counsel could not provide the Court with any alternative understanding of this lyric. Hr'g Tr. at 34:5-35:19. Furthermore, in "The Heart Part 6," Drake confirms that he understands Lamar to be referring to these preexisting rumors when Drake rapped, "Only f***in' with Whitneys, not Millie Bobby Browns, I'd never look twice at no teenager." Req. J. Not., Ex. O. To understand the relevant context for these back-and-forths, the Court takes judicial notice of the fact that Millie Bobby Brown is a well-known actress, and that she has given interviews stating that she and Drake formed a friendship when she was 14 years old and he was 32 years old. *See, e.g.*, Lynn Hirschberg, *Millie Bobby Brown Is Already an Icon For Her Generation*, W MAGAZINE, accessed at https://www.wmagazine.com/story/millie-bobby-brown-w-magazine-cover-interview [https://perma.cc/R8GR-CW5S].

if this line was susceptible to such an interpretation standing alone, however, no reasonable listener could understand it in this way given the overall context. Indeed, during this rap battle, Drake and Lamar each used similar hyperbolic threatening language. *See, e.g.*, Req. J. Not., Ex. K ("But don't tell no lie about me and I won't tell truths 'bout you"); Ex. M ("Your darkest secrets are comin' to light"); Ex. N ("I been in this industry twelve years, I'ma tell y'all one lil' secret/It's some weird s*** goin' on and some of these artists be here to police it"); Ex. O ("I got your f***ing lines tapped, I swear that I'm dialed in/ . . . What about the bones we dug up in that excavation?"). This kind of posturing in a rap diss track does not make such lines more likely to be understood by the ordinary listener to be anything but pure opinion.

## II.    Second Degree Harassment

New York does not recognize a civil cause of action for harassment. *Ralin v. City of New York*, 844 N.Y.S.2d 83, 84 (2d Dep't 2007) ("New York does not recognize a cause of action to recover damages for harassment."); *Wells v. Town of Lenox*, 974 N.Y.S.2d 591, 593 (3d Dep't 2013) ("With regard to the alleged harassment, New York does not recognize a common-law cause of action to recover damages for harassment" (cleaned up)). Notwithstanding this precedent, Plaintiff attempts to bring a claim for harassment under section 240.26(3) of the New York Penal Code. A person commits harassment in the second degree when they hold the "intent to harass, annoy or alarm another person" and "engage[] in a course of conduct or repeatedly commit[] acts which alarm or seriously annoy such other

29

SPA-30

person and which serve no legitimate purpose." N.Y. Pen. Law § 240.26(3). Plaintiff alleges that the Recording, Video and Image "individually and collectively provide a call to target Drake, including through violence," Am. Compl., ¶ 249, and that Defendant's "course of conduct in publishing specific and unequivocal threats of violence has placed Plaintiff in reasonable fear of physical harm," *id.*, ¶ 250. This state criminal statute does not provide a private right of action, however. Accordingly, Plaintiff fails to state a claim for harassment.

Under New York law, "[w]here a penal statute does not expressly confer a private right of action on individuals pursuing civil relief, recovery under such a statute 'may be had only if a private right of action may fairly be implied.'" *Hammer v. Am. Kennel Club*, 1 N.Y.3d 294, 299 (2003). To determine whether a criminal statute gives rise to a private right of action, courts look at three factors: "(1) plaintiff must be one of the class for whose benefit the statute was enacted; (2) recognition of a private right of action must promote the legislative purpose; and (3) creation of such a right must be consistent with the legislative scheme." *Id.* (cleaned up).

The third factor's bar is high because, "[a]s a general rule, when a statute is contained solely within the Penal Law Section, the [New York] legislature intended it as a police regulation to be enforced only by a court of criminal jurisdiction." *Casey Sys., Inc. v. Firecom, Inc.*, No. 94 CIV. 9327 (KTD), 1995 WL 704964, at *3 (S.D.N.Y. Nov. 29, 1995). Thus, "[r]arely is there a private right of action under a criminal statute." *Senese v. Hindle*, No. 11-CV-0072 (RJD), 2011 WL 4536955, at

30

*11 (E.D.N.Y. Sept. 9, 2011); *see also Watson v. City of New York,* 92 F.3d 31, 36 (2d Cir. 1996) ("In the absence of any guidance from state courts, federal courts are hesitant to imply private rights of action from state criminal statutes.").

In *Hammer*, the New York Court of Appeals concluded that there was no private right of action under animal protection criminal statutes because "enforcement authority lies with police and societies for the prevention of cruelty to animals and violations [are] handled in criminal proceedings." *Id.* at 300. In light of this "comprehensive statutory enforcement scheme," recognizing a private right of action would be inconsistent with legislative intent. *Id.*; *see also Golden v. Diocese of Buffalo, NY*, 125 N.Y.S.3d 813, 816 (4th Dep't 2020) ("[R]ecognizing a private right of action [for criminal nuisance] would not be consistent with the existing mechanism for enforcing the statute, i.e., criminal prosecution.").

Consistent with this precedent, courts routinely dismiss civil harassment claims as not cognizable under New York law. *See, e.g.*, *Cablevision Sys. Corp. v. Communic'ns Workers of Am. Dist.*, 16 N.Y.S.3d 753, 754 (2d Dep't 2015) (applying *Hammer* to uphold dismissal of harassment claim based on Penal Law); *Broadway Cent. Prop. Inc. v. 682 Tenant Corp.*, 749 N.Y.S.2d 225, 227 (1st Dep't 2002) ("New York does not recognize a civil cause of action for harassment."); *see also Masic v. Town of Franklinville, New York*, No. 1:24-CV-18-GWC, 2025 WL 2480898, at *16 (W.D.N.Y. Aug. 27, 2025) (applying *Hammer* to find there is no implied right of action under section 240.26); *Stathatos v. William Gottlieb Mgmt.*, No. 18-CV-03332 (KAM) (RER), 2020 WL 1694366, at *4 (E.D.N.Y. Apr. 6, 2020) ("[P]laintiff's

allegations of perjury, witness intimidation, witness or evidence tampering, and harassment are criminal charges without a private right of action.").

While Plaintiff cites cases in which courts have recognized a private right of action for criminal harassment under New York law, *see* Opp'n Br. at 26 n.15, most of this authority predates *Hammer*. As for the two cited cases that post-date *Hammer*, *Baiqiao Tang v. Wengui Guo*, No. 17 Civ. 9031 (JFK), 2019 WL 6169940, at *6 (S.D.N.Y. Nov. 20, 2019), and *Blasetti v. Pietropolo*, 213 F. Supp. 2d 425, 428 (S.D.N.Y. 2002), neither of those cases mention *Hammer* or engage in the analysis required by the New York Court of Appeals to imply a private right of action from a provision of the Penal Law.[6]

There is nothing to distinguish criminal harassment from other provisions of the New York criminal code for which there is no implied private right of action. The New York legislature conferred authority to enforce the criminal harassment statute upon local law enforcement. *Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 71 (2013) ("We have therefore declined to recognize a private right of action in instances where the Legislature specifically considered and expressly provided for enforcement mechanisms in the statute itself." (cleaned up)). There are no indications in the statutory scheme that the legislature intended to confer a civil

_____

[6] For example, *Baiqiao Tang*'s discussion of this issue is limited to a single sentence, a quotation from *Blasetti v. Pietropolo*. *Blasetti*, in turn, simply states that an implied cause of action exists without engaging in further analysis and cites as support for this proposition cases that predate *Hammer*. Further, an examination of the cases on which *Blasetti* relies likewise finds that none conducted the analysis required under New York law. The Court does not find these authorities persuasive.

cause of action for violation of section 240.26.  Plaintiff's claim for harassment must therefore be dismissed.

### III.  New York General Business Law Section 349

Plaintiff's final cause of action, brought under section 349 of New York General Business Law ("GBL"), fares no better.  Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."  Plaintiff alleges that, "on information and belief," Defendant "engaged in deceptive acts and practices in the conduct of business, trade, and commerce by covertly financially incentivizing third parties—including music platforms and social media influencers—to play, stream, and promote the Recording."  Am. Compl., ¶ 256; *see also id.*, ¶¶ 13, 148, 152, 182-83.  As one example, Plaintiff alleges that he "understands" that UMG covertly paid a popular NFR Podcast to promote the Recording and publish podcast episodes and other content about the Recording.  *Id.*, ¶ 182.  On information and belief, Plaintiff further claims that UMG used its resources to incentivize third parties to use bots to stream the Recording and subsequently extolled the Recording's streaming numbers on Spotify while knowing that millions of the streams were false and fraudulent.  *Id.*, ¶¶ 227-29, 257.  Lastly, the Amended Complaint alleges that UMG paid at least one radio promoter to engage in pay-for-play arrangements, or "payola," of the Recording on New York radio stations.  *Id.*, ¶¶ 184-85, 258.

To successfully state a claim under section 349, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are

misleading in a material way, and (3) the plaintiff has been injured as a result." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020) (quotations and citations omitted). Plaintiff asserts that Defendant's deceptive acts and practices were intended to inflate the public's view of the Recording's popularity and success, which would lead a reasonable consumer of music to be materially misled. Am. Compl., ¶ 259.

Defendant first argues that Plaintiff uses an improper pleading device, as his section 349 allegations all rest upon information and belief and do not go beyond "pure conjecture and speculation." ECF No. 43 at 22-23 (quoting *Boehm v. Sportsmem, LLC*, No. 18-CV-556 (JMF), 2019 WL 3239242, at *2 n.1 (S.D.N.Y. July 18, 2019)). Plaintiff counters that the applicable standard is plausibility under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Opp'n Br. at 23; *see also* Hr'g Tr. 43:15-22.

"*Twombly* does not prevent a plaintiff from pleading facts 'on information and belief' in appropriate circumstances," *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 526 (S.D.N.Y. 2013), but the plaintiff may only do so "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible," *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (cleaned up). In that scenario, the allegations "must be accompanied by a statement of the facts upon which the belief is founded." *Pakter*, 931 F. Supp. 2d at 527 (cleaned up).

Plaintiff argues that both *Pakter* conditions are satisfied because the Amended Complaint alleges that UMG made indirect payments to a wide array of unknown third parties and also "pleads sufficient 'factual information' concerning UMG's scheme, including examples thereof, contemporary reports, as well as UMG's past practices." Opp'n Br. at 23. At oral argument, Plaintiff stressed that "Not Like Us" was the fastest song to reach 300 million streams on Spotify within just thirty-five days, which Plaintiff argues is a sufficient basis for the Court to infer that Defendant implemented a technique to manipulate stream totals, among other "unprecedented tactics," to reach "unprecedented rocketing up the streaming chart." Hr'g Tr. 43:23-44:18.

The Court disagrees. To allege that UMG implemented covert practices to manipulate streams of "Not Like Us" and inflate the Recording's perceived popularity, Plaintiff relies on Tweets[7] by individual users and reporting from fans to allege that UMG utilized covert tactics to manipulate streams of "Not Like Us." Am. Compl., ¶¶ 180-183; *see also* Hr'g Tr. 45:22-46:2. The Court finds Plaintiff's reliance on online comments and reporting insufficient to meet the plausibility standard. *See Castenada v. Amazon.com, Inc.*, 679 F. Supp. 3d 739, 750-51 (N.D. Ill. 2023) (finding that "[w]hen it comes to particularity (and plausibility, too), the experience of a no-name person" from a small set of anonymous customer reviews "does not add much heft to the complaint"); *Doe v.*

---

[7] Tweets are now known as Posts on X. X was formerly known as Twitter, where users could post their writings and media as a "Tweet."

*Kamehameha Sch./Bernice Pauahi Bishop Estate*, Civ. No. 08–00359 JMS–BMK, 2008 WL 5423191, at *3 (D. Haw. Dec. 31, 2008) (finding a lack of probity from anonymous online comments that "invite[] commentators to make outrageous statements under a veil of secrecy"). A small sample of users' possible experience, communicated through Tweets and other anonymized commentary, fails to establish a plausible inference that UMG manipulated listeners into streaming "Not Like Us" instead of Drake's music.

While these covert practices of providing financial incentives to undisclosed third parties and leveraging of business relationships, if they exist, may be facts that are "peculiarly within the possession and control of" UMG, Plaintiff's allegations —based on what boils down to unreliable online commentary —do not form a "sufficient factual basis such that there is a 'reasonable expectation that discovery will reveal evidence of illegality.'" *Asset Co IM Rest, LLC v. Katzoff*, No. 23 Civ. 9691 (JPC), 2025 WL 919489, at *11 (S.D.N.Y. Mar. 26, 2025) (quoting *Arista Records*, 604 F.3d at 120). Ultimately, Plaintiff fails to provide any facts or circumstances that would make it "highly plausible" that UMG conducted such covert business tactics. *Moraes v. White*, 571 F. Supp. 3d 77, 103 (S.D.N.Y. 2021).

Even if the Court accepted Plaintiff's pleadings on information and belief, Plaintiff still has not stated a claim for relief under section 349. Plaintiff has not sufficiently alleged deceptive practices that are consumer oriented. "Under New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property primarily for personal,

36

family or household purposes." *McCracken v. Verisma Sys., Inc.*, 131 F. Supp. 3d 38, 46 (W.D.N.Y. 2015) (cleaned up). "A defendant engages in 'consumer-oriented' activity if the company's actions cause any consumer injury or harm to the public interest. *Anderson v. Unilever U.S., Inc.*, 607 F. Supp. 3d 441, 451 (S.D.N.Y. 2022) (cleaned up). While section 349 does not preclude an action brought by one business competitor against another, it is at its core a "consumer protection device." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995).

The Amended Complaint does not indicate how any of the deceptive practices allegedly utilized by UMG harmed consumers. For example, the Amended Complaint does not allege that consumers paid more than they otherwise would have for a product, purchased a product that they otherwise would not have because of misrepresentations regarding the product, or otherwise received less in value for any purchases that they did make. *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 102 (2d Dep't 2012) (holding that section 349 is limited to deceptive practices that "pertain[] to an issue that may bear on a consumer's decision to participate in a particular transaction" or which "undermine a consumer's ability to evaluate his or her market options and to make a free and intelligent choice"). The Amended Complaint is somewhat vague as to who the class of consumers is and what product, goods, or services they are purchasing. It is not clear how the alleged redirection of Spotify "users who are searching for other unrelated songs and artists" to the Recording would amount to actual harm of consumers or any limitation of their choices. At most, the allegations suggest that

SPA-38

UMG engaged in practices to make "Not Like Us" seem more popular than it actually was, without connecting that activity to any consumer harm. Such practices, without more, do not state a claim under section 349 of the GBL.

## CONCLUSION

Defendant's motion to dismiss is GRANTED. The Clerk of the Court is respectfully directed to terminate ECF Nos. 42, 78, and 81, and to close the case.

SO ORDERED.

Dated: October 9, 2025
New York, New York

_____
JEANNETTE A. VARGAS
United States District Judge

SPA-39

§ 240.26 Harassment in the second degree, NY PENAL § 240.26

KeyCite Yellow Flag

Unconstitutional or Preempted  Prior Version Recognized as Unconstitutional by   People v. Singh,   N.Y.City Crim.Ct.,   Feb. 20, 2001

KeyCite Yellow Flag
Proposed Legislation

> McKinney's Consolidated Laws of New York Annotated
>     Penal Law (Refs & Annos)
>         Chapter 40. Of the Consolidated Laws (Refs & Annos)
>             Part Three. Specific Offenses
>                 Title N. Offenses Against Public Order, Public Sensibilities and the Right to Privacy
>                     Article 240. Offenses Against Public Order (Refs & Annos)

McKinney's Penal Law § 240.26

§ 240.26 Harassment in the second degree

Currentness

A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person:

1. He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same; or

2. He or she follows a person in or about a public place or places; or

3. He or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose.

Subdivisions two and three of this section shall not apply to activities regulated by the national labor relations act, [1] as amended, the railway labor act, [2] as amended, or the federal employment labor management act, [3] as amended.

Harassment in the second degree is a violation.

**Credits**
(Formerly § 240.25, L.1965, c. 1030. Amended L.1967, c. 791, § 41; L.1988, c. 86, § 2. Renumbered and amended L.1992, c. 345, §§ 3, 4; L.1994, c. 109, § 1.)

**Editors' Notes**

### SUPPLEMENTARY PRACTICE COMMENTARIES

*by William C. Donnino*

**Culpable Mental State**

In *People v. Lagano,* 39 N.Y.3d 108, 181 N.Y.S.3d 174, 201 N.E.3d 791 (2022), the defendant was convicted of violating subdivision (1) of Penal Law § 240.26 [with intent to harass, annoy or alarm, he threatened the complainant with physical contact]. The question presented was whether the defendant in a telephone conversation in fact threatened the complainant.

With respect to the required nature of a threat, the Court explained:

"the statute criminalizes a 'true threat,' not mere angry words; hence 'genuine threats of physical harm fall within the scope of the statute [while] an outburst, without more, does not' .... A 'true threat' is one that a reasonable person in the victim's position would consider to be an unequivocal statement of intended physical harm." *Id.* at 112.

In *Lagano*, the Court found that the defendant by telephone made "specific and unequivocal" threats to D.D., his former intimate partner--"the type of statements that a reasonable person in D.D.'S position, knowing that defendant was an armed police officer who was trained in the use of deadly force and who believed her to be unfaithful and an extortionist, would commonly understand as words describing intended violent action and not a crude outburst, puffery, or bluffs." *Id.* at 112.

With respect to the defendant's claim that "his statements did not communicate an immediate threat of physical harm--a present danger--the statute does not include a temporal requirement. The timing of the threatened action may go to whether it is a real and unequivocal threat, but does not foreclose a factual finding that the threat is genuine in nature." *Id. at* 113.

After *Lagano*, the United States Supreme Court decided *Counterman v. Colorado*, 600 U.S. 66, 143 S.Ct. 2106, 216 L.Ed.2d 775 (2023), holding that the First Amendment required, before a person could be held accountable for a communication which produced a subjective fear in the recipient, that the actor had to have "some subjective understanding of the threatening nature of his statements," and deemed a mental state of "recklessness" sufficient--meaning, the "State must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence. The State need not prove any more demanding form of subjective intent to threaten another." By contrast to Colorado's statute, the New York statute requires an "intent" (i.e., a "conscious objective" [Penal Law § 15.05[1]]) to harass, annoy, or alarm the recipient of the purported threat; thus, if it is a "true threat," the defendant's "conscious objective" to harass, annoy, or alarm may permit the inference that he "consciously disregarded a substantial risk that his communications would be viewed as threatening violence."

**PRACTICE COMMENTARIES**

*by William C. Donnino*

When the Penal Law was enacted in 1965, "harassment," as defined in this statute, was set forth in Penal Law former § 240.25 as a single-degree offense. It was then composed of five subdivisions. Ultimately, two subdivisions were repealed (two and four) and two subdivisions (three and five) were renumbered two and three, respectively, and in 1992, the single-degree offense was divided into two degrees, with the single-degree harassment statute renumbered Penal Law § 240.26 and designated "harassment in the second degree," and the "harassment in the first degree" statute added as Penal Law § 240.25. L.1992, c. 345.

§ 240.26 Harassment in the second degree, NY PENAL § 240.26

---

***Culpable Mental State***

Harassment is akin to disorderly conduct; but it "is directed toward an individual rather than toward the public in general" [*People v. Todaro*, 26 N.Y.2d 325, 330, 258 N.E.2d 711, 713 (1970)]; it "does not require any intent or likelihood of public disorder, as in disorderly conduct, but an intent to 'harass, annoy or alarm' an individual." Staff Notes of the Commission on Revision of the Penal Law. Proposed New York Penal Law. McKinney's Spec. Pamphlet. (1964), p. 389.

An information charging "harassment in the second degree" is "jurisdictionally defective" if it fails to recite that the acts were done with " 'intent to harass, annoy or alarm'." *People v. Hall*, 48 N.Y.2d 927, 928, 425 N.Y.S.2d 56, 401 N.E.2d 179 (1979).

The issue is not whether a particular person has been harassed, annoyed or alarmed by the actor's conduct, but rather whether the actor intended to harass, annoy or alarm an individual. In *People v. Concannon*, 28 N.Y.2d 854, 322 N.Y.S.2d 251, 271 N.E.2d 229 (1971), for example, the defendant (Mrs. Barbara Concannon) picketed her husband's office to protest his lack of support. She, as well as her children, carried signs which inter alia read: "Daddy, why did you sell your car to Mr. & Mrs. Dieckhoff?" Mrs. Dieckhoff was employed in the office of the defendant's husband, and Mrs. Dieckhoff, not the defendant's husband, filed the harassment complaint. The Court of Appeals held that the evidence did "not establish that defendant intended to harass the complainant," Mrs. Dieckhoff, in violation of what is presently subdivision three of the instant section. *See also People v. Jemzura*, 29 N.Y.2d 590, 324 N.Y.S.2d 315, 272 N.E.2d 897 (1971) (the evidence did not establish that the defendant intended to harass, annoy or alarm a judge when the defendant attempted to make a citizen's arrest of the judge).

**Subdivision (1)**

The "crux" of subdivision one is the "element of physical contact: actual, attempted or threatened." *People v. Bartkow*, 96 N.Y.2d 770, 772, 725 N.Y.S.2d 589, 749 N.E.2d 158 (2001). While related to assaultive conduct, under the current Penal Law, a consummated assault requires that the actor at least cause "physical injury," i.e., the "impairment of physical condition or substantial pain" [Penal Law § 10.00(9)]. The definition of "physical injury" was, however, intended to exclude such things as "petty slaps, shoves, kicks and the like." Staff Notes of the Commission on Revision of the Penal Law. Proposed New York Penal Law. McKinney's Spec. Pamphlet (1964), p. 330. *See* Practice Commentary to Penal Law article 120. Thus, if such conduct is committed or attempted "with intent to harass, annoy or alarm," it is more appropriately prosecuted as the violation of "harassment in the second degree" rather than assault. And a "single incident" of such conduct is "legally sufficient to support a finding of harassment in the second degree." *Tamara A. v. Anthony Wayne S.*, 110 A.D.3d 560, 561, 974 N.Y.S.2d 48, 49 (1st Dept. 2013).

The last portion of subdivision one is directed at a person who "threatens" to strike, shove, kick or otherwise subject another to physical contact. While "genuine threats of physical harm," when coupled with the requisite mens rea, may fall within the scope of the statute, a single threat to "beat the crap out of" someone with nothing demonstrating that the threat was "either serious, should reasonably have been taken to be serious, or was confirmed by other words or acts showing that it was anything more than a crude outburst," would be insufficient to support a conviction under subdivision one. *People v. Dietze*, 75 N.Y.2d 47, 53-54, 550 N.Y.S.2d 595, 549 N.E.2d 1166 (1989). *Compare People v. Vega*, 95 A.D.3d 773, 945 N.Y.S.2d 288 (1st Dept. 2012) (the evidence of second-degree harassment was sufficient where the victim had previously been hurt by the defendant and on the instant occasion the defendant "walked 'very close' to her [the victim's] face, and threatened that 'this wasn't over yet,' 'that it was going to get worse' and that she [the defendant] 'was going to finish off what she had started' ").

**Subdivision (2)**

This subdivision (formerly subdivision three) was new to the current Penal Law, and covers a form of stalking, by following a person in or about a public place with the requisite intent. In 1992 and 1999, in recognition of the seriousness of stalking and the inadequate deterrence and punishment for such conduct found in this subdivision, separate statutes specifically directed at this conduct and other forms of stalking were enacted, including the addition of "harassment in the first degree" [Penal Law § 240.25]. *See* Practice Commentary to Penal Law § 240.25, and Penal Law §§ 120.14 (Menacing) and 120.40 (Stalking).

**Subdivision (3)**

This is a catchall subdivision (formerly subdivision five) comparable to the last subdivision of the disorderly conduct section [Penal Law § 240.20(7)]. It was "deemed necessary because of the impossibility of compiling a comprehensive list of the numerous specific kinds of conduct logically falling within the proscriptions of the 'harassment' offense." Staff Comments of the Commission on Revision of the Penal Law. Revised Penal Law. McKinney's Spec. Pamphlet (1965), p. 300. The offense, however, requires a "course of conduct" or repeated acts; thus, one isolated incident will not suffice. *See also People v. Chasserot*, 30 N.Y.2d 898, 335 N.Y.S.2d 442, 286 N.E.2d 925 (1972)(one telephone call in which the defendant made threats against the complainant was not harassment); *People v. Otto*, 40 N.Y.2d 864, 387 N.Y.S.2d 1010, 356 N.E.2d 481 (1976) (the defendant, a former union member, did not commit harassment when he disrupted the office routine at the union hall and refused to leave when requested to do so by the business manager); *People v. Valerio*, 60 N.Y.2d 669, 468 N.Y.S.2d 100, 455 N.E.2d 659 (1983) (the defendant did not commit harassment when, while picketing a union headquarters, the defendant pointed to a union official as he left the building and in a loud voice called him corrupt).

For a further discussion of the element "course of conduct," in an analogous statute, *see People v. Stuart*, 100 N.Y.2d 412, 427, 765 N.Y.S.2d 1, 797 N.E.2d 28 (2003) and the Practice Commentary to Penal Law § 120.40 under the heading, "Stalking in the fourth degree."

*Stuart* viewed the element of "no legitimate purpose" to mean "the absence of a reason or justification to engage someone, other than to hound, frighten, intimidate or threaten." *Id.* at 428.

**Proviso**

In 1994, the harassment in the first and second degree statutes were amended to add a proviso to exclude "activities" regulated by the National Labor Relations Act, the Railway Labor Act, or the Federal Employment Labor Management Act, "such as picketing, [which] were not intended to be covered by the stalking provisions...." 1994 Governor's Approval Memorandum 109.

In 1999, the Clinic Access and Anti-Stalking Act added a subdivision four to Penal Law § 5.10, which by its terms applies to harassment in the first and second degree [L.1999, c. 635]. That subdivision four in part duplicates, in somewhat different form, the proviso presently found in this statute, and adds an express proviso exempting conduct, such as "peaceful picketing or other peaceful demonstration," which is "protected from legal prohibition by the federal and state constitutions." The proviso's reference to laws outside the instant statute and to matters which may be uniquely within a defendant's knowledge, normally indicates a legislative intent that the proviso be a defense, to be raised by the defense at trial before the People are required to disprove it beyond a reasonable doubt. *See People v. Kohut*, 30 N.Y.2d 183, 187, 331 N.Y.S.2d 416, 420, 282 N.E.2d 312 (1972); *People v. Santana*, 7 N.Y.3d 234, 237, 818 N.Y.S.2d 842, 851 N.E.2d 1193 (2006); *People v. Davis*, 13 N.Y.3d 17, 31-32, 884 N.Y.S.2d 665, 912 N.E.2d 1044 (2009). *See also* CJI2d (NY) Penal Law § 240.25 which does not list the provisos as elements of the offense.

SPA-43

§ 240.26 Harassment in the second degree, NY PENAL § 240.26

Notes of Decisions (409)

**Footnotes**

1    29 USCA § 151 et seq.

2    45 USCA § 151 et seq.

3    So in original. Probably refers to the Federal Service Labor-Management Relations Act, 5 USCA § 7101 et seq.

McKinney's Penal Law § 240.26, NY PENAL § 240.26
Current through L.2025 chapters 1 to 669. Some statute sections may be more current, see credits for details.

**End of Document**          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

SPA-44

§ 349. Deceptive acts and practices unlawful, NY GEN BUS § 349

🚩 KeyCite Red Flag

Enacted Legislation   Amended by   2025 Sess. Law News of N.Y. Ch. 708 (S. 8416) (McKINNEY'S),

🚩 KeyCite Yellow Flag
Unconstitutional or Preempted

🚩 KeyCite Yellow Flag
Proposed Legislation

McKinney's Consolidated Laws of New York Annotated
    General Business Law (Refs & Annos)
        Chapter 20. Of the Consolidated Laws
            Article 22-a. Consumer Protection from Deceptive Acts and Practices (Refs & Annos)

McKinney's General Business Law § 349

§ 349. Deceptive acts and practices unlawful

Effective: March 31, 2014 to February 16, 2026
Currentness

(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

(b) Whenever the attorney general shall believe from evidence satisfactory to him that any person, firm, corporation or association or agent or employee thereof has engaged in or is about to engage in any of the acts or practices stated to be unlawful he may bring an action in the name and on behalf of the people of the state of New York to enjoin such unlawful acts or practices and to obtain restitution of any moneys or property obtained directly or indirectly by any such unlawful acts or practices. In such action preliminary relief may be granted under article sixty-three of the civil practice law and rules.

(c) Before any violation of this section is sought to be enjoined, the attorney general shall be required to give the person against whom such proceeding is contemplated notice by certified mail and an opportunity to show in writing within five business days after receipt of notice why proceedings should not be instituted against him, unless the attorney general shall find, in any case in which he seeks preliminary relief, that to give such notice and opportunity is not in the public interest.

(d) In any such action it shall be a complete defense that the act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any official department, division, commission or agency of the United States as such rules, regulations or statutes are interpreted by the federal trade commission or such department, division, commission or agency or the federal courts.

(e) Nothing in this section shall apply to any television or radio broadcasting station or to any publisher or printer of a newspaper, magazine or other form of printed advertising, who broadcasts, publishes, or prints the advertisement.

(f) In connection with any proposed proceeding under this section, the attorney general is authorized to take proof and make a determination of the relevant facts, and to issue subpoenas in accordance with the civil practice law and rules.

SPA-45

§ 349. Deceptive acts and practices unlawful, NY GEN BUS § 349

(g) This section shall apply to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state, and shall not supersede, amend or repeal any other law of this state under which the attorney general is authorized to take any action or conduct any inquiry.

(h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

(j) Notwithstanding any law to the contrary, all monies recovered or obtained under this article by a state agency or state official or employee acting in their official capacity shall be subject to subdivision eleven of section four of the state finance law.

**Credits**
(Added L.1970, c. 43, § 2, eff. Sept. 1, 1970. Amended L.1980, c. 346, § 1; L.1984, c. 157, § 1; L.2014, c. 55, pt. HH, § 6, eff. March 31, 2014.)

**Editors' Notes**

**VALIDITY**

<For validity of this section, see Critcher v. L'Oreal USA, Inc., 959 F.3d 31 (2d Cir. 2020); National Institute for Family and Life Advocates et al v. James, 746 F.Supp.3d 100 (W.D.N.Y 2024).>

Notes of Decisions (2424)

McKinney's General Business Law § 349, NY GEN BUS § 349
Current through L.2025 chapters 1 to 669. Some statute sections may be more current, see credits for details.