# 25-2758

## IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

AUBREY DRAKE GRAHAM,

*Plaintiff-Appellant,*

v.

UMG RECORDINGS, INC.,

*Defendant-Appellee.*

On Appeal From the United States District Court
for the Southern District of New York (Vargas, J.)

### BRIEF FOR DEFENDANT-APPELLEE

ROLLIN A. RANSOM
SIDLEY AUSTIN LLP
350 South Grand Avenue
Los Angeles, C.A. 90071
(213) 896-6000

EAMON P. JOYCE
NICHOLAS P. CROWELL
KATELIN EVERSON
JAMES R. HORNER
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, N.Y. 10019
(212) 839-5300

*Counsel for Defendant-Appellee UMG Recordings, Inc.*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

UMG Recordings, Inc. is a wholly-owned indirect subsidiary of Universal Music Group, N.V., a Netherlands public limited company. No other publicly-held company owns 10% or more of the stock of UMG Recordings, Inc. Bollere SE is a publicly traded company organized under the laws of France and owns more than 10% of Universal Music Group, N.V.'s stock. No other publicly-held company owns 10% or more of Universal Music Group, N.V.'s stock.

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

STATEMENT OF THE ISSUES ............................................................... 3

STATEMENT OF THE CASE .................................................................. 3

I.    Factual Background .......................................................................... 3

        A.    The Parties ............................................................................ 3

        B.    The Rap Beef ......................................................................... 3

        C.    "Not Like Us" Is A Massive Success ....................................... 9

II.    Procedural History ........................................................................ 10

SUMMARY OF THE ARGUMENT ......................................................... 13

STANDARD OF REVIEW ...................................................................... 15

ARGUMENT ......................................................................................... 16

I.    The Court Properly Dismissed Drake's Defamation Claim ......... 16

        A.    "Not Like Us" is Nonactionable Opinion ............................... 16

                1.    The Rap Diss Track Forum Strongly Conveys
                      Opinion ..................................................................... 19

                2.    The Broader Context Likewise Confirms that "Not Like
                      Us" is Nonactionable Opinion .................................... 26

                3.    The Tone and Language of "Not Like Us" Signal
                      Nonactionable Opinion ............................................... 34

        B.    "Not Like Us" Is Not Mixed Opinion ..................................... 37

        C.    Drake's Remaining Defamation Arguments Fail .................. 41

                1.    Drake Misstates the Test for Assessing Fact or Opinion
                      in Context .................................................................. 42

                 2.    The District Court Correctly Took Judicial Notice of
                      the Other Songs in the Feud ...................................... 46

                 3.    Drake's Republication Argument is Meritless ............ 49

II.    The Court Properly Dismissed Drake's Harassment Claim ......... 55

        A.    Penal Law § 240.26 Does Not Create an Implied Private
             Right of Action ..................................................................... 56

1.      A Private Right of Action is Inconsistent with the Legislative Scheme ...................................................... 57

2.      Drake's Reliance on Galella Does Not Save His Claim .................................................................. 60

B.      Drake Fails to Allege a Penal Law Violation ......................... 61

III.    The Court Properly Dismissed Drake's GBL Claim ...................... 62

A.      Drake Does Not Allege Deceptive Conduct .......................... 63

B.      Drake Fails to Allege Consumer-Oriented Conduct ............. 67

C.      Drake Fails to Allege An Injury Caused by UMG ................ 68

CONCLUSION ................................................................................... 70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*600 W. 115th St. Corp. v. Von Gutfeld,*
80 N.Y.2d 130 (1992)................................................................34, 45

*Albert v. Loksen,*
239 F.3d 256 (2d Cir. 2001) ............................................................40

*Amigo Shuttle Inc. v. Port Auth. of N.Y. & N.J.,*
2025 WL 2618862 (2d Cir. Sep. 11, 2025).......................................64

*Bellin v. Zucker,*
6 F.4th 463 (2d Cir. 2021)................................................................15

*Biro v. Conde Nast,*
883 F. Supp. 2d 441 (S.D.N.Y. 2012)...............................................17

*Boykin v. KeyCorp,*
521 F.3d 202 (2d Cir. 2008) ............................................................65

*Brian v. Richardson,*
87 N.Y.2d 46 (1995)................................................................. *passim*

*Burns Jackson Miller Summit & Spitzer v. Lindner,*
59 N.Y.2d 314 (1983).......................................................................60

*Cablevision Sys. Corp. v. Commc'ns Workers of Am. Dist. 1,*
16 N.Y.S.3d 753 (2d Dep't 2015) .....................................................59

*City of New York v. Smokes-Spirits.Com, Inc.,*
12 N.Y.3d 616 (2009)...........................................................67, 68, 69

*Clomon v. Jackson,*
988 F.2d 1314 (2d Cir. 1993) ..........................................................44

*Coleman v. Grand,*
158 F.4th 132 (2d Cir. 2025)...............................................16, 18, 48

*Condit v. Dunne,*
    2008 WL 2676306 (S.D.N.Y. July 8, 2008) .......................................... 51

*Cooper v. Franklin Templeton Invs.,*
    2023 WL 3882977 (2d Cir. June 8, 2023) ............................... 17, 39, 51

*Cort v. Ash,*
    422 U.S. 66 (1975) ........................................................................... 60

*Cruz v. TD Bank, N.A.,*
    22 N.Y.3d 61 (2013) ......................................................................... 57

*Davis v. Boeheim,*
    24 N.Y.3d 262 (2014) ............................................................ 18, 44, 45

*Dorce v. City of New York,*
    2 F.4th 82 (2d Cir. 2021) ................................................................. 47

*Firth v. State,*
    98 N.Y.2d 365 (2002) ................................................................ 50, 51

*Galella v. Onassis,*
    487 F.2d. 986 (2d Cir. 1973) ...................................................... 60, 61

*Gisel v. Clear Channel Commc'ns, Inc.,*
    942 N.Y.S.2d 751 (4th Dep't 2012) .................................................. 39

*Goshen v. Mut. Life Ins. Co.,*
    98 N.Y.2d 314 (2002) ....................................................................... 67

*Gross v. N.Y. Times Co.,*
    82 N.Y.2d 146 (1993) ................................................................. *passim*

*Hammer v. Am. Kennel Club,*
    1 N.Y.3d 294 (2003) ................................................................... 56, 57

*Hartman v. 536/540 E. 5th St. Equities, Inc.,*
    797 N.Y.S.2d 73 (1st Dep't 2005) .................................................... 59

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP
    v. Matthew Bender & Co.,*
    37 N.Y.3d 169 (2021) ................................................................. 63, 68

*Hobbs v. Imus,*
698 N.Y.S.2d 25 (1st Dep't 1999) ......................................................22

*Hobish v. AXA Equit. Life Ins. Co.,*
205 N.Y.S.3d 395 (1st Dep't 2024).....................................................69

*Immuno AG. v. Moor-Jankowski,*
77 N.Y.2d 235 (1991).................................................................. *passim*

*Jankowicz v. Fox News Network, LLC,*
2025 WL 2630572 (3d Cir. Sep. 12, 2025).........................................34

*Jones v. Atl. Recs.,*
2023 WL 5577282 (S.D.N.Y. Aug. 29, 2023) .....................................47

*Kajoshaj v. N.Y. City Dep't of Educ.,*
543 F. App'x 11 (2d Cir. 2013) ..........................................................65

*Konkur v. Utica Acad. of Sci. Charter Sch.,*
38 N.Y.3d 38 (2022)..................................................................... 56, 57

*LaNasa v. Stiene,*
2025 WL 893456 (2d Cir. Mar. 24, 2025).............................. 17, 38, 39

*Levin v. McPhee,*
119 F.3d 189 (2d Cir. 1997) ..............................................................42

*Long v. Beneficial Fin. Co.,*
330 N.Y.S.2d 664 (4th Dep't 1972) ...................................................60

*Mann v. Abel,*
10 N.Y.3d 271 (2008)..........................................................................16

*Metz v. State,*
20 N.Y.3d 175 (2012).........................................................................58

*Millus v. Newsday, Inc.,*
89 N.Y.2d 840 (1996).........................................................................18

*Mr. Chow of N.Y. v. Ste. Jour Azur S.A.,*
759 F.2d 219 (2d Cir. 1985) ..............................................................17

vi

*New York v. Feldman,*
  210 F. Supp. 2d 294 (S.D.N.Y. 2002)...............................................68

*Ortiz v. Ciox Health LLC,*
  37 N.Y.3d 353 (2021)......................................................57, 58, 59

*Pahuta v. Massey-Ferguson, Inc.,*
  170 F.3d 125 (2d Cir. 1999) .......................................................59, 60

*Palin v. N.Y. Times Co.,*
  940 F.3d 804 (2d Cir. 2019) .............................................................45

*People v. Marquan M.,*
  24 N.Y.3d 1 (2014).........................................................................62

*People v. Stuart,*
  100 N.Y.2d 412 (2003).....................................................................62

*Plavin v. Grp. Health Inc.,*
  35 N.Y.3d 1 (2020)...........................................................................68

*Pyskaty v. Wide World of Cars, LLC,*
  856 F.3d 216 (2d Cir. 2017) .............................................................64

*Ralin v. City of New York,*
  844 N.Y.S.2d 83 (2d Dep't 2007) .......................................................59

*Rapaport v. Barstool Sports, Inc.,*
  2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021)............................... *passim*

*Rapaport v. Barstool Sports Inc.,*
  2024 WL 88636 (2d Cir. Jan. 9, 2024) ...................................... *passim*

*Russello v. United States,*
  464 U.S. 16 (1983)........................................................................58, 59

*Schlessinger v. Valspar Corp.,*
  21 N.Y.3d 166 (2013)........................................................................58

*Sheehy v. Big Flats Cmty. Day, Inc.,*
  73 N.Y.2d 629 (1989).......................................................................61

vii

*Small v. Lorillard Tobacco Co.*,
  94 N.Y.2d 43 (1999)................................................................ 68

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ...................................... 26, 46

*Steinhilber v. Alphonse*,
  68 N.Y.2d 283 (1986)............................................... *passim*

*Sweeney v. Prisoners' Legal Servs. of N.Y., Inc.*,
  538 N.Y.S.2d 370 (3d Dep't 1989) .................................... 44

*Talbert v. Tynes*,
  2026 WL 739736 (1st Dep't Mar. 17, 2026) ............... 22, 43

*Torain v. Liu*,
  279 F. App'x 46 (2d Cir. 2008)............................... 17, 31, 49

*Torain v. Liu*,
  2007 WL 2331073 (S.D.N.Y. Aug. 16, 2007) ............... 39, 40

*Valley Elecs. AG v. Polis*,
  2022 WL 893674 (2d Cir. Mar. 28, 2022)........................... 34

*Woodbridge Structured Funding, LLC v. Pissed Consumer*,
  6 N.Y.S.3d 2 (1st Dep't 2015) ...................................... 38, 39

*Yamashita v. Scholastic Inc.*,
  936 F.3d 98 (2d Cir. 2019) .................................................. 64

*Zuckerbrot v. Lande*,
  167 N.Y.S.3d 313 (N.Y. Sup. 2022) .................................. 45

**Statutes**

N.Y. Civ. Rights Law § 40-c ................................................ 58

N.Y. Civ. Rights Law § 40-d................................................ 58

N.Y. Civ. Rights Law § 79-n............................................... 58

N.Y. Penal Law § 10.00............................................... 57, 58

viii

N.Y. Penal Law § 240.26 ..............................................................56, 57, 62

**Rules**

Fed. R. Evid. 201.................................................................................26

**Other Authorities**

Callie Ahlgrim, *13 times Drake has had beef with other rappers, including Kendrick Lamar, Pusha T, and Kanye West*, Bus. Insider (Feb. 4, 2025), https://www.businessinsider.com/drake-beefs-kendrick-lamar-kanye-west-pusha-t-meek-mill.....................................................4

Carmen Vitali, *Will Kendrick Lamar perform 'Not Like Us' at Super Bowl LIX halftime show?*, Fox Sports (Feb. 7, 2025), https://www.foxsports.com/stories/nfl/will-kendrick-lamar-perform-not-like-us-super-bowl-lix-halftime-show ...........................54

Elijah Wald, *Talking 'Bout Your Mama: The Dozens, Snaps, and the Deep Roots of Rap* (Oxford Univ. Press 2014) ........................4

Mark Savage, *Kendrick Lamar's Super Bowl show was one big tease*, BBC (Feb. 9, 2025), https://www.bbc.com/news/articles/cz0l5m5m943o...........................55

Robert Fink, *the dozens*, Encyclopedia Britannica, https://www.britannica.com/topic/the-dozens (last visited Mar. 25, 2026) ....................................................................................4

Rolling Stone, *The 150 Greatest Hip-Hop Videos of All Times* (Aug, 10, 2023), https://www.rollingstone.com/music/music-lists/best-rap-music-videos-1234788922/lil-kim-feat-da-brat-left-eye-missy-misdemeanor-elliott-and-angie-martinez-not-tonight-ladies-night-remix-1234790252/ ...........................................35

Sam Pazzano, *Drake entourage member guilty of assaulting woman*, Toronto Sun (May 12, 2015), https://torontosun.com/2015/05/12/drake-entourage-member-guilty-of-assaulting-woman .................................................8

x

XXL Staff, *50 of the Greatest Hip-Hop Album Covers of All Time* (Mar. 29, 2023), https://www.xxlmag.com/hip-hop-album-covers/ ................................................................. 35

## INTRODUCTION

In spring 2024, superstar rap artists Drake and Kendrick Lamar had "perhaps the most infamous rap battle in the genre's history[.]" SPA-1. They slung at each other a series of "diss tracks"—a mainstay of the rap genre in which artists seek to one-up each other with mockery and verbal disrespect. This "vitriolic war of words" took on "increasingly heated rhetoric, loaded accusations, and violent imagery." *Id.*

After Drake's tracks accusing Lamar of, *inter alia*, beating his fiancée and not fathering one of his children, and encouraging Lamar to "talk about [Drake] likin' young girls," SPA-18-19, Lamar issued his final track in the series. "Not Like Us" hurled profane and hyperbolic insults at Drake about many subjects, including taunting "Say, Drake, I hear you like 'em young," and mocking Drake and his crew as "certified pedophiles." SPA-7-8. (The latter riffed on Drake's 2021 album "Certified Lover Boy." SPA-10.)

"Not Like Us" "dealt the metaphorical killing blow." SPA-1. The track became one of the most popular and critically acclaimed rap tracks ever, winning multiple Grammys.

After losing the battle, Drake sued UMG, the record company to

which both he and Lamar are signed. Although Drake had used UMG's platform to attack Lamar in equally incendiary terms, he now claims UMG defamed him by releasing the recording, that the track violates N.Y. Penal Law, and that UMG's promotion of it violated N.Y. General Business Law (GBL) § 349.

The District Court dismissed. Applying settled New York law, it recognized that whether statements convey fact or opinion depends on full context, including forum, tone, language, and surrounding circumstances. The court correctly held that "Not Like Us"—a diss track released during a rhetoric-drenched rap feud and full of hyperbole, boasts, and insults—would be understood by a reasonable listener as opinion.

Drake does not show otherwise on appeal. Instead, he seeks to strip words from their context and deem them actionable defamation if anyone, anywhere, might treat them as factual. That is not the law, and Drake's view would critically undermine a highly creative art form built on exaggeration, insult, and wordplay. Drake's Penal Law and GBL arguments fare no better.

This Court should affirm the dismissal.

2

## STATEMENT OF THE ISSUES

1.     Did the court correctly hold that Drake's defamation claim fails because "Not Like Us" constitutes nonactionable opinion?

2.     Did the court correctly hold that N.Y. Penal Law § 240.26 does not imply a private right of action, or does the claim fail for independent reasons?

3.     Did the court correctly hold that Drake failed to state a GBL 349 claim?

## STATEMENT OF THE CASE

### I.     Factual Background

#### A.     The Parties

UMG is a global music company that contracts with some of the biggest artists in the world. JA-29 ¶27. These artists include Drake and Lamar, both world-famous performers. *Id*. Drake is one of the "best-selling music artists of all time[.]" JA-31 ¶33. Lamar also has sold hundreds of millions of albums and has won the Pulitzer Prize. *See, e.g.*, JA-180.

#### B.     The Rap Beef

"Competition and verbal sparring have been integral to rap music since the art form's inception in the 1970s." JA-360; *see* JA-179-180

3

(discussing rap feuding). "[B]raggadocio, hyperbole, and competitive wordplay are among rap's most defining artistic practices … where exaggeration and lyrical cleverness take precedence over the truth." JA-360. Indeed, scholars trace rap's roots to "The Dozens," a verbal game in which participants trade insulting rhymes until one's opponent is unable to respond.[1]

"Rap battles and 'diss tracks' are often vicious, graphic, and hyperbolic, and rap lyrics regularly contain accusations of disreputable conduct, including illegal behavior." JA-360-361. Rap's history is rich with these battles, and Drake is a prolific combatant, having traded diss tracks with many artists before Lamar.[2]

In 2024, Drake and Lamar had a "rap beef," JA-104 ¶202. They traded several "diss tracks, sometimes within the same hour," JA-178-179, laced with "progressively caustic, inflammatory insults and accusations," SPA-18. Their feud became a massive cultural

---

[1] *See, e.g.*, Elijah Wald, *Talking 'Bout Your Mama: The Dozens, Snaps, and the Deep Roots of Rap* (Oxford Univ. Press 2014); Robert Fink, *the dozens*, Encyclopedia Britannica, https://www.britannica.com/topic/the-dozens (last visited Mar. 25, 2026).

[2] *See, e.g.*, Callie Ahlgrim, *13 times Drake has had beef with other rappers, including Kendrick Lamar, Pusha T, and Kanye West*, Bus. Insider (Feb. 4, 2025), https://www.businessinsider.com/drake-beefs-kendrick-lamar-kanye-west-pusha-t-meek-mill.

phenomenon. *See, e.g.*, JA-194-221 (approximately 150 N.Y. Times articles in roughly a year).

On April 19, 2024, Drake released a diss track directed at Lamar called 'Push Ups.'" SPA-5. Drake "mocks Lamar's height and shoe size," and "questions Lamar's success." *Id.*; *see* JA-232 ("*How the fuck you big-steppin' with a size-seven men's on?*," "*Pipsqueak, pipe down*"). A few days later, impatient with Lamar for not having responded, Drake released "Taylor Made Freestyle" "in which he used artificial intelligence-generated voices of deceased rapper 2Pac and rapper Snoop Dogg to goad Lamar" into responding. SPA-5. In 2Pac's voice, Drake encourages Lamar to "*[t]alk about [Drake] likin' young girls*" on his next track:

> *Kendrick, we need ya, the West Coast savior*
> *Engraving your name in some hip-hop history*
> *If you deal with this viciously*
> *You seem a little nervous about all the publicity*
> *Fuck this Canadian lightskin, Dot*
> *We need a no-debated West Coast victory, man*
> *Call him a bitch for me*
> *Talk about him likin' young girls, that's a gift from me*
> *Heard it on the Budden Podcast, it's gotta be true*

JA-235. "Drake, in his own voice, further taunts Kendrick for failing to come up with a satisfactory response." SPA-5; *see* JA-236 ("*You tryna let*

5

*this shit die down, nah, nah, nah/ Not this time, n\*\*\*\*, you followin'*
*through … What the fuck is takin' so long? We waitin' on you*").

Lamar answered by releasing "Euphoria" on April 30, which "accuses Drake of fabricating his claims." SPA-6. It blasts Drake's music, JA-243, parenting, JA-245 ("*I got a son to raise, but I can see you don't know nothin' 'bout that*"), and character and identity, JA-244-245.

"On May 3, 2024, the feud between Drake and Lamar escalated, as they lobbed increasingly vicious, personal accusations at each other over the course of the day." SPA-6. Lamar released "6:16 in LA," which calls Drake a "terrible person" and a "bully" among a volley of taunts, and asserts, "*Everyone inside your team is whispering that you deserve it.*" JA-248. Drake responded that day with "Family Matters," SPA-7, a blistering attack that:

- criticizes Lamar's authenticity, JA-249 ("*Always rappin' like you 'bout to get the slaves freed/ You just actin' like an activist, it's make-believe*");

- "calls into question whether Lamar is the biological father of one of his children," SPA-7; JA-250;

- "jabs at Lamar's relationship with his partner," SPA-7;

6

- suggests Lamar cheats on her, JA-252 ("*Why did you move to New York? / Is it 'cause you livin' that bachelor life? … 'Cause we know the girls that you actually like / Your darkest secrets are comin' to light*");

- claims that Lamar is a domestic abuser, JA-252 ("*When you put your hands on your girl / Is it self-defense 'cause she bigger than you? … They hired a crisis management team / To clean up the fact that you beat on your queen*"); SPA-7; and

- makes violent allusions. JA-249, JA-252.

"Almost immediately after the release of 'Family Matters,' Lamar unleashed the scathing 'Meet the Grahams,'" SPA-7, which says, *inter alia*, that Drake is a "deadbeat" father, *id.,* among scorching attacks, JA-253-255.

The next day Lamar released "Not Like Us." Like the preceding tracks, it is thick with epithets, rhetoric, and hyperbole. Lamar profanely mocks Drake, JA-122-23 ("*You n*****'ll get a wedgie, be flipped over your boxers,*" "*Why you trollin' like a bitch? Ain't you tired?*" "*What's up with these jabroni-ass n***** tryna see Compton?*"), and his brand, OVO, *id.* ("*What OVO for? The 'Other Vaginal Option'? Pussy,*" "*What is the owl?*

7

*Bird n\*\*\*\*\* and bird bitches*"[3]), and calls Drake a "liar" who exploits other artists, JA-123 ("*you not a colleague, you a fuckin' colonizer*").

Taking up Drake's above-mentioned invitation to "*[t]alk about [Drake] likin' young girls*," Lamar makes the statements at issue here:

> S*ay, Drake, I hear you like 'em young*
> *You better not ever go to cell block one*
> *To any bitch that talk to him and they in love*
> *Just make sure you hide your lil' sister from him*
> *They tell me Chubbs the only one that get your hand-me-downs*
> *And Party at the party playin' with his nose now*
> *And Baka got a weird case, why is he around?*
> *Certified Lover Boy? Certified pedophiles*

JA-122.[4]*; id.* ("*Tryna strike a chord and it's probably A-Minor*"); JA-123 ("*your homeboy need subpoena, that predator move in flocks / That name gotta be registered and placed on neighborhood watch*"). The cover art for "Not Like Us" is an image of Drake's Toronto mansion, obviously doctored to appear as if it is dotted with 13 sex offender markers. *See* JA-42-43 ¶65.

---

[3] OVO, which is used for Drake's record label and a clothing company, has an owl logo. JA-31 ¶¶35-36.

[4] "Chubbs, Party, and Baka are associates of Drake's." SPA-8, n.3. Baka was arrested in 2014 on human trafficking and assault charges, then convicted of assault. *See* JA-261; Sam Pazzano, *Drake entourage member guilty of assaulting woman*, Toronto Sun (May 12, 2015), https://torontosun.com/2015/05/12/drake-entourage-member-guilty-of-assaulting-woman.

Drake responded the following day with "The Heart Part 6," which re-ups the themes that Lamar commits domestic abuse, JA-257 ("*I don't wanna fight with a woman beater*"), and did not father one of his children, *id.* ("*Like if Dave really fucked your girl and got her pregnant, talk about breedin' resentment*"). It says that Drake anticipated the very taunts that he now claims are defamatory, JA-256 ("*This Epstein angle was the shit I expected / TikTok videos you collected and dissected*"), and denies them, JA-257 ("*I'd never look twice at no teenager*").

On July 4, Lamar released the "Not Like Us" video. JA-59 ¶105. It is replete with exaggerated and non-literal imagery. For example, it opens with Lamar whispering to a clown that he sees "dead people"—a nod to the film The Sixth Sense, *see* JA-239, implying hyperbolically that Drake has been defeated in the rap battle. Again, owl imagery alludes to Drake's brand OVO, with Lamar seen beating an owl piñata. JA-61-62 ¶¶109-110.

## C. "Not Like Us" Is A Massive Success

"Not Like Us" was 2024's bestselling rap track, JA-72 ¶137, and Rolling Stone deemed it 2024's "biggest moment in music," JA-102 ¶197. It won five Grammy Awards: Record of the Year, Song of the Year, Best

Rap Performance, Best Rap Song, and Best Music Video. JA-83 ¶164. Lamar performed a live version at the Super Bowl Halftime Show in February 2025. JA-85 ¶¶167-168.

## II. Procedural History

Weeks before the Super Bowl performance, Drake filed suit, asserting claims for defamation, second-degree harassment, and under GBL 349. *See* ECF No. 1. The GBL claim was based on the false assertion that UMG "use[d] bots to stream" "Not Like Us." *Id.* ¶¶200, 228, 233; *see* JA-90 ¶173 ("Bots are software programs designed to mimic human behavior to appear to be real social media accounts."). That assertion was directly refuted by the source Drake relied on. After UMG sent a Rule 11 letter, Drake "agreed" to "withdraw … and correct" the allegation. *See* Ransom Decl., ¶2 & Ex. 1., ECF No. 24.

Drake filed an amended complaint on April 16, 2025, asserting the same three claims. JA-14-133. The District Court (Vargas, J.) granted UMG's motion to dismiss in full, relying heavily on authorities by this Court and the New York Court of Appeals. SPA-1-38.

On defamation, the court recognized that New York's Constitution provides for absolute protection of opinions. SPA-11. It explained that

courts must therefore determine, as a question of law, whether challenged statements convey fact or opinion by considering whether the full context of the communication signals to reasonable readers or listeners that what is being read or heard is likely to be opinion, not fact. SPA-11-13.

Applying that framework, the court held that "Not Like Us" cannot reasonably be understood to convey factual matter. SPA-11. It analyzed "the forum in which ['Not Like Us'] was published, the surrounding circumstances, the tone and language of the [song], and its apparent purpose." SPA-14. The court concluded that the "forum" of "Not Like Us"—a rap diss track—would not convey to the reasonable listener that it is the "product of a thoughtful or disinterested investigation, conveying … factchecked verifiable content." SPA-15. The court reasoned that surrounding circumstances—the track "was published as part of a heated public feud, in which both participants exchanged progressively caustic, inflammatory insults and accusations"—provided "precisely the type of context in which an audience may anticipate the use of epithets, fiery rhetoric or hyperbole rather than factual assertions." SPA-18 (cleaned up). And the track's language and tone reinforce that it "can only

11

reasonably be understood as opinion," SPA-23, because it is "replete with profanity, trash-talking, threats of violence, and figurative and hyperbolic language, all of which are indicia of opinion," SPA-24. The court found "upon a full consideration of the context in which 'Not Like Us' was published, that a reasonable listener could not have concluded that [the song] was conveying objective facts about Drake." SPA-25.

Using that contextual analysis, the court also rejected Drake's contention that "Not Like Us" constitutes actionable mixed opinion. SPA-27 ("In the context of this rap diss battle, no reasonable person would listen to 'Not Like Us' and assume that Lamar uniquely had access to credible, provable facts that revealed Drake to be a pedophile.").

The court dismissed Drake's harassment claim, holding that N.Y. Penal Law § 240.26(3) does not create an implied private right of action. SPA-29-33. The court reasoned that "recognizing a private right of action would be inconsistent with legislative intent," as the legislature "conferred authority to enforce the criminal harassment statute upon local law enforcement." SPA-31-32.

Finally, in dismissing the GBL claim, the court primarily found Drake's "information and belief" pleadings insufficient to plausibly allege

12

that UMG engaged in a deceptive scheme to inflate the popularity of "Not Like Us." SPA-33-36. It also held the claim failed because Drake did not allege how "UMG harmed consumers." SPA-37.

Drake appealed. Upon docketing, he moved this Court to certify the implied right of action question to the Court of Appeals. This Court referred that separately briefed motion to this merits panel.

## SUMMARY OF THE ARGUMENT

The District Court rightly dismissed this action.

I. The court correctly held that Drake's defamation claim failed because "Not Like Us" constituted nonactionable opinion. The court followed the Court of Appeals' long line of precedents holding that context is critical to distinguishing between opinion and factual claims, and this Court's application of those rules in *Rapaport v. Barstool Sports* and *Torain v. Liu* to reject defamation claims as a matter of law where the complained-of statements arose, as here, in a war of words.

This presents a clearer case for affirmance than *Rapaport* and *Torain*. Everything about this context—large and small—confirms opinions are at issue. "Not Like Us" falls within a genre typified by inflammatory putdowns, epithets, fiery rhetoric, vulgarity, and

13

hyperbole. And this particular diss track delivers in spades, bouncing from allusions to the crucifixion, to pop-culture-infused double-entendres, to braggadocio about Lamar's superiority vis-à-vis Drake and Lamar's hometown, to put downs about, *inter alia*, Drake's crew, relationships, brand, authenticity, artistic prowess, and hometown, all the way to the pedophilia-related taunt about which Drake complains. Moreover, "Not Like Us" capped off a high-profile *rap battle* in which Drake and Lamar traded a string of "caustic, inflammatory" diss tracks. SPA-18. Drake dissed Lamar regarding, among other things, philandry, domestic abuse, and Lamar's height, career, and authenticity, and urged Lamar to "[t]alk about [Drake] likin' young girls." JA-235.

Drake's attempt to rip the words he now dislikes from their immediate and broader context has no support in governing law. Nor does Drake's fallback claim that two lyrics in "Not Like Us" imply undisclosed facts; the same relevant context forecloses that argument. And Drake's last-ditch effort to identify some threshold legal or procedural error in the District Court's approach is equally meritless. The District Court's work was careful, methodical, and comported fully with controlling law.

14

II. The District Court properly dismissed Drake's supposed implied right of action for Second-Degree Harassment under N.Y. *Penal* Law § 240.26. The Court of Appeals has specifically limited the availability of implied rights, and nothing about this criminal statute meets those standards. Tellingly, the Legislature expressly enacted a civil claim to enforce a neighboring provision of the Penal Law, but declined to do the same for the part Drake invokes. The Appellate Division has squarely rejected that there is a right of action. Even if one existed, Drake's claim would fail because he cannot satisfy many of § 240.26's requirements.

III. Drake's GBL claim fails because his information-and-belief allegations—resting largely on anonymous online commentary—do not plausibly plead deception. The court also correctly held that Drake did not allege consumer-oriented harm, and his alleged injury is derivative and speculative.

## STANDARD OF REVIEW

Rule 12(b)(6) dismissal is reviewed *de novo. E.g., Bellin v. Zucker*, 6 F.4th 463, 472 (2d Cir. 2021). In assessing whether plaintiff has stated a plausible claim to relief, the court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling

15

on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* at 473.

## ARGUMENT

### I. The Court Properly Dismissed Drake's Defamation Claim.

#### A. "Not Like Us" is Nonactionable Opinion.

The District Court rightly dismissed Drake's defamation claim predicated on "Not Like Us"—more aptly, a handful of lines within the track—as nonactionable opinion. *See* SPA-11-29. Consistent with this Court's rejection of analogous claims in *Rapaport* and *Torain*, the court recognized that the full context for "Not Like Us"—a *rap diss track*, laden with epithets, fiery rhetoric and hyperbole, released in the midst of a public and very acrimonious rap battle—foreclosed Drake's claim that the track conveyed a factual message that Drake is a pedophile. *See* SPA-13.

Under New York law, "[e]xpressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." *Mann v. Abel*, 10 N.Y.3d 271, 276 (2008); *accord Coleman v. Grand*, 158 F.4th 132, 139 (2d Cir. 2025); SPA-11-12. "[W]hether a statement is opinion or rhetorical

16

hyperbole as opposed to a factual representation is a question of law for the court." *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985); *accord Rapaport v. Barstool Sports Inc.*, 2024 WL 88636, at *2 (2d Cir. Jan. 9, 2024) (summary order); *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153 (1993) (fact versus opinion assessment "must be made by the court"); SPA-12.

Thus, defamation claims are "routinely resolve[d] … at the motion to dismiss stage." SPA-12 (citing, *inter alia, Brian v. Richardson*, 87 N.Y.2d 46, 52 (1995)).[5] There is "'particular value' in resolving defamation claims at the pleading stage, 'so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms.'" *E.g., Biro v. Conde Nast*, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012) (quoting *Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 379 (1995)); SPA-12-13.

In determining whether challenged statements convey fact or opinion, the legal question is whether the statements "would have been

---

[5] *See, e.g., Steinhilber v. Alphonse*, 68 N.Y.2d 283 (1986) (affirming dismissal of claim as nonactionable opinion); *Cooper v. Franklin Templeton Invs.*, 2023 WL 3882977 (2d Cir. June 8, 2023) (summary order) (same); *LaNasa v. Stiene*, 2025 WL 893456 (2d Cir. Mar. 24, 2025) (summary order) (same); *Torain v. Liu*, 279 F. App'x 46 (2d Cir. 2008) (summary order) (same).

17

understood by a reasonable audience as assertions of fact that were proffered for their accuracy." *Rapaport v. Barstool Sports, Inc.*, 2021 WL 1178240, at *11 (S.D.N.Y. Mar. 29, 2021); *see Coleman*, 158 F.4th at 139 (similar); *Millus v. Newsday, Inc.,* 89 N.Y.2d 840, 842 (1996) (similar). Courts consider:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact[.]

*Brian*, 87 N.Y.2d at 51; *accord Coleman*, 158 F.4th at 139; SPA-13.

The third "context" factor is critical. *See, e.g.*, *Rapaport*, 2024 WL 88636, at *2 ("The Court of Appeals of New York has consistently focused its analysis on the overall context in which the complained-of assertions were made."); *Coleman*, 158 F.4th at 140-41. The context inquiry is "holistic." SPA-13; *Davis v. Boeheim*, 24 N.Y.3d 262, 270 (2014). "[C]ourts are required to take into consideration the larger context in which the statements were published, including the nature of the particular forum," and "the content of the communication as a whole," *Brian*, 87 N.Y.2d at

18

51, including its "tone and language" and "apparent purpose," SPA-14 (citing *Brian*).

### 1. The Rap Diss Track Forum Strongly Conveys Opinion.

The District Court looked first to the "forum" or medium at issue— a rap diss track—which it rightly held signals nonactionable opinion. SPA-14-15.

Courts regularly find that the genre and medium of challenged speech support a conclusion that the speech is opinion, even where other factors suggest the words could convey factual claims. In doing so, the Court of Appeals has consistently held that "the common expectation" of readers/listeners in a particular forum is highly significant. *E.g.*, *Brian*, 87 N.Y.2d at 53 (Op-Ed readers); *Gross*, 82 N.Y.2d at 156; *see* SPA-14-15 (collecting cases). For example, in *Immuno AG. v. Moor-Jankowski* the Court of Appeals held, as a matter of law, that even "serious and restrained" language constituted opinion because "the common expectation of a letter to the editor is not that it will serve as a vehicle for the rigorous and comprehensive presentation of factual matter but as one principally for the expression of individual opinion." 77 N.Y.2d 235, 253-54 (1991). It did so notwithstanding that the statements "if studied long

enough in isolation—could be found to contain implied factual assertions." *Id.* at 255. Courts cannot "sift[] through a communication for the purpose of isolating and identifying assertions of fact." *Brian*, 87 N.Y.2d at 51-54.

Applying these rules, this Court has concluded that defamation claims fail as a matter of law in mediums like this one. In *Rapaport*, this Court affirmed dismissal of defamation claims premised on, *inter alia*, a "six-minute long" "Fire Rap … diss track" video in which defendants "rapp[ed] a constant stream of insults and slurs about Rapaport" (which occurred mid-war of words between entertainers, *see infra* § I.A.2). 2024 WL 88636, at *4.[6] This Court did so notwithstanding that the statements—accusing Rapaport of having herpes and stalking and physically abusing his ex-girlfriend—obviously could be deemed factual in another medium like "a news program or [] a journalistic piece," SPA-

---

[6] The *Rapaport* district court had "no difficulty concluding that the context of [the] diss track video reasonably signals to viewers that the challenged statements are the prejudiced, opinionated viewpoints of the Barstool Defendants, not accurate factual assessments of Rapaport." 2021 WL 1178240, at *16 (cleaned up). The video, "offered in the midst of a hostile public feud between Rapaport and Barstool" and replete with "[e]xaggerated, vitriolic words and imagery … attack[ing] all aspects of Rapaport's life, including his career, popularity, relationships, appearance, age, and legal troubles," signal to the audience that it "is not intended to reflect an accurate factual assessment of Rapaport." *Id.* at *15-16.

14, that "encouraged the reasonable reader to be less skeptical and more willing to conclude that they stated or implied facts." *Gross*, 82 N.Y.2d at 147 (cleaned up). Such considerations had no application to the rap diss video in *Rapaport*.

The same is true here. A rap diss track signals—if not shouts—opinion not fact. It is the quintessence of an art form expected to contain "considerable hyperbole, speculation, [and] diversified forms of expression and opinion." *Brian*, 87 N.Y.2d at 53. There is no "common expectation," *id.*, of finding factual statements in rap tracks, especially *diss* tracks. They are not where a reasonable audience turns to find "the rigorous and comprehensive presentation of factual matter," *Immuno*, 77 N.Y.2d at 253, let alone factual claims about a rival's predilections or unlawful conduct. The reasonable listener would not typically view statements in diss tracks "to represent factual assertions about the opposing artist, but rather to demonstrate skill and dominance … through clever wordplay, hyperbole, bluster, and demonstrations of disrespect." JA-357. This is especially so when—consistent with the genre—the "pedophiles" language on which Drake fixates is plucked from a series of hyperbolic disses, including taunts that Drake is "a jabroni

21

[stupid]-ass n****" and "fuckin' colonizer," his skills make him akin to a "ball boy" (not a player like Lamar), he lacks "street cred" and owes others for his "lingo." *See also infra* § I.A.3.

Accordingly, the District Court rightly concluded that the "average listener is not under the impression that a diss track is the product of a thoughtful or disinterested investigation, conveying to the public fact-checked verifiable content." SPA-15. This conclusion fits easily within controlling New York law. *See, e.g., Immuno*, 77 N.Y.2d at 253 ("common expectation" regarding letters to the editor); *Brian*, 87 N.Y.2d at 53 (expectations of "considerable hyperbole, speculation … and opinion" for Op-Eds); *id.* ("expect[ation of] vigorous expressions of personal opinion" at public hearings); *Hobbs v. Imus*, 698 N.Y.S.2d 25, 26 (1st Dep't 1999) (statements by shock talk hosts nonactionable because they would be understood in the "the crude and hyperbolic manner that has, over the years, become their verbal stock in trade"); *Talbert v. Tynes*, 2026 WL 739736, at *1 (1st Dep't Mar. 17, 2026) (statement that plaintiff "harmed multiple women and is abusive and manipulative," made on Twitter "where hyperbole and rhetorical exaggeration are common," nonactionable).

Drake essentially concedes this. He barely addresses the court's reasoning and lacks rejoinder to such authorities. As to forum, he merely asserts that the court created a "categorical rule" that "defamation in rap cannot give rise to a cause of action so long as the rap also includes profanity or threats of violence." Br. 41-42. That blatantly mischaracterizes the holding.

Rather than announce any categorical rule, the court stated the opposite, noting that the "forum in which a statement appears is *not* dispositive of the fact versus opinion inquiry," but instead provides "contextual indicia that can inform the Court's analysis." SPA-15 (emphasis added). It nowhere indicated that a diss track could *never* be defamatory; it simply recognized that the "average listener" in this forum and "common expectation" for statements in this forum were significant. SPA-14. It held, including in light of those considerations, that *this* diss track could not be understood by a reasonable listener as conveying fact. *See* SPA-14-25.

That approach tracks Court of Appeals precedent. In *Brian*, for example, the court held that an article's appearance in an opinion section "does not automatically insulate the author from liability for

23

defamation," but "emphasized that the forum in which a statement has been made" is a "useful gauge." 87 N.Y.2d at 52-53 (focusing on "the common expectation" of readers of Op-Ed pages and the fact that the speaker, like Lamar, "signall[ed] that he was not a disinterested observer"). The Court therefore affirmed the dismissal of the defamation claim, treating the speaker's—the former U.S. Attorney General, no less—"specific charges about plaintiff [as] allegations and not demonstrable fact." *Id.* at 53-54.

At best, Drake's "categorical rule" argument is really a gripe that the forum-specific "common expectation" inquiry is misguided. But controlling law dictates that inquiry, and Drake identifies nothing to suggest that the court misapprehended the common expectation for diss tracks, much less this particular track. *See* SPA-14-25.

Additionally, in trying to prop up his "categorical rule" contention, Drake mischaracterizes the court's analysis of the tone and language of "Not Like Us." *See* Br. 41-42. Drake contends that on the court's logic, "so long as a song includes profanity and threats, it is immune from defamation liability[.]" *Id.* That grossly oversimplifies the court's assessment of tone and language. *See infra* § I.A.3. Again, it created no

24

categorical bar based on magic words or themes. Instead, after correctly explaining that "[l]oose, figurative or hyperbolic statements," and "imaginative expression[s]" have repeatedly been held to signal nonactionable opinion, the court found that "Not Like Us" is replete with "profanity, trash talking, [and] threats of violence" *and* "figurative and hyperbolic language." SPA-23-24; *see id.* (examples of lyrics reflecting "hyperbolic vituperations"); *infra* § I.A.3.

Finally, Drake argues that the District Court's purported categorical rule "ignores that rap music can convey factual assertions" because "rap lyrics are regularly used as evidence in criminal cases[.]" Br. 43. Beyond the fact that the District Court imposed no such rule, Drake's argument is nonsensical. Whether rap lyrics are admissible as evidence for the jury to weigh in determining whether *factually* a crime has been committed is distinct from the issue here—where the court must consider, *as a matter of law*, whether a reasonable person would understand "Not Like Us" to convey opinion. Drake's argument is also astoundingly hypocritical. In November 2022, Drake signed a petition criticizing "the trend of prosecutors using artists' creative expression against them" by treating rap lyrics as fact. JA-175-176. The petition

25

decries that "more than any other art form, rap lyrics are essentially being used as confessions in an attempt to criminalize Black creativity and artistry," and that the "use of lyrics against artists in this way is un-American and simply wrong." *Id.*[7]

### 2. The Broader Context Likewise Confirms that "Not Like Us" is Nonactionable Opinion.

The District Court next considered the surrounding circumstances in which *this* diss track was released, *i.e.*, a *rap beef* "in which both participants exchanged progressively caustic, inflammatory insults and accusations." SPA-18.

The court rightly found that broader context also signals opinion. *See* SPA-15-22. As the New York Court of Appeals has explained, "even apparent statements of fact may assume the character of statements of opinion … when made in public debate, heated labor dispute, or other circumstances in which an audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole." *Steinhilber*, 68 N.Y.2d at 294; *see Brian*, 87 N.Y.2d at 48-49 (rejecting claim that arose during sparring between

---

[7] Drake contends that the petition cannot be considered because the court did not expressly take judicial notice. *See* Br. 43 n.4. There is no rule that requires express reference by the court; regardless, the petition is readily noticeable here, as it was below. *See* Fed. R. Evid. 201(b); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

26

former AG Richardson and plaintiff, a friend of another former Attorney General).

This Court's *Rapaport* decision is instructive. It held that accusations that plaintiff had herpes and stalked and abused his ex-girlfriend were nonactionable because they arose from a "very acrimonious dispute" between the parties "that would have been obvious to even the most casual observer." 2024 WL 88636, at *3. It concluded that even "ostensibly factual statements could be reasonably understood as part of a tasteless effort to lampoon because they were made in the emotional aftermath of a situation when animosity would be expected to persist" and in which "an audience may anticipate the use of epithets, fiery rhetoric or hyperbole." *Id.* at *4 (cleaned up).[8]

So too here. The surrounding circumstances signal to the reasonable listener that the complained-of statements convey opinion.

---

[8] Drake's attempts to distinguish *Rapaport* fail. His argument (Br. 31-32) that it involved summary judgment is a red herring as there was no motion to dismiss there and both the district court and this Court ruled as a matter of law. His suggestion that the statements in *Rapaport* did not make "serious allegation[s]" is nonsense, as shown. He also argues that the diss track video in *Rapaport* described the history of the dispute between the parties, which "contextualized" for the audience that they were part of a feud. But there were approximately 80 statements at issue in *Rapaport, see* 2021 WL 1178240, at *10, any number of which did not include such background.

This *diss* track was released in "perhaps the most infamous rap battle in the genre's history," a "vitriolic war of words" between Drake and Lamar, in which they traded a series of diss tracks that contained "increasingly heated rhetoric, loaded accusations, and violent imagery." SPA-1. "Not Like Us" was Lamar's final track in the feud that followed Drake's tracks accusing Lamar of domestic abuse and implying he was not the father of one of his children. *See supra* pp.4-8. If ever there was a circumstance for the audience to "anticipate the use of epithets, fiery rhetoric or hyperbole," *Steinhilber*, 68 N.Y.2d at 294, this is it.

In response, Drake wrongly argues that the court's context review was *both* too broad and too narrow. Br. 28-36.

To start, these arguments "isolate and emphasize individual factors" in the court's opinion to mischaracterize its holistic contextual analysis. *Rapaport*, 2024 WL 88636 at *3. The court did not find that the statements at issue were non-actionable opinion *only* with reference to other songs in the feud. *See id.* That broader context was *one* aspect of the court's comprehensive analysis in which *everything* signals opinion.

Regardless, both of Drake's arguments fail.

28

First, the District Court did not define the context too broadly. Br. 28. In Drake's (strained) view, because of the "cultural ubiquity" of "Not Like Us," the Court should ignore the broader context that gave rise to the song and assess it as a "singular entity[.]" JA-491[39:14-15]; *see* Br. 28-29; SPA-19-22. The District Court rightly rejected this argument.

Drake's argument fundamentally misunderstands New York defamation law. Drake would have this Court ignore the broader context entirely (save for assessing "modern attitudes" toward allegations of pedophilia, *see infra*). He argues that defining the context as the "entire rap battle," including the "six songs that preceded the Recording" is improper because "global listeners of the Recording would not necessarily have known about the rap battle between Lamar and Drake[.]" Br. 28, 32; *id.* at 34 (similar).

In effect, Drake seeks to roll back 40 years of state defamation law and replace New York's standard for assessing whether statements convey fact or opinion based on an assessment of the *full context* with the narrower federal standard that the Court of Appeals has not followed since *Steinhilber*. *See Immuno*, 77 N.Y.2d at 244, 252-56 (federal standard focuses narrowly on whether a statement is made in "loose,

figurative, [or] hyperbolic language," whereas *Steinhilber*'s test requires consideration of the "whole communication, its tone and apparent purpose," and "the broader social setting").

"[C]ourts are *required* to take into consideration the larger context in which the statements were published[.]" *Brian*, 87 N.Y.2d at 51 (emphasis added). *Rapaport, Steinhilber*, and *Torain* make that clear. *See* SPA-16-18 (discussing same). Drake cannot distinguish them, Br. 31-35, ignoring that all those courts looked to the broader background that gave rise to the challenged statements to understand a reasonable person's perception.

For instance, in *Steinhilber*, the court explained that the "broader social context" required consideration of the "factual background leading to the preparation" of the challenged statements, including that the plaintiff was a "scab" during the union strike, and crossed the picket line in "defiance of the strike order." 68 N.Y.2d at 294. The court found that "the most significant circumstance of the broader social context" was "that the message [at issue] was prepared and played as part of the union's effort to punish a former member," and concluded that in "the emotional aftermath of a strike when animosity would be expected to

30

persist—particularly against a former member who was seen as a 'traitor' to the cause," the statements "would be taken by the ordinary person not literally, but figuratively." *Id.*

More notably, in *Torain*, this Court affirmed the district court's consideration of plaintiff's prior statements (sexually inappropriate comments about a child) that triggered defendant's allegedly defamatory statements (calling plaintiff a "pedophile"). 279 F. App'x at 47-48. This Court squarely rejected an argument like Drake's:

> Torain contends that the district court improperly considered the statements that he made during his "war of words" because they were not included in his complaint. This argument fails… [I]n determining whether a statement is actionable, the court "should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable listener would have believed that the challenged statements were conveying facts about the libel plaintiff."

*Id.* at 47 n.1 (cleaned up).[9]

---

[9] Drake's argument that this reasoning does not apply because the *Torain* plaintiff "introduced th[e] context in his complaint" is wrong. As noted, in *Torain*, this Court found that *unpled* comments were necessary for understanding the broader context. Regardless, Drake's complaint injected that context, conceding that "Not Like Us" was part of a "rap beef" with Lamar, JA-28 ¶24, and including audio and YouTube video links to nearly all of the prior diss tracks, *see* JA-104 n.280.

As in *Torain*, the Court cannot assess "Not Like Us" in a vacuum. The context of the vitriolic rap beef that gave rise to the song is central. "Here, that factual context is the insults and trash talking that took place via these diss tracks in the days and weeks leading up to the publication of 'Not Like Us.'" SPA-20. As the District Court summarized, the "songs released during this rap battle are in dialogue with one another," they "reference prior songs and then respond to insults and accusations" in prior tracks. SPA-20; *see also supra* § I.A.2. Indeed, understood in context, Lamar's lyric "Say, Drake, I hear you like 'em young" calls back to Drake's lyrics in "Taylor Made Freestyle" to "Talk about him likin' young girls, that's a gift from me/ Heard it on the Budden Podcast, it's gotta be true." SPA-19. As much as Drake may dislike that context after the fact, it is fair game and critical to consider under New York law.

Even putting aside the lyrics of the other songs, the fact of the *feud itself* signals to the reasonable listener that "Not Like Us" conveys opinion. SPA-21 ("it was not just the Recording which gained a cultural ubiquity, but the rap battle itself"); *see* JA-194-221. It blinks reality to suggest that "perhaps the most infamous rap battle in the genre's history," SPA-1, has not become ubiquitous. Thus, as in *Rapaport*, the

32

release of "Not Like Us" in "the midst of a public and very acrimonious" rap battle between Drake and Lamar "that would have been obvious to even the most casual observer" (especially when coupled with the forum, and the language and tone of the track) signals to the reasonable listener that it is opinion. 2024 WL 88636, at *3.

Paradoxically, Drake argues that the court's context definition was simultaneously *too narrow*. Br. 35-36. Drake contends that the court needed to consider how "the reasonable listener would understand the defamatory statements in the broader social context of modern attitudes towards allegations of pedophilia and sexual abuse." *Id* at 35. The argument is telling. Drake, who would have the court ignore *entirely* the broader feud in which "Not Like Us" is obviously situated, seeks to invoke "modern attitudes" to effectively convert any statement touching on pedophilia or sexual abuse to one of fact. Drake offers no authority to support this move. *Cf. Gross*, 82 N.Y.2d at 155 ("[T]here is simply no special rule of law making criminal slurs actionable regardless of whether they are asserted as opinion or fact."). And the factual underpinnings for Drake's argument put him on a limb. He contends that societal attitudes to sexual improprieties have evolved in the context of

33

the "downfall of … rappers like R. Kelly and Sean 'Diddy' Combs." Br. 35. Neither R. Kelly nor Combs was brought down by a diss track; they were indicted by federal prosecutors and convicted by juries.

### 3. The Tone and Language of "Not Like Us" Signal Nonactionable Opinion.

Finally, the District Court exhaustively considered the tone and language of "Not Like Us." SPA-23-25; *supra* pp.22, 25; *see, e.g.*, *Brian*, 87 N.Y.2d at 51 (courts must consider "tone and apparent purpose"). In holding that they also convey opinion, the court's analysis was again steeped in appellate precedent. Statements "laden with epithets, vulgarities, hyperbole, and non-literal language and imagery" signal opinion, *Rapaport*, 2024 WL 88636, at *4, as do "rambling," "figurative," "colloquial and loose terms," *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 143-44 (1992), "informal" writing, *Valley Elecs. AG v. Polis*, 2022 WL 893674, at *2 (2d Cir. Mar. 28, 2022) (summary order), and "politically-charged words," *Jankowicz v. Fox News Network, LLC*, 2025 WL 2630572, at *4 (3d Cir. Sept. 12, 2025) (applying New York law).

"Not Like Us" drips with these markers of opinion. It "is replete with profanity, trash-talking, threats of violence, and figurative and hyperbolic language, all of which are indicia of opinion." SPA-24. A

"reasonable listener would not equate a song that contains lyrics such as, 'Ain't no law, boy, you ball boy, fetch Gatorade or somethin', since 2009 I had this b**** jumpin',' with accurate factual reporting." *Id.* The same is true track-wide. No sober factual analysis is conveyed by passages like "Certified boogeyman, I'm the one that up the score with 'em/ Walk him down, whole time, I know he got some ho in him," or "You n*****'ll get a wedgie, be flipped over your boxers." JA-122. Indeed, Drake admits that even the excerpts about which he complains use figurative language. *See, e.g.*, JA-41 ¶61 ("In a play on the dual meaning of minor—a person under the age of 18 and a musical scale—the Recording says that Drake is 'Tryna strike a chord and it's probably A-Minor.'").

The same is true of the cover art and video.[10] The cover—an image of Drake's mansion overlayed with sex offender markers—is "obviously doctored, further underscoring the non-factual nature of ['Not Like Us']." *Rapaport*, 2021 WL 1178240, at \*16. As the District Court observed, "[n]o

---

[10] Hyperbole and non-literal imagery are prevalent in this part of the rap genre too. *See, e.g.*, XXL Staff, *50 of the Greatest Hip-Hop Album Covers of All Time* (Mar. 29, 2023), https://www.xxlmag.com/hip-hop-album-covers/; Rolling Stone, *The 150 Greatest Hip-Hop Videos of All Time* (Aug. 10, 2023), https://www.rollingstone.com/music/music-lists/best-rap-music-videos-1234788922/lil-kim-feat-da-brat-left-eye-missy-misdemeanor-elliott-and-angie-martinez-not-tonight-ladies-night-remix-1234790252/.

35

reasonable person would view the Image and believe that in fact law enforcement had designated thirteen residents in Drake's home as sex offenders." SPA-26 It is figurative, hyperbolic and exaggerated—classic opinion.

The video is similarly "laden with epithets, vulgarities, hyperbole, and non-literal … imagery." *Rapaport*, 2024 WL 88636, at \*4. Lamar skips hopscotch while singing the A-Minor line—hardly "suggestive of objective reporting." SPA-26; *see* JA-61 ¶107. Lamar also beats an owl piñata with the disclaimer "NO OVHOES WERE HARMED DURING THE MAKING OF THIS VIDEO." JA-61-62 ¶¶109-110. No reasonable person would need a disclaimer that the piñata is not *literally* Drake and his crew; the imagery is satirical, figurative and hyperbolic.[11]

\*   \*   \*

All of the relevant context-related considerations demonstrate that "Not Like Us" conveys opinion. Taken together, as they must be, the court below got the result exactly right. "The statements [in 'Not Like Us'] were largely laden with epithets, vulgarities, hyperbole, and non-literal

---

[11] As with forum, Drake's *only* argument remains the baseless charge that the District Court created a "categorical rule," which fails for the reasons discussed *supra* § I.A.1.

language and imagery; delivered in the midst of a public and very acrimonious dispute between the [Drake] and [Lamar] that would have been obvious to even the most casual observer;" and released in a rap diss track, a "platform[] where audiences reasonably anticipate hearing opinionated statements." *Rapaport*, 2024 WL 88636, at *3. This Court should affirm the dismissal of Drake's defamation claim.

## B. "Not Like Us" Is Not Mixed Opinion.

Drake's fallback position is that even if "Not Like Us" conveys opinion, it constitutes actionable mixed opinion. Br. 44-47. He says two lyrics leave the impression that Lamar "has insider knowledge of Drake's alleged sexual misconduct[.]" Br. 44. They are: "Rabbit hole is still deep, I can go further, I promise,"[12] and "Say, Drake, I hear you like 'em young[.]" Br. 44-45. The District Court rightly rejected this argument. SPA-26-29.

The governing legal framework is essentially the same as that above. A reasonable person standard is used to assess, as a question of law, whether a statement implies undisclosed facts (making it "mixed

---

[12] The rabbit hole is classically fantastic, not home for factual fodder. As the District Court noted, it "is not at all clear that" Drake's framing "is a natural reading of this lyric." SPA-28. Regardless, the argument fails as a matter of law for all the reasons otherwise discussed.

37

opinion"). *See Steinhilber*, 68 N.Y.2d at 290 (the court's "essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were spoken or written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion"); SPA-27. Thus, for all the contextual reasons already discussed, the statements at issue fail to imply undisclosed facts. *See id.* ("[T]hat same context negates any implication that Lamar's lyrics are based upon undisclosed facts."); *supra* p.32 (discussing "Taylor Made Freestyle").

This Court's decision in *LaNasa v. Stiene* is instructive. It held that although two statements "may cross the line into becoming potentially actionable mixed opinions," they did not imply undisclosed facts where they "could be reasonably understood as part of a tasteless effort to lampoon because they were made in circumstances where an audience may anticipate the use of epithets, fiery rhetoric or hyperbole." 2025 WL 893456, at *3 (cleaned up); *see, e.g.*, *Woodbridge Structured Funding, LLC v. Pissed Consumer*, 6 N.Y.S.3d 2, 3 (1st Dep't 2015) ("Although some of the statements are based on undisclosed, unfavorable facts known to the writer, the disgruntled tone, anonymous posting, and predominant

38

use of statements that cannot be definitively proven true or false, supports the finding that the challenged statements are only susceptible of a non-defamatory meaning, grounded in opinion."). The same is true here.

Moreover, this Court and others have rejected mixed opinion arguments like Drake's where, as here, the challenged statement implicates controversies that are widely known or reported. *See, e.g.*, *Cooper*, 2023 WL 3882977, at *4 (statements made "after video of the [incident that gave rise to the statements] was circulated widely and became international news" "would be understood by the reasonable reader as being based on the publicly available video of the incident" not undisclosed facts); *Gisel v. Clear Channel Commc'ns, Inc.*, 942 N.Y.S.2d 751, 752 (4th Dep't 2012) (because defendant's statements "were based on facts that were widely reported … and were known to his listeners, it cannot be said that his statements were based on undisclosed facts"); *Torain v. Liu*, 2007 WL 2331073, at *3 (S.D.N.Y. Aug. 16, 2007) (even if defendant "called plaintiff a 'racist pedophile' without first specifically referencing … plaintiff's statements, the extensive media coverage surrounding plaintiff's comments makes it impossible that an informed

39

listener would think that defendant was accusing plaintiff of being a pedophile based on some undisclosed information known only to him"), *aff'd*, 279 F. App'x 46.

Here, rumors about Drake's relationships with minors predate "Not Like Us" and have been widely reported. *See*, *e.g.*, JA-178-193 (Lamar is "indicting Drake for years of … rumors and speculations around his misbehavior around minors"); SPA-28 & n.5 (finding that Drake's invitation in "Taylor Made Freestyle" that Lamar should "talk about [Drake] likin' young girls" "clearly prods Lamar to discuss preexisting rumors about Drake's interest in minors").[13] Drake *confirmed* that he understood the track to refer to this history. JA-256-257 ("*This Epstein angle was the shit I expected,*" "*Only fuckin' with Whitneys, not Millie Bobby Browns*").

Drake has no meaningful response. He primarily resorts to *Albert v. Loksen*, 239 F.3d 256, 267 (2d Cir. 2001), a case that *nowhere* mentions mixed opinion. He otherwise quotes lyrics from other songs in the feud

---

[13] JA-237-241 (allegations of Drake "having inappropriate sexual relationships with minors" is "a topic Drake has had to debunk in the past;" "Not Like Us" reflects these "rumors surrounding Drake's personal life"); JA-259-284 ("[W]hen Millie Bobby Brown was 13, she met Drake at a concert. He was 30 or 31 at the time… She said they would text a lot in interviews").

40

(about which he made no argument below, *see* JA-423-425), arguing that the court erred by drawing inferences against him from those songs in its contextual analysis without crediting that they could "lead reasonable listeners to believe that Lamar has undisclosed information." Br. 46-47. But this argument fails, as discussed *infra* § I.C, because it improperly seeks to convert a question of law into one of fact. And the District Court rightly found in deciding the relevant question of law that lyrics like those Drake cites—plus those in his own songs, such as "Your darkest secrets are comin' to light," and "What about the bones we dug up in that excavation?" SPA-29—show that "during this rap battle, Drake and Lamar each used similar hyperbolic threatening language." *Id.* Accordingly, "no reasonable listener could understand" the statements to imply undisclosed facts, but would see them instead as "posturing in a rap diss track." *Id.*

## C. Drake's Remaining Defamation Arguments Fail.

Unable to show error in the court's context-based analysis, Drake fishes for some antecedent legal or procedural error. *See* Br. 16-27, 36-41. This fails.

41

### 1. Drake Misstates the Test for Assessing Fact or Opinion in Context.

Drake asserts that a defamation claim should survive if *any* reading of the complained-of statements *could* implicate factual representations. *See* Br. 17-18, 24 (relying on anonymous online comments).

Endorsing Drake's position would turn the law upside down. The Court of Appeals and this Court have repeatedly cautioned against interpreting words divorced from their context. *See, e.g.*, *Immuno*, 77 N.Y.2d at 255 (rejecting attempt to "stud[y]" words "in isolation"); *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) (same); *Brian*, 87 N.Y.2d at 51 (similar); *Gross*, 82 N.Y.2d at 155 (providing examples of when the statement "John is a thief" would be factual and when it would not). Courts conduct this contextual analysis through the lens of an "average" or "reasonable" person, not what any particular reader might think. *See supra* §§ I.A.1-3; SPA-13.

Drake's argument is irreconcilable with that approach, and egregiously so, because it primarily relies on roughly 60 cherry-picked anonymous online comments from handles like "@randomforyoutube3215," and "@ImChickenLittle." *See* Br. 24; JA-22-23 ¶14, JA-44-51 ¶¶73-82, JA-62-64 ¶¶114-116, JA-87-89 ¶¶170-171

42

(pulled from an apparent universe of 9 billion listens/views, JA-103 ¶199). Not only are these comments irrelevant to the court's context analysis, but Drake fails even to grapple with whether the commenters were making factual statements or whether they too were stating opinions. *See*, *e.g.*, SPA-14; *Talbert*, 2026 WL 739736 (dismissing Twitter-based claims).[14]

Moreover, this Court has rejected precisely the argument that because *someone* treated something as fact, the reasonable person test must be met. In *Rapaport*, plaintiff argued that the district court "incorrectly overlooked evidence that Barstool's audience interpreted [the alleged] defamatory statements as true" on the basis that Rapaport's "podcast received thousands of negative statements" in the aftermath of Barstool's campaign, including comments repeating and expanding on the challenged statements. JA-340-344. This Court disagreed. *Rapaport*, 2024 WL 88636, at *5. Drake is effectively seeking to impose something

---

[14] Additionally, Drake says "[e]ntertainment industry insiders and media experts … also interpreted the Recording as a factual[.]" Br. 26. Even if these were a proxy for the applicable reasonable person standard, neither supports his assertion. *See* JA-53-54 ¶¶84-85 (NPR program (JA-259-285) in which participant states "to be clear, at this point, there is no evidence that Drake has committed a crime"); JA-54 ¶87 (comments by actor Seth Rogen: "I don't know if he is [a pedophile]").

akin to a "least sophisticated consumer" standard that has never been recognized in New York's defamation law. *Cf. Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993) (adopting that standard in the FDCPA context and contrasting it with the "reasonable consumer" standard).

Neither Drake's invocation of *Davis v. Boeheim*, Br. 17-18 (quoting 24 N.Y.3d at 272 ("'the motion to dismiss must be denied if the communication at issue taking the words in their ordinary meaning and context, is also susceptible to a defamatory connotation'")),[15] nor anything else he cites, *id.* at 24-25, supports his attempt to rework the governing standard or allow online comments to carry the day. *Davis* does not involve reliance on anonymous online comments to resolve the fact/opinion question. More fundamentally, *Davis* instructs that "context" is critical. *Davis* applies the *same* fact/opinion test enshrined in *Steinhilber* and its progeny, finding there that the statements (referencing a university investigation) implied the speaker had

---

[15] The language Drake lifts from *Davis* is a passing quotation from *Sweeney v. Prisoners' Legal Services of New York, Inc.,* about the distinct question of whether an impugned statement is reasonably susceptible to *defamatory connotation*, not whether a reasonable observer would understand it as fact or opinion. *See* 538 N.Y.S.2d 370, 371-72 (3d Dep't 1989). *Sweeney* deals separately with "Defendants' alternate ground for dismissal … that, even if defamatory, their communication is constitutionally immune as an expression of pure opinion." *Id.* at 372-73.

44

undisclosed information because they "were not rhetorical hyperbole," were published in a newspaper article, were made by a person with authority at the university, and came before the university itself released the results of the investigation. 24 N.Y.3d at 271-73 (cleaned up). Drake's only other argument—that *Davis* or other cases support the notion that whether anyone hypothetically "*could*" understand a statement a particular way is distinct from how a statement "*would*" be interpreted, Br. 17—is nonsensical. *Davis* uses those words interchangeably in successive sentences. *See* 24 N.Y.3d at 269-70 ("whether a reasonable reader could have concluded" and "whether a reasonable reader would consider") (cleaned up). *Von Gutfeld*, which Drake cites, is similar. *See* 80 N.Y.2d at 139, 141, 143 (not distinguishing between "could" and "would" constructions).[16]

---

[16] Drake's remaining authorities (Br. 24-25) for urging the court to take account of subjective views through the guise of reasonable person analysis do not support any such approach. The *dicta* from *Palin v. N.Y. Times Co.* concerns the distinct issue of whether statements are "capable of being proven false," 940 F.3d 804, 816 (2d Cir. 2019), not whether their tone and context indicate to a reasonable person that the statements are opinion. And *Zuckerbrot v. Lande*, 167 N.Y.S.3d 313, 332 (N.Y. Sup. 2022), merely noted that subjective third-party internet posts were pled.

### 2. The District Court Correctly Took Judicial Notice of the Other Songs in the Feud.

Drake also argues that the District Court erred by "reaching beyond the pleadings" to "draw[] factual inferences from judicially-noticed lyrics" in "Taylor Made Freestyle," the diss track in which Drake used the AI-generated voice of deceased rapper 2Pac, to urge Lamar to "[t]alk about [Drake] likin' young girls[.]" Br. 20-22; *id.* at 27 (arguing conversion to summary judgment was necessary). Drake complains that rather "than simply acknowledging the lyrics' existence," the court relied on them in assessing the broader context and "used its subjective interpretation of the lyrics to contradict Drake's allegations." Br. 22. This argument fails many times over.

First, Drake assumes that there is *another* interpretation of "talk about [Drake] likin' young girls[.]" *Id.* But Drake's counsel "could not provide the Court with any alternative understanding of this lyric" at oral argument. SPA-28 n.5; *see* JA-486-487[34:5-35]. Nor does his brief here. There is not one.

Second, this Court "review[s] the District Court's determination of whether to take judicial notice of facts for abuse of discretion," *Staehr,* 547 F.3d at 424, and Drake does not attempt to show such an abuse.

Third, Drake waived any such challenge below by conceding at oral argument that the court *could* take judicial notice of the other song lyrics. JA-481-482[29:24-30:3] ("[W]e don't challenge that the Court can take notice of the fact that lyrics exist in a song out in the world."); *see Dorce v. City of N.Y.*, 2 F.4th 82, 102 (2d Cir. 2021) (party is "bound by concessions made by [his] counsel at oral argument.").

Fourth, courts "may take judicial notice of [song] lyrics because 'they can be obtained from widely available and reliable sources, the accuracy of which cannot reasonably be questioned.'" *Jones v. Atl. Recs.*, 2023 WL 5577282, at *5 n.5 (S.D.N.Y. Aug. 29, 2023), *aff'd sub nom. Jones v. Atl. Recording Corp.*, 2025 WL 1872808 (2d Cir. July 8, 2025).[17]

Fifth, Drake's argument that the court erred in drawing inferences against him conflates a question of law with a question of fact. Drake's (tortured) logic is that the court took notice of "Taylor Made Freestyle" for the "the truth of [the] matters asserted," and drew "factual inferences" against him by finding that "the *only* inference a reasonable listener

---

[17] "Taylor Made Freestyle" and the line in question have also been widely reported on—including in an article Drake cites—such that its accuracy cannot reasonably be questioned. *See* Br. 21 (citing Jon Blistein, *Drake Removes 'Taylor Made Freestyle' After Lawsuit Threat Over AI Tupac*, Rolling Stone (Apr. 26, 2024)).

could make from an artistically projected, and AI-generated, voice of Tupac was a *factual* message from Drake designed to 'goad' Lamar into making pedophilia allegations against him." Br. 20-22 (emphasis in original).

The court obviously did not take notice of "Taylor Made Freestyle" *for the truth of the matters asserted*. Doing that would have required it to find that the lyrics were true. It also did not make findings of fact. Rather, it considered *as a question of law* whether the reasonable listener would understand "Not Like Us" to convey fact or opinion, and as part of that analysis, situated the song in the context of the broader rap feud. As discussed *supra* § I.A.2, extensive precedent—including this Court's *Torain* decision—shows that the District Court was right to consider this broader context.

Drake does not cite a single defamation case in support of this argument and for good reason. The focus on context—not merely what words might mean in the abstract—necessitates that courts frequently draw legal conclusions that disfavor a defamation plaintiff's proposed cold reading of a challenged statement. *See, e.g., Coleman*, 158 F.4th at 143 (statement that plaintiff would "never take no for an answer"

nonactionable because a reasonable person would understand it as defendant's subjective perception of plaintiff's persistent requests for sex); *Rapaport*, 2024 WL 88636, at \*2-4 (statements that plaintiff had herpes and committed domestic abuse and stalking); *Torain*, 279 F. App'x at 47-48 (statement calling plaintiff "sick racist pedophile" nonactionable in context).

### 3. Drake's Republication Argument is Meritless.

Drake argues that the court erred by overlooking UMG's purported "republications" of "Not Like Us." *See* Br. 36-41. According to Drake, UMG "republished" the track by releasing the music video; permitting the recording to be played at two political rallies and the Grammys; allowing Lamar to perform the song at a Juneteenth Pop Out concert; and arranging for it to be performed at the Super Bowl. *See* Br. 36-37. Drake says the District Court erred by holding "that the context for *each* of these republications was necessarily the same—the entire rap battle," *id.* at 37 (emphasis in original), and that it should have performed a separate context assessment for each, *id.* at 38-39. The argument is without authority and meritless.

First, Drake did not tell the court below that it needed to do separate context analyses. He barely raised republication, conceding at oral argument that there was "a lack of grappling with the—and perhaps due to imprecise briefing on our part—the nature—the role that republication plays in this case." JA-489[37:20-23]. Drake's effort to inject this issue now comes too late.

Regardless, the argument is meritless. Republication under New York Law "occurs upon a separate aggregate publication from the original, on a different occasion" that "is intended to and actually reaches a new audience." *Firth v. State*, 98 N.Y.2d 365, 371 (2002).

Drake's "republication" argument is undone by his admission that "Not Like Us" immediately became ubiquitous, generating a record-breaking 13 million streams in 24 hours, debuting at No. 1, and reaching 96 million streams in a week. JA-100-101 ¶194. He nowhere explains how later plays of a song already heard on that scale reached "a new audience" in subsequent "republications." *Firth*, 98 N.Y.2d at 371. Put differently, if the track was nonactionable opinion at the outset, it did not morph into fact as more people heard it and learned about this rap battle.

50

Nor does Drake cite authority requiring a separate context analysis for every later airing of the same song. His theory would invite the multiplicity of actions *Firth* warned against. *Id.* at 369-71. This Court's *Cooper* decision confirms the proper approach. There, plaintiff alleged that statements made by defendant in May, June and July of the same year defamed her by accusing her of being racist. *See* 2023 WL 3882977, at *2. The court held that all three statements were nonactionable because the reasonable audience would have understood them as "an expression of opinion based on the widely circulated video" to which the statements responded. *Id.* at *4. The Court did not do *separate* context assessments for each statement. It assessed them in view of the broader context applicable to all.

The only even remotely relevant authority that Drake offers (Br. 39) is *Condit v. Dunne*, 2008 WL 2676306 (S.D.N.Y. July 8, 2008). *Condit* applies California law and involved *a new statement* accusing the plaintiff of committing murder *four years* after the defendant had made a series of statements accusing plaintiff of the same. There, defendant's initial series of statements had already been the subject of their own action that resulted in a settlement.

51

Drake otherwise cites cases about whether alleged republications are time-barred, Br. 37, 39, whether statements were published with actual malice, Br. 39-40, and cases articulating New York's fact versus opinion test, Br. 38. *None* support doing separate contextual assessments of alleged republications.

Not only is Drake bereft of authority, but the argument would elevate form over substance because "separate" context assessments would not be different. What is at issue for each purported republication is "Not Like Us," either in the form of the recording, the video, or live performances. In *every* case, the context—the forum, language, tone, and broader circumstances that gave rise to the song—is the *same*. *See* SPA-22 ("Republication cannot transform Lamar's statement of opinion into UMG's statement of fact."[18]).

Drake's argument is just another attempt to divorce "Not Like Us" from the broader rap feud with Lamar. *See* Br. 38 (arguing listeners at

---

[18] Drake's contention that the District Court was wrong because "Lamar's mental state is entirely irrelevant" misses the point. Br. 39. The court was not concerned with Lamar's mental state (which goes to malice, and only if Drake had sued the real subject of his frustration, Lamar). The court meant (rightly) that "Not Like Us," taken in context, conveys opinion, and that analysis does not change because the song (in its same form) was purportedly authorized by UMG to be played in different venues after its initial release.

the Super Bowl and political rallies could have understood the statements in "Not Like Us" "as *standalone assertions* to be taken seriously") (emphasis added). And while the argument misunderstands New York defamation law for all the reasons discussed *supra*, it fails even on Drake's terms.

For example, three "republications" (Grammys, a Kamala Harris rally, and Democratic National Convention) involve playing the Recording at new venues. Br. 37. Again, it is illogical and wrong on the law to suggest that playing the *exact format* of the track would be republication, as discussed *supra*. Moreover, the reasonable viewer of the Grammy Awards is someone *more* likely to know about the rap beef between Drake and Lamar (especially as the feud had been in the media for nine months). *See* JA-83 ¶164. And Drake's resort to the Democratic National Convention is even worse. While noting that the Recording was played during the "roll call" vote, *see* JA-82 ¶162 n.200, Drake fails to mention that it was *excerpted* so the audience merely heard the lyrics "*they not like us*" on repeat, but *not* the lyrics Drake claims are defamatory, *see id.* (linked video). Even if the audience had heard those lyrics, Drake's contention (Br. 38) that "political junkies who tuned into

53

a political convention"—in summer 2024—would not have been familiar with the feud between Drake and Lamar is nonsense. Drake pleads the "convention was reportedly viewed by approximately 20 million people across 12 television networks." JA-82 ¶162. Surely he cannot contend that *20 million people* had no knowledge of a feud that had gained "cultural ubiquity," SPA-21, simply because they have some interest in politics. The same is true of the Kamala Harris rally video that went "viral" on social media. JA-82 ¶161.

Lamar's live performance of "Not Like Us" at the "'Ken & Friends Pop Out' Juneteenth concert," JA-70 ¶131, was (as the name indicates) performed at *Lamar's* concert, which would attract an audience familiar with his work and the feud.

Similarly, the context of the Super Bowl performance undoubtedly put a reasonable viewer on even greater notice of the feud than the original, non-actionable track itself. Reporting about the feud—and whether Lamar would play "Not Like Us"—was rampant pre-performance.[19] Lamar also made references to *this* lawsuit in that

---

[19] *See, e.g.*, Carmen Vitali, *Will Kendrick Lamar perform 'Not Like Us' at Super Bowl LIX halftime show?* Fox Sports (Feb. 7, 2025), https://www.foxsports.com/stories/nfl/will-kendrick-lamar-perform-not-like-us-super-bowl-lix-halftime-show.

performance: "I want to play their favorite song... but you know they love to sue[.]"[20] This expressly contextualized the rap beef for the audience. *See Rapaport,* 2021 WL 1178240, at *15. Drake also fails to plead that UMG had any responsibility for publishing (even indirectly) "Not Like Us" at the Super Bowl. He says only on "information and belief" that UMG "conferred financial benefits on the parties in charge of the Super Bowl Performance and leveraged existing business relationships to secure [Lamar's] headliner-spot." JA-84 ¶165.

Finally, the music video was released *after* the song had already become a hit and the subject of substantial media attention related to the feud. And its imagery seizes on the feud for the audience, including, *inter alia*, Lamar beating an owl piñata and starring down an owl in a cage. JA-61-62 ¶¶109-110. It is not reasonable to suggest the average viewer would see it as making standalone factual assertions.

## II. The Court Properly Dismissed Drake's Harassment Claim.

Drake contends that "Not Like Us" violates the *Penal* Law. Br. 47-51. The claim fails because, as the District Court held, "[t]his state

---

[20] *See, e.g.*, Mark Savage, *Kendrick Lamar's Super Bowl show was one big tease*, BBC (Feb. 9, 2025), https://www.bbc.com/news/articles/cz0l5m 5m943o.

criminal statute does not provide a private right of action," SPA-30, and for other reasons not reached.

## A. Penal Law § 240.26 Does Not Create an Implied Private Right of Action.

The Second-Degree Harassment statute Drake invokes has no express right of action, let alone any facial applicability in the civil context. N.Y. Penal Law § 240.26(3) ("A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person:… He or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose.").

"Where a penal statute does not expressly confer a private right of action on individuals pursuing civil relief, recovery under such a statute 'may be had only if a private right of action may fairly be implied.'" *Hammer v. Am. Kennel Club*, 1 N.Y.3d 294, 299 (2003); *see Konkur v. Utica Acad. of Sci. Charter Sch.*, 38 N.Y.3d 38, 40-41 (2022) ("legislative intent" controls).

The existence of an implied right of action hinges on: "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would

56

promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme." *Hammer*, 1 N.Y.3d at 299 (cleaned up). "[A]ll three factors must be satisfied before an implied private right of action will be recognized." *Konkur*, 38 N.Y.3d at 41 (cleaned up). The third factor is dispositive here. *See* SPA-32-33.

### 1. A Private Right of Action is Inconsistent with the Legislative Scheme.

In evaluating the third factor, the Court of Appeals holds that "where a statutory scheme contains private *or public enforcement* mechanisms, this demonstrates that the legislature considered and decided what avenues of relief were appropriate." *Ortiz v. Ciox Health LLC*, 37 N.Y.3d 353, 360, 362 (2021) (emphasis added); *see Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 71 (2013). This statute both specifies its public enforcement mechanism and, unlike neighboring provisions, lacks the mechanism Drake seeks.

First, "'the Legislature specifically considered and expressly provided for enforcement mechanisms' in th[is statute] itself." *Cruz*, 22 N.Y.3d at 71; *see* SPA-32-33. It makes Second-Degree Harassment "a violation," N.Y. Penal Law § 240.26, thereby incorporating the public enforcement mechanism for "violations," *id.* § 10.00(3) ("Violation means

57

an offense … for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed."). Such a "law providing for criminal penalties ... demonstrate[s] intent not to impose [a] private right of action." *Ortiz*, 37 N.Y.3d at 362; *see, e.g.*, *Metz v. State*, 20 N.Y.3d 175, 180-81 (2012) (holding "a private right of action would be incompatible with the legislative design" where the statute specified what would constitute "a class E felony" versus "a misdemeanor"); *Schlessinger v. Valspar Corp.*, 21 N.Y.3d 166, 171 (2013) (civil penalty provision indicated exclusive government enforcement).[21]

Second, the Legislature expressly enacted private rights of action for *the adjacent Penal Law harassment provision*. It created a "civil remedy" for "conduct that would constitute harassment under section 240.25 of the penal law." N.Y. Civ. Rights Law § 79-n(2); *id.* §§ 40-c(2), 40-d (similar). The *absence* of a civil remedy for § 240.26 was by design. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("particular

---

[21] In briefing his motion to certify this issue to the Court of Appeals, Drake makes failed attempts to distinguish *Metz* and *Schlessinger*. Whereas Drake claims that *Metz* did not involve an implied right, Reply 8, the opinion holds that "recognizing a private right of action would be incompatible with the legislative design," *Metz*, 20 N.Y.3d at 180. Drake notes the statute in *Schlessinger* involved civil penalties, *see* Reply 9, but cannot explain how a statute creating only criminal penalties would be more consistent with a private right of action.

language in one section of a statute but omi[ssion] in another section of the same Act" means the legislature presumptively "act[ed] intentionally and purposely in the disparate inclusion or exclusion"); *Ortiz*, 37 N.Y.3d at 364 (rejecting right of action where "the legislature affirmatively provided mechanisms for enforcing other related provisions of the Public Health Law, but did not here").

Finally, as the court below recognized (SPA-29, 31), the weight of authority, including uniform New York appellate precedent, rejects a private right of action for § 240.26. *See, e.g.*, *Cablevision Sys. Corp. v. Commc'ns Workers of Am. Dist. 1*, 16 N.Y.S.3d 753, 754 (2d Dep't 2015) (affirming dismissal of claims premised on, *inter alia*, § 240.26 because "the subject Penal Law provisions do not create a private right of action"); *Ralin v. City of N.Y.*, 844 N.Y.S.2d 83, 84 (2d Dep't 2007) ("New York does not recognize a cause of action to recover damages for harassment"); *Hartman v. 536/540 E. 5th St. Equities, Inc.*, 797 N.Y.S.2d 73, 74 (1st Dep't 2005) (similar). Even if the Court of Appeals had not spoken as loudly against implying private rights of action under the Penal Law, these precedents would resolve this issue. *See, e.g.*, *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999) ("We are bound ... to

apply the law as interpreted by New York's intermediate appellate courts ... unless we find persuasive evidence that the New York Court of Appeals … would reach a different conclusion.").

### 2. Drake's Reliance on *Galella* Does Not Save His Claim.

Drake does not undermine these showings. He first turns to an ambiguous footnote in *Galella v. Onassis*, 487 F.2d. 986, 994 n.11 (2d Cir. 1973), calling it "good law." Br. 48. The language he identifies is, at most, *dicta*[22] that in turn cites a case that never even mentions whether there is a private right of action under the harassment statute in question. *See Long v. Beneficial Fin. Co.*, 330 N.Y.S.2d 664 (4th Dep't 1972). Even if *Galella* had involved a private right of action question, it predates the now-governing New York standard for implied rights of action and therefore does not address the issue. New York's now-governing test derives from *Cort v. Ash*, 422 U.S. 66 (1975), which the Court of Appeals did not adopt until a decade after *Galella*, *see Burns Jackson Miller*

---

[22] As UMG's opposition to Drake's certification motion details, *Galella* did not present any question of whether a private right of action existed. *See* Opp'n 18-20. In rejecting a First Amendment defense to "tortious conduct" for which defendant was found liable, 487 F.2d at 994, this Court stated in a footnote that another harassment statute, Penal Law § 240.25 makes "[h]arassment … a criminal violation" and that "[c]onduct sufficient to invoke criminal liability for harassment *may* be the basis for private action," *id.* n.11 (emphasis added).

60

*Summit & Spitzer v. Lindner*, 59 N.Y.2d 314 (1983); *Sheehy v. Big Flats Cmty. Day, Inc.*, 73 N.Y.2d 629, 633-34 (1989) (doing so for criminal statutes in 1989).[23]

Thus, Drake largely ignores New York's standard, arguing that a "comprehensive enforcement scheme" forecloses a right of action and that a non-comprehensive scheme indicates legislature's intent for one. Br. 50-51. Drake never explains what "comprehensiveness" means here or why exactly Section 240.26 fails this test. Regardless, nothing Drake cites adopts his "comprehensiveness" test, and his cases predate *Hammer*, *Metz*, *Schlessinger*, *Cruz*, and *Ortiz*. That the Court of Appeals has called some enforcement mechanisms comprehensive shows sufficiency not necessity (at most).

### B.   Drake Fails to Allege a Penal Law Violation.

The claim fails for other reasons not reached below.

*First*, Drake cannot show that UMG acted "with intent to harass, annoy or alarm" him. N.Y. Penal Law § 240.26. Drake asserts an intent to "devalue Drake's music and brand in order to gain leverage in

---

[23] Drake also cites cases tracing back to *Galella* without conducting any analysis. *See* Br. 49. Not one cites, much less applies, New York's test for implied rights of action.

61

negotiations." JA-107 ¶213. This allegation is speculative and illogical. Nothing supports the notion that UMG's contract with Drake would be *more* profitable for UMG if Drake was "devalued." *Id.*

*Second*, Drake fails to allege that UMG acted with "no legitimate purpose" in publishing and promoting "Not Like Us." N.Y. Penal Law § 240.26(3). "'[N]o legitimate purpose' means *the absence* of a reason or justification to engage someone, other than to hound, frighten, intimidate or threaten." *People v. Stuart*, 100 N.Y.2d 412, 428 (2003) (emphasis added). As Drake admits, UMG's "motive was financial." JA-117 ¶251.

*Third*, Drake cannot satisfy the requirement that UMG "engage[d] in *a course of conduct or repeatedly commit[ted qualifying] acts*." N.Y. Penal Law § 240.26(3) (emphasis added). "[C]ourse-of-conduct" statutes are constitutional *only because* they "criminalized conduct … without regard to the content of any communication." *People v. Marquan M.*, 24 N.Y.3d 1, 11 n.4 (2014). Section 240.26(3) cannot support a claim based on the pure speech of publishing "Not Like Us."

## III. The Court Properly Dismissed Drake's GBL Claim.

The District Court properly dismissed the GBL claim because Drake fails to plausibly allege that UMG engaged in a deceptive scheme

to inflate the popularity of "Not Like Us," or that any conduct at issue was consumer-oriented. SPA-33-38; *see Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*, 37 N.Y.3d 169, 176 (2021) ("[P]laintiff must allege that: (1) the defendant's conduct was consumer-oriented; (2) the defendant's act or practice was deceptive or misleading in a material way; and (3) the plaintiff suffered an injury as a result of the deception.").

Drake claims "on information and belief" that UMG "engaged in deceptive acts and practices" by "covertly financially incentivizing third parties … to play, stream, and promote the Recording," and making "materially false and misleading representations about the Recording's popularity to consumers." JA-117-118 ¶¶256-257.

## A. Drake Does Not Allege Deceptive Conduct.

Drake's (baseless) allegations of a covert scheme by UMG to drive streams are made "[o]n information and belief," *see, e.g.*, JA-90 ¶173, predicated on a handful of (largely anonymized) online posts. JA-92 ¶¶177-178; *see* SPA-33.

A "small sample of users' possible experience, communicated through Tweets and other anonymized commentary, fails to establish a

63

plausible inference that UMG manipulated listeners into streaming 'Not Like Us[.]'" SPA-36. Quoting this Court's precedent and, in turn, *Twombly*, the court recognized that even when information supposedly is "peculiarly within the possession and control of" the defendant, a plaintiff must still allege facts creating a "reasonable expectation that discovery will reveal evidence of illegality." *Id.* (cleaned up) (quoting *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) and, in turn, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "[Drake's] allegations—based on what boils down to unreliable online commentary" fail that test. *Id.*

The District Court had ample support in this Court's precedents. *See, e.g.*, *Yamashita v. Scholastic Inc.*, 936 F.3d 98, 107 (2d Cir. 2019) (even when facts are "peculiarly within [the defendant's] possession and control," plaintiff still "must marshal more than unsubstantiated suspicions" to state a claim"); *Amigo Shuttle Inc. v. Port Auth. of N.Y. & N.J.*, 2025 WL 2618862 (2d Cir. Sept. 11, 2025) (summary order) (same); *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 226 (2d Cir. 2017) (same).

Drake labels these ordinary rules a "heightened pleading standard." Br. 52-54. But the District Court quoted *Arista* and

64

*Twombly*—the very authorities Drake invokes. What Drake really seeks is exemption from any meaningful pleading burden. *See* Br. 53 ("[t]he inquiry should have stopped" once he said information was "peculiarly within the possession and control of UMG").

That is not the law. Drake largely disregards the above authorities and instead primarily relies on *Boykin v. KeyCorp*, 521 F.3d 202 (2d Cir. 2008). *Boykin*, however, heavily relied on this Court's subsequently reversed decision in *Iqbal*. And this Court has explained that "*Boykin* … cannot be read to conflict with *Iqbal*'s requirements" and that even "where information is 'particularly within defendants' knowledge and control … such pleadings must be grounded in a good-faith basis in fact[.]" *Kajoshaj v. N.Y. City Dep't of Educ.*, 543 F. App'x 11, 15-16 (2d Cir. 2013) (summary order).

Drake does not seriously contend that his few allegations are sufficient under governing law, only briefly addressing them. Br. 54-55. Drake has only two fact allegations about *any* activity by UMG in connection with "Not Like Us." The first internet post, which Drake says was deleted and he did not preserve, supposedly linked UMG to a "slow ass digital marketer paying to clown the suit" (*i.e.*, not to promote "Not

65

Like Us"). JA-92 ¶177. The second, anonymous post says that UMG and Lamar used bot streaming. JA-92 ¶178.

Given Drake's absence of basis for information-and-belief allegations, he resorts to the kind of distortions that necessitated the withdrawal of his original allegations under threat of sanction. *See supra* p.10. He assertedly pled "comments from a rapper with industry knowledge that UMG used artificial streaming to spread the Recording." Br. 54. To claim that Drake pleaded any such thing is false. He actually alleged that a "podcast host" claimed that "*Kendrick* used bots" so Drake would have "more dislikes than likes," without referencing UMG. JA-91-92 ¶176 (emphasis added). Drake's remaining allegations are more speculative. *See* JA-93 ¶180 (two X posts from July 2024 showing "Not Like Us" being recommended to Spotify users who searched for rap artists).

Permitting plaintiffs to proceed on conjecture sourced to anonymous social media would defang *Twombly/Iqbal* and flood the courts with baseless claims and conspiracy theories. The court correctly dismissed.

### B. Drake Fails to Allege Consumer-Oriented Conduct.

The court also held that Drake failed to allege actionable consumer-oriented conduct. SPA-36-37. GBL 349 is directed at "wrongs against the consuming public." *City of N.Y. v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 623 (2009).

The court found that Drake did not plead facts indicating "how any of the deceptive practices allegedly employed by UMG *harmed consumers*," let alone allege how any consumer decision could be affected by the supposed deception. SPA-36-37 (emphasis added). As the court understatedly observed, "[t]he Amended Complaint is somewhat vague as to who the class of consumers is and what product, goods, or services they are purchasing." SPA-37. Drake claimed only that "UMG engaged in practices to make 'Not Like Us' seem more popular than it actually was, without connecting that activity to any consumer harm." SPA-38.

Drake fails to show otherwise here. He contends only that the "consumer-oriented" conduct could be *any* "repeated acts of deception directed at a broad group of individuals." Br. 56 (cleaned up). This is in tension with the Court of Appeals' recognition that the conduct must "result in a *transaction* in which the consumer was harmed." *Goshen v.*

67

*Mut. Life Ins. Co.*, 98 N.Y.2d 314, 326 (2002) (emphasis added); *cf. Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56 (1999) ("deception" alone is not "actual harm"). Drake's authorities (Br. 56) show likewise. *See, e.g.*, *New York v. Feldman*, 210 F. Supp. 2d 294, 302 (S.D.N.Y. 2002) (scheme to manipulate auctions, harming "unsophisticated individual sellers"); *Plavin v. Grp. Health Inc.*, 35 N.Y.3d 1, 12-13, (2020) (deceptive marketing induced customers to select insurance that did not cover out-of-network procedures as represented). Drake cannot show that UMG's purported scheme "would amount to actual harm of consumers or any limitation of their choices." SPA-37.

## C. Drake Fails to Allege An Injury Caused by UMG.

Finally, this Court can affirm on the alternative ground that Drake fails to allege a cognizable "injury as a result of the deception." *Himmelstein*, 37 N.Y.3d at 176. Injury cannot be "indirect or derivative," as "when the loss arises solely as a result of injuries sustained by another party." *Smokes-Spirits.Com, Inc.*, 12 N.Y.3d at 622.

But Drake's theory is "each time the Recording was artificially streamed, Drake's songs received a disproportionate share from the pool of royalties collected based on the streaming data," and "every time the

68

Recording was played [on the radio], Drake lost the opportunity for one of his songs to be played." JA-118-19 ¶¶262-263. At best, this is a derivative or indirect injury theory, because it is "contingent on harm to third parties," *i.e.*, the purported harm to streaming platforms and consumers that Drake loosely claims were deceived by UMG's supposed scheme to inflate the popularity of "Not Like Us." *Smokes-Spirits.Com, Inc.*, 12 N.Y.3d at 623. Regardless, it is pure speculation that a Drake song would necessarily have been played instead of "Not Like Us." *See Hobish v. AXA Equit. Life Ins. Co.*, 205 N.Y.S.3d 395, 396 (1st Dep't 2024) (rejecting "speculative" injury).

## CONCLUSION

This Court should affirm.

March 27, 2026                                Respectfully submitted,

                                             /s/ Eamon P. Joyce

Rollin A. Ransom                             Eamon P. Joyce
SIDLEY AUSTIN LLP                            Nicholas P. Crowell
350 South Grand Avenue                       Katelin Everson
Los Angeles, C.A. 90071                      James R. Horner
(213) 896-6000                               SIDLEY AUSTIN LLP
                                             787 Seventh Avenue
                                             New York, N.Y. 10019
                                             (212) 839-5300

*Counsel for Defendant-Appellee UMG Recordings, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

1. This brief complies with the type-volume limitation of Local Rule 32.1(a)(4) and Federal Rule of Appellate Procedure 32 because it contains 13,995 words, excluding the items exempted by Federal Rule of Appellate Procedure Rule 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: New York, New York
March 27, 2026

Respectfully submitted,
*/s/ Eamon P. Joyce*
Eamon P. Joyce
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
ejoyce@sidley.com

71

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2026 I caused the foregoing brief to be served on all registered counsel through the Court's CM/ECF system.

Dated:  New York, New York
March 27, 2026

Respectfully submitted,
*/s/ Eamon P. Joyce*
Eamon P. Joyce
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
ejoyce@sidley.com

72