# 25-2758

# United States Court of Appeals for the Second Circuit

**AUBREY DRAKE GRAHAM**,

*Plaintiff-Appellant,*

v.

**UMG RECORDINGS, INC.**,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF SOCIAL SCIENTISTS AND LEGAL SCHOLARS
AS *AMICI CURIAE* IN SUPPORT OF
DEFENDANT-APPELLEE AND AFFIRMANCE**

JACK I. LERNER
UCI INTELLECTUAL PROPERTY, ARTS, AND
  TECHNOLOGY CLINIC[*]
University of California, Irvine School of Law
401 E. Peltason, Irvine CA 92697
(949) 824-7684

April 3, 2026        Counsel for *Amici Curiae*

---

[*] This brief was prepared with the assistance of Katrina Shelton, Stephanie Yanes, Jana Ariss, Shannon Barbour, and James Blitz, who are members of the UCI Intellectual Property, Arts, and Technology Clinic and Certified Law Students pursuant to Rule 9.42 of the California Rules of Court.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTEREST OF AMICI ............................................................................................ 1

SUMMARY OF ARGUMENT ................................................................................ 2

ARGUMENT ........................................................................................................... 4

I.    Rap is an Established Musical Genre with Distinct Artistic Conventions that Courts Must Consider Before Treating Lyrics as Factual Representations. ...4

    A.  Rap Music Has a Long History as a Rebellious and Defiant Art Form that Has Developed Unique and Specific Artistic Conventions and Modes of Expression ....................................................................................................4

    B.  The Normative Conventions of Rap as a Genre ........................................5

    C.  "Diss Tracks," Rap Battles, and Rap Feuds Are Part of an Established Tradition in Rap Music Involving Outrageous Hyperbole and Exaggeration, Which Neither Fans Nor Performers Take as Literal. ........8

II.   The Use of Rap Lyrics in Judicial Proceedings Threatens to Undermine Important Civil and Constitutional Rights ....................................................17

    A.  Treating Rap Lyrics as Factual Representations Undermines First Amendment Rights ................................................................................17

    B.  Treating Rap Lyrics as Literal Makes It More Likely that Rap Lyrics Will Be Exploited to Introduce Prejudice and Racial Bias in Other Cases .....19

CONCLUSION ......................................................................................................23

APPENDIX A: List of *Amici Curiae* ................................................................ A-1

i

# TABLE OF AUTHORITIES

**CASES**

*Bey-Cousin v. Powell*, 570 F. Supp. 3d 251 (E.D. Pa. 2021) ..................................18

*Boladian v. UMG Recordings, Inc.*, 123 F.App'x 165 (6th Cir. 2005)....................19

*Diaz v. Gazmey-Santiago,* 2020 U.S. Dist. LEXIS 38488 (D.P.R. Mar. 3, 2020) ..19

*Haupt v. United States* 330 U.S. 631 (1947) ..........................................................19

*Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003).........................................19

*People v. Coneal*, 254 Cal. Rptr. 653 (Cal. Ct. App. 2019) ......................................5

*Rapaport v. Barstool Sports Inc.*, No. 22-2080-cv, 2024 U.S. App. LEXIS 556 (2d Cir. Jan. 9, 2024) .................................................................................................19

*United States v. Jordan*, 714 F. Supp. 3d 158 (E.D.N.Y. 2024) ...........................5, 7

**STATUTES**

A.B. 2799, 2021-2022 Leg., Reg. Sess. (Cal. 2022). .............................................20

Cal. Evid. Code §352.2 ...........................................................................................20

**RULES**

Federal Rule of Evidence 403................................................................................20

Federal Rule of Evidence 404................................................................................20

**OTHER AUTHORITIES**

50 Cent & Jeff O'Connell, *Formula 50: A 6-Week Workout and Nutrition Plan That Will Transform Your Life* (2013) ...............................................................6

Adam Dunbar & Charis E. Kubrin, *Imagining violent criminals: An experimental investigation of music stereotypes and character judgments*, 14 *J. Exp. Crim*. 507 (2018)..................................................................................................1

Adam Dunbar, Charis E. Kubrin, and Nicholas Scurich, *The Threatening Nature Of "Rap" Music,* 22 *Psychol. Pub. Pol'y & L*., 280-292 (2016) ......................1, 21

Andre Gee, *Rappers Are Saying They're 'Cappin' in Songs. Here's Why*, Complex (Aug. 10, 2022)......................................................................................5

Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 *Colum. J. L. & Arts* 1 (2007) ...........................................................7

*Art on Trial: Protect Black Art*, https://www.protectblackart.co ...........................22

Carrie B. Fried, *Bad Rap For Rap: Bias In Reaction To Music Lyrics,* 26 *J. Applied Soc. Psychol.* 2135 (1996) ...................................................................21

Charis E. Kubrin & Erik Nielson, *Rap on Trial*, 4 *Race & Just.* 185 (2014)........4, 6

Charis E. Kubrin, *Gangstas, Thugs, and Hustlas: Identity and the Code of the Street in Rap Music,* 52 *Soc. Probs.* 360 (2005) .................................................1, 6

Daniel Gilligan, *The Art of 'diss tracks'*, 5 *Alfred J.* 14 (2015) ..............................14

Daniel Silver et. al., *Genre Complexes in Popular Music*, 11 *PLoS One* (2016)....10

David Caplan, *The Art of Rhymed Insult*, 88 *Va. Q. Rev* 119 (2012)............... 13, 16

Denise Herd, *Changing Images of Violence in Rap music lyrics: 1979-1997*, 30 *J. Pub. Health Pol'y* 395 (2009) ...................................................................... 13, 15

DiArron Morrison & Diana Watkins Dickerson, *A Call (and Response) to Battle Rap*, 12 *J. Cont. Rhet.* 106 (2022) ................................................................ 11, 12

Elijah Wald, *The Dozens: A History of Rap's Mama* (2012) ...................................8

Enis Oğuz & Hale Işık-Güler, *Rap Devil versus Rap God: Impoliteness in a Rap Battle*, 21 *J. Pol. Res.* 127 (2024)................................................. 9, 10, 13, 15, 16

Erik Nielson & Andrea Dennis, *Rap on Trial: Race, Lyrics and Guilt in America* (2020)..................................................................................................5

H. Samy Alim et. al., *Moving the Crowd, "Crowding" the Emcee*: *The Coproduction and Contestation of Black Normativity in Freestyle Rap Battles,"* 22 *Discourse Soc*. 422 (2011) ....................................................... 10, 12

Henry Louis Gates, Jr., *The Signifying Monkey: A Theory of African American Literary Criticism* (1988) ...............................................................4, 5

Jack Lerner, Charis Kubrin, et al*., Rap on Trial Legal Guide* (2d. Ed. 2024) ....1, 18

Jack Lerner, *Rap on Trial: A Brief History*, 27 *Chap. L. Rev.* 405 (2024)..............18

James D. Johnson et.al., *Converging interracial consequences of exposure to violent rap music on stereotypical attributions of blacks,* 36 *J. Experimental Soc. Psychol*. 233 (2000)...................................................................................20

Jeff Chang, *Can't Stop Won't Stop: A History of the Hip-Hop Generation* (2005)..4

Joseph D. Johnson & Natalie Schell-Busey, *Old Message in a New Bottle, Taking Gang Rivalries Online Through Rap Battle Music Videos on Youtube*, 4 *J. Qualitative Crim. Just. & Criminology* 42 (2016) ........................................ 13, 15

Laurie A. Rudman & Matthew R. Lee, *Implicit and explicit consequences of exposure to violent and misogynous rap music*. 5 *Group Process. & Intergroup Relat*. 133 (2002) ..........................................................................................20

Lily E. Hirsch, *Insulting Music: A lexicon of Insult in Music* (2022). ................9, 13

Lola Ogunnaike & John Leland*, Feuding for Profit: Rap's War of Words*, *N.Y. Times*, Nov. 3, 2002.................................................................................15

Marcus W. Johnson, *Serious with Wordplay: Battle Rap as a Critical Literary Site and Model*, 3 *J. Culture & Values Educ*. 25 (2020).............................................11

Matthew Oware**,** *Battle Rap: An Exploration of Competitive Rhyming in Hip Hop*, in *African Battle Traditions of Insult* (2023)..........................................................11

Matthias Mauch, et al., *The Evolution of Popular Music: USA 1960-2010*, 2 *Royal Society Open Science* 5 (2015)...................................................................11

Mian Jia & Shuting Yao, *Yo I am Superman, You Kiddo Go Home: Ritual Impoliteness in Chinese Freestyle Rap Battles*, 42 *Text & Talk* 691 (2021) 10, 13

Mtume ya Salaam, *The Aesthetics of Rap*, 29 *J. Pop. Cult*. 303 (1995).................15

Paul Edwards, *How to Rap: The Art and Science of the Hip-Hop MC* (2009) .........7

Sandra Graham & Brian S. Lowery, *Priming unconscious racial stereotypes about adolescent offenders*. 28 *Law & Hum. Behav*. 483 (2004) ..................................20

Singhi Mavima, *Bigger By the Dozens: The Prevalence of Afro-Based Tradition in Battle Rap*, 3 *J. Hip Hop Stud.* 86 (2016).................................. 8, 9, 10, 12, 13, 15

Steve Stoute, *The Tanning of America: How Hip-Hop Created a Culture that Rewrote the Rules of the New Economy* (2011) .....................................................11

Stuart P. Fischoff, *Gangsta' Rap and a Murder in Bakersfield*, 29 *J. Applied Soc. Psychol.* 795 (1999).....................................................................................21

*The Oxford Handbook of Hip Hop Music* (Justin D. Burton & Jason Lee Oakes eds., online ed.. 2018)......................................................................................9, 12

Tia Tyree & Melvin Williams, *Black Women Rap Battles*: *A Textual Analysis of U.S. Rap Diss Song*. 25 *Wom. & Music* 64 (2021)................................. 13, 14, 15

Tricia Rose, *Black Noise: Rap Music and Black Culture in Contemporary America* (1994)......................................................................................................4

Venla Sykäri, *Interactive Oral Composition: Resources, Strategies, and the Construction of Improvised Utterances in a Finnish Freestyle Rap Battle*, 132 *J. Am. Folklore* 3 (2019) ..................................................................................10

v

## INTEREST OF AMICI[1]

Amici are nationally-recognized experts on the use of rap lyrics in court. They are criminologists and scholars of criminal justice, freedom of expression, and intellectual property. Amici have authored landmark experimental studies demonstrating that rap evidence creates a strong risk of bias in the courtroom;[2] a legal treatise on the use of rap lyrics in criminal proceedings;[3] content analyses of rap music;[4] and research on the intersection of race and the criminal justice system. Amici have served as expert witnesses, been widely quoted in media, and presented their research to thousands of attorneys, judges, scholars, and members of the public.[5]

---

[1] Amici have no personal or financial stake in this case, nor any relationship to the parties to this litigation. Neither the parties nor their counsel have authored this brief in whole or in part. Both parties have consented to the filing of this brief. See Fed. R. App. P. 29(a)(2) and 2d Cir. Rule 29.1(b).

[2] See, e.g., Adam Dunbar, Charis E. Kubrin, and Nicholas Scurich, The Threatening Nature Of "Rap" Music, 22 Psychol. Pub. Pol'y & L., 280-292 (2016); Adam Dunbar & Charis E. Kubrin, Imagining violent criminals: An experimental investigation of music stereotypes and character judgments, 14 J. Exp. Crim. 507 (2018).

[3] See Jack Lerner, Charis Kubrin, et al., Rap on Trial Legal Guide, 87-89 (2d. Ed. 2024).

[4] See, e.g., Charis E. Kubrin, Gangstas, Thugs, and Hustlas: Identity and the Code of the Street in Rap Music, 52 Soc. Probs. 360, 367 (2005).

[5] A list of amici curiae professors and their institutional affiliations is provided in Appendix A. The views expressed by amici do not purport to represent the views of their affiliated institutions.

As experts on rap music and its use in judicial proceedings, *amici* seek to provide this Court with the contextual framework necessary to examine rap lyrics— one that accounts for rap's history as artistic expression, its genre-specific practices, and, in particular, the unique role and normative conventions of battle raps, rap feuds, and "diss tracks." A thorough understanding of this context is necessary not only to assess the defamation claim at issue in this case,[6] but to prevent the harms that arise when courts treat rap lyrics as confessions or factual representations.

## SUMMARY OF ARGUMENT

Drake's defamation claim rests on the assumption that every word of "Not Like Us" should be taken literally, as a factual representation. This assumption is not just faulty—it is dangerous. When rap lyrics are admitted, it is because they are treated as literal. This in turn opens the door to racial bias and stereotypes in the courtroom, as empirical studies demonstrate. Treating rap lyrics as literal also threatens First Amendment speech protections, and the practice already has created a demonstrable chilling effect across the industry.

The United States District Court for the Southern District of New York appropriately dismissed Drake's defamation claim and correctly held that, in context, a reasonable listener could not have interpreted "Not Like Us" as a series of

---

[6] *Amici* take no position on other causes of action at issue in this appeal.

2

factual statements. Drake's appeal rests on the argument that the District Court wrongly presumed the audience consisted of rap "superfans" with special knowledge of rap history.[7] But as *amici* demonstrate and the District Court held, a rap feud—especially one encompassing numerous recordings and captivating millions of listeners all over the world—must be evaluated in the broader context of a decades-old, widely understood tradition in rap music.

As this Court considers the song lyrics at issue in this appeal, *amici* respectfully urge this Court to consider rap's history and artistic conventions—and to recognize that diss track lyrics are far from factual representations. As we demonstrate below, they are hyperbolic forms of creative expression consistent with the unique artistic practices and normative conventions of the genre. Diss tracks are an emblematic and long-standing feature of the history and cultural context of rap. They are understood by audiences not to represent factual assertions about the opposing artist, but rather to demonstrate skill and dominance meant to build allegiance and win competitions through clever wordplay, hyperbole, bluster, and demonstrations of disrespect. This Court should consider this context and find the rap lyrics at issue in this case are a form of rhetorical hyperbole, not factual

---

[7] Brief for Appellant at 35, *Graham v. UMG Recordings, Inc.* (2d Cir. filed Jan. 21, 2026) (No. 25-2758).

assertions.

## ARGUMENT

I. **Rap is an Established Musical Genre with Distinct Artistic Conventions that Courts Must Consider Before Treating Lyrics as Factual Representations**

   **A. Rap Music Has a Long History as a Rebellious and Defiant Art Form that Has Developed Unique and Specific Artistic Conventions and Modes of Expression**

Rap music is the verbal and musical element of hip hop, a cultural movement born in response to social conditions in predominantly Black urban communities, including economic decline, deindustrialization, urban neglect, and high crime.[8] Hip hop comprises multiple forms of artistic expression including breakdancing, DJing, graffiti, and MC'ing.[9]

Rap is an extension of the Black American tradition of oral storytelling and "signifying," a technique that incorporates exaggeration, metaphor, and wordplay.[10] The core of "signifying" is the intentional manipulation of language, contrasting between literal and figurative meanings to create ambiguous and intentionally

---

[8] Charis E. Kubrin & Erik Nielson, *Rap on Trial*, 4 *Race & Just.* 185, 187 (2014).

[9] *See* Tricia Rose, *Black Noise: Rap Music and Black Culture in Contemporary America* 2 (1994); Jeff Chang, *Can't Stop Won't Stop: A History of the Hip-Hop Generation* 17 (2005)).

[10] Henry Louis Gates, Jr., *The Signifying Monkey: A Theory of African American Literary Criticism* 53 (1988).

complex messages.[11] When combined with rap's use of constantly evolving Black vernacular slang, and its tendency to create new words and attribute varied meanings to common words, rap is particularly susceptible to misinterpretation.

It is therefore critically important that courts understand the history, norms, and artistic conventions of rap music as crucial factors in determining the meaning of rap lyrics. In the words of the California Court of Appeal, given "the figurative expressions which they are . . . they are not intended to be and should not be read literally on their face."[12]

## B. The Normative Conventions of Rap as a Genre

Courts frequently misinterpret rap lyrics as literal statements of fact, overlooking rap's distinct conventions arising from both historical traditions and intense market pressures. These misinterpretations, which can amount to criminalization of rap lyrics, pose a serious threat to artistic expression.[13] Two key normative conventions make rap particularly susceptible to misinterpretation in judicial proceedings.

---

[11] *Id*.

[12] *People v. Coneal*, 254 Cal. Rptr. 653, 666 (Cal. Ct. App. 2019). *See also United States v. Jordan*, 714 F. Supp. 3d 158 (E.D.N.Y. 2024) (engaging in extensive review of history and context of rap music); Erik Nielson & Andrea Dennis, *Rap on Trial: Race, Lyrics and Guilt in America* (2020).

[13] Andre Gee, *Rappers Are Saying They're 'Cappin' in Songs. Here's Why*, *Complex**Error! Bookmark not defined.** (Aug. 10, 2022).

First, stage names and public personas are a defining feature of the genre. Rap artists routinely create fictionalized characters under which they perform: Marshall Mathers performs as "Eminem"; Jeffery Williams performs as "Young Thug"; and so on. Rap artists often create a hypermasculine, street-hardened persona for their musical careers because such personas lead to greater commercial success.[14] But these personas rarely represent real-life identities. When discussing his song "High All the Time" from the hit album *Get Rich or Die Tryin'*, Curtis James Jackson III, known professionally as 50 Cent, explained, "I don't drink and I don't use drugs, and I didn't back then either. I put that joint on the first record because I saw artists consistently selling 500,000 with that content."[15]

Even as rap artists fabricate criminal personas, they also strive to appear authentic and proclaim they are "keepin' it real." But "keepin' it real" doesn't mean lyrics should be taken as fact. The term can mean rejecting "sanitized Hollywood depictions of life," revealing "the complexities and depth of life in the inner city,"

---

[14] The rise of "gangsta rap" (a subgenre of rap focusing on street hustlers and urban life in the United States) in the 1980s popularized violent criminal personas among rap artists. Early rap groups like N.W.A and the Geto Boys found commercial success beyond the Black community, making these personas a powerful tool for broader appeal and marketability. See Eithne Quinn, *Nuthin' But a G' Thang: The Culture and Commerce of Gangsta Rap* (2004); Kubrin, supra note 4; Kubrin & Nielson, *supra* note 8, at 198.

[15] 50 Cent & Jeff O'Connell, *Formula 50: A 6-Week Workout and Nutrition Plan That Will Transform Your Life* 2-3 (2013).

or even fabricating criminal activities to maintain a tough image—a common practice in the rap industry.[16] Without understanding the multilayered complexities of rap artists' claims to authenticity, courts can misconstrue rap lyrics as literal depictions of real life.

Second, braggadocio, hyperbole, and competitive wordplay are among rap's most defining artistic practices. As *amici* discuss below, these characteristics define rap battles and diss tracks, where exaggeration and lyrical cleverness take precedence over the truth.[17] Rappers use these battles to showcase their lyrical skills, focusing on creative insults designed to entertain and impress their audience. It is critically important that courts consider the particular artistic norms around rap battles when determining whether lyrics should be deemed factual representations.

---

[16] Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 *Colum. J. L. & Arts* 1, 19-20 (2007). *See also Jordan*, 714 F. Supp. 3d at 163.

[17] Paul Edwards, *How to Rap: The Art and Science of the Hip-Hop MC* 25 (2009).

### C. "Diss Tracks," Rap Battles, and Rap Feuds Are Part of an Established Tradition in Rap Music Involving Outrageous Hyperbole and Exaggeration, Which Neither Fans Nor Performers Take as Literal.

Competition and verbal sparring have been integral to rap music since the art form's inception in the 1970s, drawing on a long tradition in African American culture. Rap battles and "diss tracks" are often vicious, graphic, and hyperbolic, and rap lyrics regularly contain accusations of disreputable conduct, including illegal behavior. Audiences avidly follow rap feuds for their entertainment value and sheer drama. They expect exaggeration, insult, and lyrics that hit below the belt. Whether audiences include avid rap fans or casual listeners, individuals understand these performances to be contests of verbal dexterity and lyrical domination—not factual arguments or a series of news reports.

Historically, the creative use of language and verbal competition are found in cultural practices within the African American community. These practices, referred to as "dissing," "capping," "roasting," or "clowning," involve ritual exchange of insult. As one example, "the Dozens" is a verbal game of dissing someone's mother using highly exaggerated, often sexually loaded, humorous ritualized insults with expletives and profane language.[18] Another example, "signifyin,'" is a style of

---

[18] *See* Singhi Mavima, *Bigger By the Dozens: The Prevalence of Afro-Based Tradition in Battle Rap*, 3 *J. Hip Hop Stud.* 86, 90 (2016); *see also* Elijah Wald, *The Dozens: A History of Rap's Mama* (2012).

8

verbal play where an individual denigrates another through witty play on words and irony.[19] These games of insult are meant to showcase the intellect, sharpness of tongue, and wit of the competitors.

Rap music is a continuation of these cultural traditions.[20] In the words of rapper Ice Cube, "the essence and the origin of hip-hop is to battle."[21] As a result, rap is an especially rich site of insult, where insults abound as a means of spice, rebellion, entertainment, and humor, building on the genre's traditional use of metaphor, play on words, and boasting.[22] Nowhere is this more evident than in rap battles and diss tracks—staples of the genre.

<u>Rap Battles</u>

A rap battle is a live contest between rappers, often performed before a crowd, where the objective is to outwit, outflow, and out-diss one's opponent. Emerging from perceived transgressions, insults or disses, rap battles are "intensely competitive verbal displays"—"manifestations of impoliteness"[23] characterized by

---

[19] Mavima, *supra* note 18, at 96.

[20] *Id.* at 89.

[21] *The Oxford Handbook of Hip Hop Music* (Justin D. Burton & Jason Lee Oakes eds., online ed. 2018).

[22] Lily E. Hirsch, *Insulting Music: A Lexicon of Insult in Music* 19 (2022).

[23] Enis Oğuz & Hale Işık-Güler, *Rap Devil versus Rap God: Impoliteness in a Rap Battle*, 21 *J. Pol. Res.* 127, 128 (2024).

verbal aggression and "lyrical invectiveness."[24] In rap battles, two components are on display: one's linguistic and witty ability, as represented by what one raps, and one's profile as an artist, showcased by their presentation and performance in battle.[25]

Rap battles nearly always incorporate insults. Insults can be aimed at the persona adopted by the opponent, but they can also be intended as direct attacks on the individual,[26] emphasizing, for example, "opponents' drug use, fictional criminal personas, failure to provide for one's children, and irresponsible criminal records,"[27] among other topics. Indeed, "[p]hysical violence references and death threats are common in rap music and rap battles."[28] Whether a battler uses jokes, insults, bravado, aggression, narrations, creative language, visual performance, or audience

---

[24] H. Samy Alim et. al., *Moving the Crowd, "Crowding" the Emcee*: *The Coproduction and Contestation of Black Normativity in Freestyle Rap Battles,"* 22 *Discourse Soc*. 422, 425 (2011); Daniel Silver et. al., *Genre Complexes in Popular Music*, 11 *PLoS One* (2016).

[25] Mavima, *supra* note 18, at 93.

[26] Venla Sykäri, *Interactive Oral Composition: Resources, Strategies, and the Construction of Improvised Utterances in a Finnish Freestyle Rap Battle*, 132 *J. Am. Folklore* 3 (2019).

[27] Mavima, *supra* note 18, at 93.

[28] *See* Oğuz & Işık-Güler, *supra* note 23, at 145; *see also* Mian Jia & Shuting Yao, *Yo I am Superman, You Kiddo Go Home: Ritual Impoliteness in Chinese Freestyle Rap Battles*, 42 *Text & Talk* 691 (2021).

participation, the objective is to be victorious by displaying superior word play.[29] Importantly, battle rap artistic conventions are not restricted to insiders or "superfans"—they are universal, and widely understood all over the world.[30] The reason for this has to do with rap's global commercial success and appeal, even among casual listeners. It has been said that rap is responsible for more musical innovation than the British invasion of the 1960s, led by the Beatles and the Rolling Stones, and the rise of rap has been called "the single most important event" in popular music during the past 50 years.[31] Over its 40-year history, rap's influence has extended far beyond music. Since the 1980s, multinational corporations incorporated rap into their marketing and advertising campaigns, and today companies like Apple, Duncan Hines, Hewlett Packard, and Procter & Gamble all incorporate rap and hip-hop culture into their branding.[32] Rap's influence can also be found in fashion, seen in film, and heard in the everyday speech of younger

---

[29] Marcus W. Johnson, *Serious with Wordplay: Battle Rap as a Critical Literary Site and Model*, 3 *J. Culture & Values Educ.* 25, 26 (2020).

[30] *See* DiArron Morrison & Diana Watkins Dickerson, *A Call (and Response) to Battle Rap*, 12 *J. Cont. Rhet.* 106, 108-111 (2022); *see also* Matthew Oware, *Battle Rap: An Exploration of Competitive Rhyming in Hip Hop*, in *African Battle Traditions of Insult* (2023).

[31] Matthias Mauch, et al., *The Evolution of Popular Music: USA 1960-2010*, 2 *Royal Society Open Science* 5 (2015).

[32] Steve Stoute, *The Tanning of America: How Hip-Hop Created a Culture that Rewrote the Rules of the New Economy,* 187-89 (2011).

generations. In short, rap is everywhere.

Because of its rawness, "battling" is sometimes criticized as embodying the worst of the violence and misogyny that rap is accused of promoting. But battle rap is not a corruption of Black culture; it is the modern incarnation of long-held oral, competitive, and communal traditions seen throughout the African American experience.[33] Indeed, battles remain an important symbolic space for rappers to construct, contest, and negotiate individual and collective identities.[34] Many of rap's biggest stars including Jay-Z, DMX, and Eminem got their start battling. Early in his career, for instance, Jay-Z engaged in career-building battles with rap artists such as Tupac, Nas, and Mobb Deep.

<u>Diss Tracks</u>

As battle rap evolved over time, battles shifted from primarily freestyle contests—improvisational verbal duels—to commercially released songs produced for mass audiences that involve the exchange of "written," or non-improvised verses, that are researched and composed with the opponent in mind.[35] These "diss songs"

---

[33] *See* Mavima, *supra* note 18, at 86; s*ee also* Morrison & Watkins Dickerson, supra note 30.
[34] *The Oxford Handbook of Hip Hop Music*, *supra* note 21.
[35] Alim et al., *supra* note 24.

12

or "diss tracks" have become an integral part of the rap battle tradition.[36]

Defined by insult, diss tracks are a pervasive and well-understood tradition in rap in which verbal threats are common and glorified.[37] In diss songs, artists verbally abuse, lay claim to territorial identities, and call into question the credibility of fellow artists. Diss tracks usually serve one of three purposes: to reclaim the respect of someone who has been put down; to put a person exhibiting hubris in their place; or to bait another person and rustle up drama.[38] Artists aim to exalt themselves by humiliating their competitors, even as diss tracks are routinely limited to verbal exchanges without real-life intentions,[39] and are understood by audiences as such:

> In insult verse, the accuracy of the charge matters less than its confident presentation. To be assertive is to be right; to be memorable is to win. . . . Rhyme works well for insult verse because it seeks to provoke a reaction, not prove a point. Rhymes protest and enliven previous ones by creating new uses: new distinctions, agreements, and contestations. A successful rhyme demands another.[40]

---

[36] Tia Tyree & Melvin Williams, *Black Women Rap Battles*: *A Textual Analysis of U.S. Rap Diss Song*. 25 *Wom. & Music* 64, 69 (2021) (explaining that rap does not have a monopoly on diss or insult, which can be found in rock, country, blues, and even folk music.); Hirsch, *supra* note 22, at 20.

[37] Denise Herd, *Changing Images of Violence in Rap music lyrics: 1979-1997*, 30 *J. Pub. Health Pol'y* 395 (2009); Joseph D. Johnson & Natalie Schell-Busey, *Old Message in a New Bottle, Taking Gang Rivalries Online Through Rap Battle Music Videos on Youtube*, 4 *J. Qualitative Crim. Just. & Criminology* 42 (2016); Mavima, *supra* note 18.

[38] Tyree & Williams, *supra* note 36, at 64.

[39] Jia & Yao, *supra* note 28; Oğuz & Işık-Güler, *supra* note 23, at 58.

[40] David Caplan, *The Art of Rhymed Insult*, 88 *Va. Q. Rev.* 119, 121 (2012).

Research analyzing the content of diss tracks reveals common themes and approaches. One analysis shows that rappers market themselves in violent frameworks, establishing their masculinity and authenticity through the expression of an individual's hardships, a threat of violence, a rejection of effeminacy and homosexuality, and the maintenance of a demeanor of violence and criminality.[41] Another content analysis found that Black female rappers are commonly "tested" or "challenged" through diss tracks.[42] Lyrics by rappers including Azealia Banks, Eve, Foxy Brown, Lil' Kim, and MC Lyte, threatened to physically harm competitors ("I'll bruise jaws"; "We can go for the hands"), send crew members to incite violence ("Don't let me have to call the squad with me and get it crackin'"),[43] or kill, shoot, or stab the competitor. Rappers also accused their competitors of having had sex to gain recording deals or advance in the rap industry.

Yet another analysis finds that Eminem and Machine Gun Kelly utilized strategies commonly observed in rap battles and diss tracks including references to physical violence and explicit threats, which is common in this sub-genre. Both rappers tried to out-diss each other by verbalizing insults, curses, and dismissals,

---

[41] Daniel Gilligan, *The Art of 'diss tracks'*, 5 *Alfred J.* 14 (2015).
[42] Tyree & Williams, *supra* note 36, at 79.
[43] *Id.***Error! Bookmark not defined.**

using irony and mocking in their lyrics.[44]

Verbal aggression in diss tracks is a critical way of drawing attention. As a result, diss tracks range from "authentic disagreements" to "contrived media spectacles."[45] Indeed, in the 1990s disparaging other rappers in rap battles and diss tracks became a popular industry tactic for increasing rap's commercial success.[46] Many of the conflicts or "beefs" between rival rappers are created as publicity stunts to raise flagging careers and sales, or create interest in new releases.[47]

Since long before the feud between Drake and Kendrick Lamar, diss tracks by famous artists have drawn the attention of hundreds of millions of people, even those who are not hip-hop fans. The 1990s East Coast/West Coast rivalry, for example, drew significant attention as rival camps of hip-hop labels and artists exchanged inflammatory diss tracks, which inspired chains of responses and included references to prior tracks, industry disputes, and public rumors. Because responses to diss tracks take time, audiences learn details about the insults and attacks in the tracks, analyze them in detail, choose sides, and discuss them with other people in

---

[44] Oğuz & Işık-Güler, *supra* note 23; Herd, *supra* note 37; Johnson & Schell-Busey, *supra* note 37.

[45] Tyree & Williams, *supra* note 36, at 83; Mavima, *supra* note 18, at 92

[46] Herd, *supra* note 37, at 402 (citing Mtume ya Salaam, *The Aesthetics of Rap*, 29 *J. Pop. Cult*. 303 (1995)).

[47] Lola Ogunnaike & John Leland*, Feuding for Profit: Rap's War of Words; In Rap Industry, Rivalries as Marketing Tool* N.Y. Times, Nov. 3, 2002, at A1.

real life and on the internet. This leads to a phenomenon in which diss tracks are deeply intertextual and layered,[48] often involving entire communities by evoking regional pride. And the battle between Eminem and Kelly inspired hundreds of videos and discussion posts on the internet, evidencing the rich dialogue and interpretation associated with rap beef culture.[49]

While insult rhymes summon allegiances, they also reconfigure them. A diss track

> transforms the listener's participation into an alliance. To say an insult rhyme is to participate in it, to claim the status of an ally. Rhyme asks for the listener to experience it, not just hear it. No matter how repellent the subject it explores or how intimidating the stance it strikes, a rhyme aims to be joined.[50]

Indeed, rappers and audiences alike are aware that their victory depends not on factual accuracy, but on the salience of their metaphors and images as well as on the audience's ability to make these context-dependent connections. Drake's argument that "Not Like Us" should be isolated from the context in which it was created and released is problematic because it oversimplifies how audiences ascertain meaning while inviting this Court to ignore critical context—both about this feud and about a well-established musical tradition. As *amici* discuss below, the music genre's

---

[48] Oğuz & Işık-Güler, *supra* note 23, at 159.
[49] *Id*.
[50] Caplan, *supra* note 40, at 126.

history of stigmatization makes rap lyrics particularly susceptible to misinterpretation, especially when taken out of context.

While "Not Like Us" is the most commercially successful and popular track arising from the feud between Drake and Lamar, its success remains grounded in the fact that it is a diss track. Audiences routinely interpret the lyrics within the broader context of this rap feud and artistic norms and expectations around rap battles and diss tracks more generally—a context in which fanciful hyperbole, exaggeration, and insult are expected and celebrated.

## II.  The Use of Rap Lyrics in Judicial Proceedings Threatens to Undermine Important Civil and Constitutional Rights

### A. Treating Rap Lyrics as Factual Representations Undermines First Amendment Rights

Drake's argument in this appeal rests on the premise that "Not Like Us" should be taken literally, as a factual representation.

*Amici* urge this court to recognize the danger that assumption poses to the First Amendment's guarantee of freedom of speech. When courts ignore rap music's history and artistic conventions, the effect is to deny rap the status of art and instead to flatten lyrics into literal confessions or statements of specific intent. As we discuss below, this problematic treatment has introduced racial bias and unfair prejudice in countless criminal cases. And it has created a demonstrable chilling effect across the

17

industry, changing longtime artistic practices—a phenomenon rappers, commentators, and policymakers are discussing with increasing urgency.[51]

The United States District Court for the Eastern District of Pennsylvania recently recognized this danger in a civil case involving rap lyrics, and established "a presumption that artistic expression is not a factual admission":

> In a society that treasures First Amendment expression, *courts should start with a presumption that art is art, not a statement of fact*. To rebut that presumption, the party offering the evidence must demonstrate that the art is the artist's attempt to tell a factual story. The mere fact that an artistic expression resembles reality is not enough because holding otherwise would risk chilling the free expression that our society holds dear.[52]

In that case, the court held that even a "first-person [narrative] that resembles real life" is not enough to overcome the presumption without some other indicia, "like the inclusion of factual detail that is not publicly available."[53] In light of the chilling effects that would occur absent this presumption—and particularly in the context of rap music—the court concluded that "The First Amendment requires no less."[54]

---

[51] *See* Lerner, Kubrin, et al*., supra* note 3, at 87-89 (collecting examples); Jack Lerner, *Rap on Trial: A Brief History*, 27 *Chap. L. Rev.* 405, 437-441 (2024).

[52] *Bey-Cousin v. Powell*, 570 F. Supp. 3d 251, 254-55 (E.D. Pa. 2021) (emphasis added).

[53] *Id.* at 255-56.

[54] *Id. See Haupt v. United States* 330 U.S. 631, 642 (1947) (speech-based evidence "is *to be scrutinized with care* to be certain the statements are not expressions of

*Amici* respectfully urge this Court to consider the First Amendment implications of this case, to establish a similar presumption, and to reject Drake's invitation to assume that diss track lyrics should be taken as assertions of fact.

### B. Treating Rap Lyrics as Literal Makes It More Likely that Rap Lyrics Will Be Exploited to Introduce Prejudice and Racial Bias in Other Cases

The argument that "Not Like Us" should be taken literally not only threatens First Amendment rights: it has also functioned as a gateway to introduce racial bias and stereotypes in the courtroom. *Amici* urge this Court to consider the danger associated with the problematic treatment of rap lyrics as factual.

If rap lyrics are considered creative expression, they are naturally less likely to be found probative, or to pass muster under Federal Rules of Evidence 403 and 404 and state equivalents; if they are treated like a diary, they are more likely to be

---

mere lawful and permissible difference of opinion" (emphasis added)). Indeed, diss tracks have been the subject of litigation in the past, but *amici* are aware of no instances in which a court has found liability based on a defamation action against a diss track. *See, e.g.*, *Diaz v. Gazmey-Santiago,* 2020 U.S. Dist. LEXIS 38488 (D.P.R. Mar. 3, 2020), at *2 (dismissing defamation claim by public figure against rapper over diss track); *Parks v. LaFace Records*, 329 F.3d 437, 462 (6th Cir. 2003) (affirming summary judgment on defamation claim in favor of creators of song "Rosa Parks"); *Boladian v. UMG Recordings, Inc.*, 123 F. App'x 165, 170 (6th Cir. 2005) (affirming dismissal of defamation claim finding plaintiff "failed to meet their burden of showing an actual, objectively verifiable defamatory statement" with respect to contested lyrics); *Rapaport v. Barstool Sports Inc.*, No. 22-2080-cv, 2024 U.S. App. LEXIS 556 (2d Cir. Jan. 9, 2024) (affirming summary judgment in favor of defendant on defamation claim rising from statements made in a diss track video).

19

admitted. Literality is thus extremely important because, as the California Legislature found, "a substantial body of research shows a significant risk of unfair prejudice when rap lyrics are introduced into evidence."[55] Explicitly recognizing the connection between unfair prejudice and literality, in 2022 the Legislature required courts to presume "that the probative value of the creative expression for its literal truth is minimal" absent certain specified conditions.[56]

Research demonstrates that rap evidence can inject bias and racial prejudice into legal proceedings. This is particularly evident when considering how rap music triggers racially biased attitudes. That is, when people think about rap music, they are also thinking about race, which results in racially biased judgments.[57] This point is supported across three decades' worth of empirical studies. These studies demonstrate that exposure to rap music can result in individuals judging a person as more hostile[58] and having worse character,[59] particularly when that person is Black.

---

[55] A.B. 2799, 2021-2022 Leg., Reg. Sess. (Cal. 2022).

[56] *Id.* (codified at Cal. Evid. Code §352.2).

[57] Dunbar & Kubrin, supra note 2.

[58] Laurie A. Rudman & Matthew R. Lee, *Implicit and explicit consequences of exposure to violent and misogynous rap music*. 5 *Group Process. & Intergroup Relat*. 133 (2002); James D. Johnson et.al., *Converging interracial consequences of exposure to violent rap music on stereotypical attributions of blacks,* 36 *J. Experimental Soc. Psychol*. 233 (2000).

[59] Sandra Graham & Brian S. Lowery, *Priming unconscious racial stereotypes about adolescent offenders*. 28 *Law & Hum. Behav*. 483, 504 (2004).

In other words, the bias activated by rap as a genre likely relates to the genre's association with the Black community.

This is also evident when considering how stereotypes about the genre affect the interpretation of the lyrics. Violent lyrics represented as rap music are, on average, interpreted as more literal and more threatening than identical lyrics represented as a different genre.[60] Similarly, individuals make inferences about a person's character based on whether they write rap lyrics, including whether they are likable and involved in criminal activity.[61]

In short, it is dangerous to take rap lyrics literally. Doing so not only flattens artistic expression and risks that the lyrics will be misunderstood or misconstrued— it opens the door to racial bias and prejudice in judicial proceedings. Introducing rap lyrics at trial is a way to invoke racial stereotypes without ever explicitly mentioning race, and to do so in a way that shapes how jurors perceive the evidence and the defendant.

Though Drake has previously acknowledged this danger publicly, he now paradoxically and problematically embraces it by citing to the fact that courts have

---

[60] Dunbar, Kubrin, and Scurich, supra note 2; Carrie B. Fried, *Bad Rap For Rap: Bias In Reaction To Music Lyrics,* 26 *J. Applied Soc. Psychol.* 2135 (1996).
[61] Stuart P. Fischoff, *Gangsta' Rap and a Murder in Bakersfield*, 29 *J. Applied Soc. Psychol.* 795, 805 (1999).

permitted the use of rap evidence in criminal trials.[62] But this comparison recklessly conflates proving elements of a crime in the criminal context with treating lyrics as factual statements in the civil defamation context. Even when rap evidence is admitted in criminal trials (despite overwhelming evidence showing a risk of unfair prejudice, racial bias, and misinterpretation), it is rarely introduced for the truth of the matter asserted. Far more often, it is used for different purposes, such as to demonstrate gang affiliation or establish that the defendant had a motive or specialized knowledge. In this appeal, by contrast, the issue is whether a rap lyric in a diss track can be elevated to a factual statement about another person.

Finally, and more fundamentally, Drake has endorsed a practice he himself has argued is dangerous and wrong.[63] He is well aware that, as three decades of research have shown, it is extremely difficult to consider rap evidence in any courtroom setting without ignoring the context; discounting rap's artistic merit; and activating racial bias and stereotypes.

---

[62] Brief for Appellant at 43.

[63] *Art on Trial: Protect Black Art*, https://www.protectblackart.co (published in the *New York Times* and the *Atlanta Journal-Constitution*, Nov. 1, 2022).

*Amici* respectfully urge this Court to consider and account for the harmful consequences that result from treating lyrics as factual assertions.

## CONCLUSION

For the foregoing reasons, *amici* respectfully urge this Court to affirm the district court's dismissal of plaintiff-appellant's defamation claim.

Dated: April 3, 2026          Respectfully Submitted,

*/s/ Jack I. Lerner*      */s/*

JACK I. LERNER

UCI INTELLECTUAL PROPERTY, ARTS, AND
       TECHNOLOGY CLINIC

UNIVERSITY OF CALIFORNIA, IRVINE
       SCHOOL OF LAW

401 E. Peltason

Irvine, CA 92697

(949) 824-7684

Counsel for *Amici Curiae*

23

## APPENDIX A: LIST OF *AMICI CURIAE*

*Institutional affiliations are listed for identification purposes only. The views expressed herein do not purport to represent the institutional views of the universities listed below.*

Lakeyta Bonnette
Professor of Political Science
College of Arts and Sciences
Howard University

Regina N. Bradley
Associate Professor of English and African Diaspora Studies
Department of English
Kennesaw State University

Adam Dunbar, Ph.D.
Assistant Professor of Criminal Justice
College of Liberal Arts
University of Nevada, Reno

Jabari Evans
Assistant Professor of Race and Media
College of Information and Communications
University of South Carolina

Murray Forman
Professor Emeritus
College of Arts, Media and Design
Northeastern University

Antoine Hardy
Assistant Professor
Department of Communication
College of Human Development, Media and Culture
Seton Hall University

Anthony Kwame Harrison
Alumni Distinguished Professor
Department of Sociology
Virginia Polytechnic Institute and State University

Charis E. Kubrin, Ph.D.
Professor of Criminology, Law & Society and (by courtesy) Sociology
School of Social Ecology
University of California, Irvine

Jack I. Lerner
Clinical Law Professor
School of Law
University of California, Irvine

Corey J. Miles
Assistant Professor
Department of Sociology and Africana Studies
Tulane University

Erik Nielson
Professor of Liberal Arts
School of Professional and Continuing Studies
University of Richmond

Lucius T. Outlaw III
Professor of Law
Supervising Attorney, Criminal Justice Clinic
Howard University School of Law

Bryon D. Turman
Senior Lecturer
Department of English
North Carolina Agricultural and Technical State University

Kyle Winnen
Department of Criminology, Law & Society
School of Social Ecology
University of California, Irvine

A-2

## CERTIFICATE OF COMPLIANCE

I, Jack I. Lerner, certify that:

1. *Amici curiae* are filing this brief within the time allowed. *See* Fed. R. App. P. 29(a)(6).

2. This brief is no longer than half the length permitted for memoranda of law as a party's principal brief in this Court. *See* Fed. R. App. P. 29(a)(5) and 2d Cir. Rule 29.1(c).

3. According to the word count of the word processing program used to prepare the foregoing memorandum of law, this document contained 5,298 words excluding the items listed in Fed. R. App. P. 32(f).

4. This brief complies with all requirements specified in Fed. R. App. P. 32.

Dated: April 3, 2026                    Respectfully Submitted,


*/s/ Jack I. Lerner*               */s/*
JACK I. LERNER
UCI INTELLECTUAL PROPERTY, ARTS, AND
    TECHNOLOGY CLINIC
University of California, Irvine School of Law
401 E. Peltason
Irvine, CA 92697
(949) 824-7684


Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2026 I caused the foregoing brief to be served

on all registered counsel through the Court's CM/ECF system.


Dated: April 3, 2026          Respectfully Submitted,

                       */s/ Czarina Ellingson       /s/*
                       CZARINA ELLINGSON
                       UCI INTELLECTUAL PROPERTY, ARTS, AND
                       TECHNOLOGY CLINIC
                       University of California, Irvine School of Law
                       401 E. Peltason
                       Irvine, CA 92697
                       (949) 824-7684