# 25-2758-cv

## In the United States Court of Appeals
## for the Second Circuit

AUBREY DRAKE GRAHAM,

*Plaintiff-Appellant,*

v.

UMG RECORDINGS, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**REPLY BRIEF OF PLAINTIFF-APPELLANT**

MICHAEL J. GOTTLIEB
WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST
LOS ANGELES, CA 90067
(310) 855-3111

ERICA L. ROSS
ANNA M. GOTFRYD
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, D.C. 20006

BRADY M. SULLIVAN
WILLKIE FARR & GALLAGHER LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019

*Counsel for Appellant*
*Aubrey Drake Graham*

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................2

    I.     THE DEFAMATION CLAIM SHOULD HAVE BEEN
           ALLOWED TO PROCEED.................................................................2

          A.    Drake Adequately Pleaded Defamatory Statements of Fact.......3

          B.    UMG Repeats the District Court's Errors in
               Arguing that No Reasonable Person Could Understand
               the Defamatory Statements as Asserting Facts.........................8

               1.    UMG Improperly Relies on Materials Outside the
                      Amended Complaint to Rebut Drake's Allegations.........8

               2.    UMG Repeats The District Court's Errors in
                      Defining the Relevant Context. ......................................11

               3.    UMG Asks This Court to Ignore Its Repeated
                      Republications of the Recording. ..................................13

                4.    UMG Embraces The District Court's De Facto
                      Categorical Rule that Rap Diss Tracks Can Never
                      Be Actionable. ...............................................................16

    II.    DRAKE ADEQUATELY PLEADED THAT THE
           DEFAMATORY STATEMENTS CONSTITUTE MIXED
            OPINION........................................................................................18

    III.    THE DISTRICT COURT ERRED BY DISMISSING DRAKE'S
           HARASSMENT CLAIM.................................................................21

          A.    A Private Right of Action for Harassment Exists....................22

          B.    UMG's Alternative Arguments Fail. ......................................24

    IV.    THE DISTRICT COURT ERRED IN DISMISSING THE
           DECEPTIVE BUSINESS PRACTICES CLAIM.............................26

          A.    Drake Has Pleaded Sufficient Facts Supporting a Covert
                Scheme. .................................................................................26

          B.    Drake Has Alleged Consumer-Oriented Conduct. ..................28

          C.    UMG's Alternative Argument Fails. ......................................29

CONCLUSION.....................................................................................................31

i

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*600 W. 115th St. Corp. v. Von Gutfeld*,
603 N.E.2d 930 (N.Y. 1992)..................................................................3, 4, 8

*Albert v. Loksen*,
239 F.3d 256 (2d Cir. 2001) ...........................................................................7

*Amigo Shuttle Inc. v. Port Auth. of N.Y. & N.J.*,
2025 WL 2618862 (2d Cir. Sept. 11, 2025).............................................27, 28

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010) .......................................................................26, 27

*Ass'n of Am. RRs. v. Seggos*,
770 F. Supp. 3d 702 (S.D.N.Y. 2025) ...........................................................7

*Biro v. Conde Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013) ............................................................14

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA, Inc.*,
818 N.E.2d 1140 (N.Y. 2004)........................................................................30

*Carroll v. Trump*,
680 F. Supp. 3d 491 (S.D.N.Y. 2023) ............................................................10

*Carruthers v. Colton*,
153 F.4th 169 (2d Cir. 2025) .........................................................................28

*Casler v. W. Irondequoit Sch. Dist.*,
563 F. Supp. 3d 60 (W.D.N.Y. 2021)..............................................................8

*Casper Sleep, Inc. v. Mitcham*,
2016 WL 7188788 (S.D.N.Y. Nov. 17, 2016)...................................................30

*CFTC v. TFS-ICAP, LLC*,
432 F. Supp. 3d 320 (S.D.N.Y. 2020) ............................................................24

*City of N.Y. v. Smokes-Spirits.Com, Inc.*,
911 N.E.2d 834 (N.Y. 2009)..........................................................................30

*Coleman v. Grand*,
  158 F.4th 132 (2d Cir. 2025) ................................................................12, 17

*Cooper v. Franklin Templeton Invs.*,
  2023 WL 3882977 (2d Cir. June 8, 2023).................................................15, 21

*Davis v. Boeheim*,
  22 N.E.3d 999 (N.Y. 2014).................................................................7, 13, 18

*Dhir v. Winslow*,
  205 N.Y.S.3d 595 (N.Y. App. Div. 2024)..................................................24, 25

*Firth v. State*,
  775 N.E.2d 463 (N.Y. 2002)......................................................................14

*U.S. ex rel. Foreman v. AECOM*,
  19 F.4th 85 (2d Cir. 2021) ................................................................2, 8, 21

*Galella v. Onassis*,
  487 F.2d 986 (1973)..........................................................................21, 23

*Gisel v. Clear Channels Commnc'ns, Inc.*,
  942 N.Y.S.2d 751 (N.Y. App. Div. 2012)........................................................21

*Global Network Commc'ns, Inc. v. City of N.Y.*,
  458 F.3d 150 (2d Cir. 2006) ...................................................................8, 11

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
  98 N.Y.2d 314 (N.Y. 2002) ........................................................................29

*Gross v. N.Y. Times Co.*,
  623 N.E.2d 1163 (N.Y. 1993).......................................................................7

*Hammer v. Am. Kennel Club*,
  1 N.Y.3d 294 (N.Y. 2003) .........................................................................22

*Hartman v. 536/540 E. 4th St. Equities*,
  797 N.Y.S. 2d 73 (N.Y. App. Div. 2005)........................................................23

*Havens v. James*,
  76 F.4th 103 (2d Cir. 2023) .......................................................................1

*Kaggen v. IRS*,
71 F.3d 1018 (2d Cir. 1995) ...............................................................20

*LaNasa v. Steine*,
2025 WL 893456 (2d Cir. Mar. 24, 2025)....................................19, 20

*Lehman v. Discovery Commc'ns, Inc.*,
332 F. Supp. 2d 534 (E.D.N.Y. 2004) ..................................................14

*Long v. Beneficial Fin. Co.*,
330 N.Y.S.2d 664 (N.Y. App. Div. 1972).............................................23

*Lynch v. City of N.Y.*,
952 F.3d 67 (2d Cir. 2020) ....................................................................7

*McDougal v. Fox News Network, LLC*,
489 F. Supp. 3d 174 (S.D.N.Y. 2020) ....................................................7

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
175 F. Supp. 2d 593 (S.D.N.Y. 2001) ..................................................29

*N. State Autobahn, Inc. v. Progressive Ins. Grp.*,
953 N.Y.S.2d 96 (N.Y. App. Div. 2012).............................................30

*Oswego Laborers' Local 214 v. Marine Midland Bank*,
647 N.E.2d 741 (N.Y. 1995).................................................................28

*Palin v. N.Y. Times Co.*,
113 F.4th 245 (2d Cir. 2024) ...............................................................17

*Palin v. N.Y. Times Co.*,
940 F.3d 804 (2d Cir. 2019) ................................................................28

*People v. Coveney*,
50 Misc.3d 1 (N.Y. App. Term 2015) ...................................................25

*People v. Marquan M.*,
19 N.E.3d 480 (N.Y. 2014)..............................................................25, 26

*People v. Pham*,
987 N.Y.S.2d 687 (N.Y. App. Div. 2014).............................................25

iv

*People v. Richmond Cap. Grp. LLC*,
  80 Misc.3d 1213(A), (N.Y. Sup. Ct. 2023) ........................................................25

*People v. Stuart*,
  797 N.E.2d 28 (N.Y. 2003)..................................................................................25

*Prignoli v. City of N.Y.*,
  1996 WL 340001 (S.D.N.Y. June 19, 1996) ......................................................23

*Pyskaty v. Wide World of Cars, LLC*,
  856 F.3d 216 (2d Cir. 2017) ...............................................................................28

*Ralin v. City of N.Y.*,
  844 N.Y.S.2d 83 (N.Y. App. Div. 2007)..............................................................23

*Rapaport v. Barstool Sports, Inc.*,
  2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021)..................................................5, 12

*Rapaport v. Barstool Sports Inc.*,
  2024 WL 88636 (2d Cir. Jan. 9, 2024) ..................................................................4

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) ....................................................................1, 20, 21

*Schonfeld v. Hilliard*,
  218 F.3d 164 (2d Cir. 2000) .........................................................................24, 29

*Sleepy's LLC v. Select Comfort Whole Corp.*,
  779 F.3d 191 (2d Cir. 2015) ...............................................................................10

*Small v. Lorillard Tobacco Co.*,
  720 N.E.2d 892 (N.Y. 1999)...............................................................................29

*Spock v. United States*,
  464 F. Supp. 510 (S.D.N.Y. 1978) ......................................................................23

*Staehr v. Hartford Fin. Servs. Grp.*,
  547 F.3d 406 (2d Cir. 2008) ...............................................................................20

*Stega v. N.Y. Downtown Hosp.*,
  107 N.E.3d 543 (N.Y. 2018)................................................................................18

v

*Steinhilber v. Alphonse*,
 501 N.E.2d 550 (N.Y. 1986)......................................................................12, 16

*Torain v. Liu*,
 2007 WL 2331073 (S.D.N.Y. Aug. 16, 2007)....................................................21

*Torain v. Liu*,
 279 F. App'x 46 (2d Cir. 2008) .........................................................................12

*True v. N.Y. State Dep't of Correctional Servs.*,
 613 F. Supp. 27 (W.D.N.Y. 1984)......................................................................23

*Turret Labs USA, Inc. v. CargoSprint, LLC*,
 2021 WL 535217 (E.D.N.Y. Feb. 12, 2021) ......................................................19

*Twombly v. Bell Atl. Co.*,
 550 U.S. 544 (2007)............................................................................................26

*Woodbridge Structured Funding, LLC v. Pissed Consumer*,
 6 N.Y.S.3d 2 (N.Y. App. Div. 2015)............................................................19, 20

*Yamashita v. Scholastic, Inc.*,
 936 F.3d 98 (2d Cir. 2019) ................................................................................28

*Zervos v. Trump*,
 94 N.Y.S.3d 75 (N.Y. App. Div. 2018) .............................................................19

**Statutes**

New York Civil Rights Law Section 40-c ..............................................................22

New York Civil Rights Law Section 40-d ..............................................................22

New York Civil Rights Law Section 79-n...............................................................22

New York General Business Law Section 349........................................................26

New York Penal Law Section 240.25................................................................22, 23

New York Penal Law Section 240.26.......................................21, 22, 23, 24, 25

**Other Authorities**

Citizen, Premium, https://citizen.com/premium (last visited Apr. 17, 2026)............5

The Joe Budden Podcast, *Episode 664 |"8:45 am in Fayetteville"*
   (Apple Podcasts, Oct. 7, 2023) .............................................................11

## INTRODUCTION

In dismissing Aubrey Drake Graham's ("Drake") Amended Complaint, the District Court relied heavily on matters outside the pleadings, weighed the evidence, made adverse factual findings contradicting well-pleaded facts, and improperly drew inferences against Drake. SPA-1-38. Tellingly, UMG Recordings, Inc.'s ("UMG") response brief, Dkt. No. 42 ("RB"), identifies *no case* approving such aggressive and unmoored judicial fact-finding at the motion-to-dismiss stage. Instead, UMG repeats the Court's errors, largely glossing over the allegations in the Amended Complaint and focusing instead on its own version of the "facts" and "evidence" from outside the pleadings. UMG's distortion of its cited authorities and its failure to mention—let alone engage with—law cited in Drake's Opening Brief, Dkt. No. 35 ("OB"), reveals that not only are the facts on Drake's side, the law is too.

Drake's case against UMG is in its infancy. The scope of the District Court's review at this stage is narrow. "The court's function is 'not to weigh the evidence that might be presented at a trial,'" *Havens v. James*, 76 F.4th 103, 116-17 (2d Cir. 2023), or "make findings of fact," *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Instead, "under Rule 12(b)(6), 'the only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor.'" *Havens*, 76 F.4th at 116.

1

The District Court failed to abide by those bedrock principles. At a minimum, it was required to convert UMG's motion to dismiss into one for summary judgment. *See U.S. ex rel. Foreman v. AECOM*, 19 F.4th 85, 106-07 (2d Cir. 2021). But it failed to do that too. Consequently, Drake never had the opportunity to contest the evidence and present what he had uncovered in the early stages of discovery. *See id.* This Court should reverse.

## ARGUMENT

### I. THE DEFAMATION CLAIM SHOULD HAVE BEEN ALLOWED TO PROCEED.

The District Court dismissed Drake's defamation claim based solely on its determination that the Recording, Video, and Image contained statements of opinion rather than actionable statements of fact. SPA-11; *see* OB-15-43. That decision turned on context. But the Court committed multiple errors in considering the relevant context: misapplying judicial notice to draw inferences *against* Drake; replacing the reasonable listener with a rap aficionado; ignoring the broader social context; failing to recognize UMG's republications to different audiences; and effectively creating a special rule that rap "diss tracks" are a defamation-free zone. UMG doubles-down on those errors and rewrites the Amended Complaint to boot. This Court should reverse.

2

## A. Drake Adequately Pleaded Defamatory Statements of Fact.

Drake stated a claim that UMG defamed him by publishing and promoting the Recording, which "was intended to convey the specific, unmistakable, and false factual allegation that Drake is a criminal pedophile." JA-18-19 ¶ 7. The Recording calls Drake a "Certified pedophile[]"; includes lyrics like "Say, Drake, I hear you like 'em young," and "Tryna strike a chord and it's probably A-Minor"; and warns that Drake has "gotta be registered and placed on neighborhood watch." JA-40-41 ¶¶ 60-61. A reasonable listener could (and countless *did*) construe the Recording as factually asserting that Drake sexually abuses children. JA-44-51 ¶¶ 72-80; OB-24-25. Entertainment industry insiders and media experts on Hollywood affairs likewise understood the Recording's core pedophilia message and debated its consequences. JA-53-54 ¶¶ 84-87; OB-25-26. And the Image and the Video reinforce those factual assertions by using actual sex-offender notification symbols and sex-trafficking imagery. OB-18-19. The broader social context also supports this view. OB-18-19, 24-26, 35-36.

That the public could and did take the core assertion of pedophilia seriously cannot come as a surprise to UMG. Unlike impromptu statements made at a public hearing or in a live rap battle, UMG's publication of the Recording (as well as the Image and Video) was the "product of some deliberation," and thus more likely to signal assertions of fact. *600 W. 115th St. Corp. v. Von Gutfeld*, 603 N.E.2d 930,

934 (N.Y. 1992). Indeed, Drake alleged that UMG had ultimate control to review and approve the Recording to "eliminate" "defamation or libel," *see* JA-38 ¶ 50. That process reflects that UMG knew the Recording would "be subjected to close, careful, and repeated [listening] over time," *Von Gutfeld*, 603 N.E.2d at 936, which is especially true given the various fora in which it was republished, including to a global audience at the Super Bowl, JA-21 ¶ 11.

UMG's primary response is to rewrite the Amended Complaint (and the Recording). UMG claims the Recording was *not* focused on calling Drake a pedophile, but instead is "a series of hyperbolic disses" on "many subjects." RB-1, 21-22; *see* RB-14. Nonsense. Even the District Court recognized that the Recording's key lyrics "explicitly name[] Drake and his associates as pedophiles." SPA-7; *see* SPA-13. "The Recording was intended to convey the specific, unmistakable, and false factual allegation that Drake is a criminal pedophile, and to suggest vigilante justice as a response." JA-18-19 ¶ 7. Nobody tried to gun down Drake because of the Recording's remarks about his "artistic prowess," "brand," or "hometown," RB-14; they did so because it proclaimed that Drake *sexually abuses children*. JA-17-19 ¶¶ 1-7.

The Recording's fixation on Drake's alleged pedophilia, and the uniquely damaging nature of such allegations, *see* OB-35-36, distinguish this case from *Rapaport v. Barstool Sports Inc.*, 2024 WL 88636, at *4-5 (2d Cir. Jan. 9, 2024).

4

*Rapaport* involved a diss track video that, unlike the Recording, was not focused on a single theme, but instead made "[e]xaggerated," "obviously hyperbolic," and "vitriolic" claims about "all aspects of Rapaport's life," none of which claimed sexual criminal conduct against minors. *Rapaport v. Barstool Sports, Inc.*, 2021 WL 1178240, at *15-16 (S.D.N.Y. Mar. 29, 2021) (video called Rapaport, *inter alia*, a "10 gallon drum of curdled milk" and a "walking blob of jizz").

The Image looks like a screenshot from Citizen[1] showing sex offenders gathered at Drake's Toronto mansion. JA-42-44 ¶¶ 65-66. Indeed, people understood the Image as supporting the Recording's pedophilia allegations. JA-48-49 ¶ 78. The Image (below left) is a literal map to Drake's Toronto home where vigilantes arrived to search for suspected sex predators or endangered minors. *See* JA-17-18, 43-44 ¶¶ 1-4, 66. Compare this to the obviously doctored, non-actionable visuals in *Rapaport* (below right) depicting a cartoon saltine sauntering on an anonymous street. The court's *summary-judgment* decision in *Rapaport* simply cannot support *dismissal* here.

---

[1] Citizen is a public-safety phone application that allows subscribers to view a map of registered sex offenders nearby. *See* Citizen, Premium, https://citizen.com/premium (last visited Apr. 17, 2026).



UMG further rewrites the Amended Complaint. UMG contends that the entire rap battle, not just the Recording, became "ubiquitous," so reasonable listeners would judge the Recording through the lens of the entire feud. *See* RB-32-33, 54. In support, UMG cites none of the 266 pleaded allegations; instead, it cites the District Court's improper findings of fact. *See* RB-27-28, 32; *see also* SPA-1, 21.

The Amended Complaint—and reality—tell a different story. "Of all the songs published during the rap beef, the Recording is the only one that 'broke through the noise' and achieved cultural ubiquity." JA-104 ¶ 202. The second-most-popular song had 4.1% of the Recording's views—the others had fewer. OB-28-29. And the Recording was repeatedly republished in contexts far removed from the rap battle, including to the largest Super Bowl audience in history (133.5 million

6

viewers).[2] JA-85 ¶ 168. The "reasonable listener" defined by UMG and the District Court thus represented, *at most*, 4.1% of listeners. The law does not permit the Court to counterfactually declare 95% of listeners *unreasonable*.

UMG's revisionist history illustrates its—and the District Court's—repeated failures to accept the pleaded facts, contrary to the motion-to-dismiss standard. *See, e.g.*, *Lynch v. City of N.Y.*, 952 F.3d 67, 74-75 (2d Cir. 2020). "[A] motion to dismiss" must be denied if "any reading of the complaint supports the defamation claim." *Davis v. Boeheim*, 22 N.E.3d 999, 1003-04, 1006-07 (N.Y. 2014); *cf. Albert v. Loksen*, 239 F.3d 256, 267 (2d Cir. 2001). Drake's allegations meet that standard.

UMG responds (RB-16-17, 41, 47-48) that whether a statement constitutes fact or opinion is a question of law. *See Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993). True enough. But that legal question depends on subsidiary questions of fact that the District Court could not resolve against Drake at this juncture. *See McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 181 (S.D.N.Y. 2020) ("[T]he question of whether the statements at issue are statements of fact is a legal one, informed by factual context of the statements in question."); *cf. Ass'n of Am. RRs. v. Seggos*, 770 F. Supp. 3d 702, 713 (S.D.N.Y. 2025) (explaining that a legal question at the motion-to-dismiss stage "sometimes requires

---

[2] UMG *intended* for the Recording to reach broad, diverse audiences, as indicated by its unprecedented removal of the Recording's copyright protections ("whitelisting"). JA-97 ¶ 189.

resolution of 'subsidiary factual disputes'" that are "inappropriate for resolution" at that stage); *Casler v. W. Irondequoit Sch. Dist.*, 563 F. Supp. 3d 60, 70 (W.D.N.Y. 2021) (concluding that, in resolving a First Amendment "legal question," the court was not entitled to consider "facts not properly before the court at this juncture"). *But see* JA-483 (Court indicating, mistakenly, that because it was deciding "a question of law," it need not "draw an inference in [Drake's] favor").

**B.** **UMG Repeats the District Court's Errors in Arguing that No Reasonable Person Could Understand the Defamatory Statements as Asserting Facts.**

**1.** **UMG Improperly Relies on Materials Outside the Amended Complaint to Rebut Drake's Allegations.**

The District Court erred in considering extra-record materials to draw inferences *against* Drake's well-pleaded allegations. Those materials provided the only "evidence" supporting the Court's articulation of an unduly broad context—the entire "rap battle." Thus, rather than assess how a "reasonable listener" would understand the Recording, *see Von Gutfeld*, 603 N.E.2d at 934, the Court looked to how a rap superfan might have done so, *see* SPA-19-22, 27-29.

The District Court's consideration of "material outside of the pleadings that [was] not attached to the complaint, incorporated by reference, or integral to the complaint" required it to "convert the motion into one for summary judgment." *Foreman*, 19 F.4th at 106-07. Its failure to do so is reversible error. *See id.* at 96; *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 155-56 (2d Cir. 2006).

8

That rule exists for good reason. The Court precluded Drake from rebutting its (and UMG's) unreasonable inferences.

This error is especially stark with respect to "Taylor Made Freestyle," which was not mentioned in the Amended Complaint, only publicly available for one week, and whose contested lyrics are not even in Drake's voice. OB-21. Despite this, the Court found that a *reasonable listener* would have understood the Recording's pedophilia allegations as a "callback" to "Taylor Made Freestyle." SPA-19.[3] The reliance on materials outside the pleadings deprived Drake of the opportunity to rebut this counterfactual assertion. The Recording's popularity and reach are unprecedented, as the Recording and Video were "heard and/or viewed over 9 billion times." JA-103 ¶ 199. In contrast, "Taylor Made Freestyle" was a far-less-popular song only available online for *one week* before it was removed so quickly that its limited listenership cannot be determined. *See* OB-21. Given this, the reasonable listener of the Recording is someone who *never heard* "Taylor Made Freestyle," *see* JA-21, 104 ¶¶ 11, 202—and certainly not (as the Court concluded) someone who

---

[3] UMG errs in asserting (RB-47) Drake waived this argument by acknowledging song lyrics could be judicially noted. As explained, the problem is not that the Court took judicial notice of the lyrics themselves, but rather *how* the Court used those lyrics: to draw inferences and resolve disputed facts adverse to the well-pleaded allegations.

(1) was familiar with the history of rap and diss tracks;[4] (2) was familiar with the Drake-Lamar feud; (3) knew all of the prior songs; (4) believed them to be in dialogue; (5) would interpret the extraordinarily popular Recording with reference to the far-less-pervasive "Taylor Made Freestyle"; (6) would interpret "Taylor Made Freestyle" as goading; (7) would see the Recording as responding to goading; and (8) would, for some (still unexplained) reason, conclude that the Recording was asserting opinion, not fact.[5]

UMG also asserts that Drake could not provide an alternative explanation for the lyrics that it claims goaded Lamar to make pedophilia allegations ("Talk about him likin' young girls, that's a gift from me/Heard it on the Budden Podcast, it's got to be true"). RB-46. But it was not Drake's burden, at the motion-to-dismiss stage, to explain what was incorrect about the factual allegations UMG offered to rebut pleaded facts. Regardless, UMG is wrong. Given the opportunity at summary judgment, Drake could have provided a ready alternative: before "Taylor Made

---

[4] Although UMG and *amici* might be finely attuned to the history and norms of rap diss tracks, nothing in the pleadings (or common sense) suggests the average listener would be. *See, e.g.*, JA-21 ¶ 11.

[5] *Amici* raise the imaginative argument that Drake *consented* to being called a pedophile through "Taylor Made Freestyle." Dkt. No. 46 at 5. But "consent" to defamation is an affirmative defense that UMG never raised. *Sleepy's LLC v. Select Comfort Whole Corp.*, 779 F.3d 191, 199 (2d Cir. 2015); *Carroll v. Trump*, 680 F. Supp. 3d 491, 514 (S.D.N.Y. 2023). And it applies only when the consenting party has "effective control over the dissemination of the defamatory material," *Carroll*, 680 F. Supp. 3d at 516—which Drake lacked.

Freestyle" was released, the Budden Podcast criticized Drake for dating *adult* women whom the host deemed too young for Drake. *See* The Joe Budden Podcast, *Episode 664 | "8:45 am in Fayetteville"* at 1:09:56-1:10:26 (Apple Podcasts, Oct. 7, 2023) ("Get the f\*\*\* away from some of these younger n\*ggas and stop f\*\*\*ing these-25-year-olds .... Why are you still f\*\*\*ing the 25-year-olds? You're a 37-year-old-billionaire.").

UMG points to *no* case where a court used extra-record material in the way the District Court did. *See* RB-48. And UMG fails to address cases where this Court has reversed when a district court considered "external material" to "make a finding of fact that *controverted* the plaintiff's own factual assertions set out in its complaint." *Global Network*, 458 F.3d at 156. That silence speaks volumes.

### 2. UMG Repeats The District Court's Errors in Defining the Relevant Context.

As discussed, the District Court's consideration of extra-record materials led it to define the relevant context too broadly. *See* OB-28-35. UMG highlights its misunderstanding of the law by arguing "[s]urely [Drake] cannot contend that 20 million people" who watched the Democratic National Convention "had no knowledge" of the rap battle. RB-54. Drake need not show that *no one* was aware of the broader rap battle; he need only show that the *reasonable viewer* would not necessarily have known the details of its back-and-forth or interpreted the Recording's allegations the way the Court did. He did so. Again, the second-most-

11

popular song had only 4.1% of the Recording's views, OB-28-29; that necessarily means most of the 20 million DNC viewers would not have heard even the next-most-popular song, let alone the only-available-for-one-week "Taylor Made Freestyle."

None of UMG's (or the District Court's) authority supports assuming, contrary to well-pleaded facts, that the "reasonable" listener would have specialized knowledge about the feud and prior songs. Unlike the Recording, the *Rapaport* video itself "describe[d] the recent history of the acrimonious dispute" of which the statements were a part, 2021 WL 1178240, at *15; *contra* UMG's assertion, RB-27 n.8, that provided context for the reasonable listener. Similarly, in *Steinhilber v. Alphonse*, 501 N.E.2d 550 (N.Y. 1986), the complained-of message was accessible *only* to individuals who had access to the union's information line, and thus who would know about the ongoing labor strike. *Id.* at 555-56. Nor is this a case like *Coleman v. Grand*, 158 F.4th 132, 142 (2d Cir. 2025), where the statements of opinion were "based on a recitation of supporting facts." 158 F.4th at 142. As for the unpublished decision in *Torain*, UMG tellingly relegates to a footnote its acknowledgment that the plaintiff "himself introduced th[e] context in his complaint." 279 F. App'x 46, 47 n.1 (2d Cir. 2008). UMG's suggestion that Drake did the same lacks merit. The Amended Complaint does not mention "Taylor Made

12

Freestyle," and the Court directly contradicted the Amended Complaint's well-pleaded allegations regarding the popularity and ubiquity of other songs.

While arguing that extra-complaint materials are fair game, UMG asks this Court to disregard the pleaded "broader social context and surrounding circumstances." *Davis*, 22 N.E. at 1005. The Recording surfaced after the #MeToo movement, in which celebrities—including rappers—faced severe consequences for sexual misconduct and child-sex-abuse crimes. *See* JA-53, 55 ¶¶ 84, 89-92. UMG's response that those individuals were "indicted by federal prosecutors," RB-34, misses the point. Given the cultural context, listeners were primed to, and did, take the Recording's allegations as factual and view its subject as another Jeffrey Epstein, Harvey Weinstein, Sean "P. Diddy" Combs, or R. Kelly. *See* JA-52-53, 89 ¶¶ 81, 84, 171. It is reversible error that the District Court drew inferences against Drake based on disputed interpretations of little-known, extra-pleading song lyrics while simultaneously ignoring well-pleaded allegations like the "broader social context" regarding pedophilia allegations against male celebrities. *Davis*, 22 N.E. at 1005.

### 3. UMG Asks This Court to Ignore Its Repeated Republications of the Recording.

UMG next urges this Court to disregard Drake's well-pleaded allegations that the Recording was repeatedly republished to new audiences further removed from the original rap battle and prior songs. *See, e.g.*, JA-18-19, 21, 24 ¶¶ 7, 11, 17. After baselessly asserting that this issue is waived when Drake repeatedly raised it below,

13

*see* JA-408, 490, UMG suggests that, because Drake pleaded the Recording was always popular, subsequent broadcasts cannot be republications reaching new audiences.  *See* RB-50.  But Drake pleaded multiple republications that necessarily reached new audiences, including that UMG (1) released the Video after the rap battle was over and Drake had informed UMG of the shooting at his home, JA-59-60 ¶ 105; and republished the Recording at (2) political and sporting events, JA-82 ¶¶ 161-63; (3) the Grammy's, JA-83-84 ¶ 164; and (4) the Super Bowl, to a global audience almost a year after the original rap battle, JA-21, 84-89 ¶¶ 11, 165-71.[6] UMG's argument also flops mathematically: the Recording's immediate popularity (96 million streams in a week) pales in comparison to the *3.65 billion* "total global views" of the Super Bowl performance—a republication *far* outside the original rap battle, including to football fans who  had "*never* before heard the song or *any* of the songs that preceded it."  *See* JA-21, 86, 101 ¶¶ 11, 168, 194.  UMG's assertion that

---

[6] UMG confusingly asserts that these are not republications.  *See* RB-53.  It is black-letter law that re-broadcasts that are "intended to and actually reach[] a new audience" are republications giving rise to a new cause of action, *see Firth v. State*, 775 N.E.2d 463, 466 (N.Y. 2002); *Lehman v. Discovery Commc'ns, Inc.*, 332 F. Supp. 2d 534, 538-39 (E.D.N.Y. 2004).  Courts likewise find republication where, as here, JA-85 ¶ 167, a subsequent broadcast is altered.  *See Biro v. Conde Nast*, 963 F. Supp. 2d 255, 268 (S.D.N.Y. 2013).

14

the Super Bowl audience had "even greater notice of the feud" than the original audience, RB-54, runs directly into these allegations. JA-21 ¶ 11.[7]

UMG then argues that, even assuming the Recording was republished, the relevant "context" for the fact-vs-opinion inquiry is carved in stone at the time of initial publication. RB-51-53. For support, UMG (again) primarily cites the District Court's conclusory and unsupported statement that "[r]epublication cannot transform Lamar's statement of opinion into UMG's statement of fact." *Id.* at 52 (citing SPA-22). Otherwise, UMG cites only an inapposite case, *Cooper v. Franklin Templeton Investments*, 2023 WL 3882977, at *4 (2d Cir. June 8, 2023). *Cooper* found nonactionable three statements made in the days and weeks after a video of the plaintiff "was circulated widely and 'became international news as a racial flashpoint'" during "an ongoing national reckoning about systemic racism." *Id.* The *Cooper* plaintiff never argued that the statements required different context analyses, and *nothing* in the case suggests that a statement's context is fixed at initial

---

[7] UMG baselessly asserts that Lamar "expressly contextualized" the rap beef for the audience by saying "I want to play their favorite song … but you know they love to sue." RB-54-55. Yet again, UMG ignores pleaded facts in favor of its narrative. In fact, the Super Bowl performance excluded the word "pedophile[]"; although that failed to change the Recording's core message, it implicitly concedes that viewers would take the lyrics literally. *See* OB-8. It is also unclear why UMG thinks the threat of defamation liability would make listeners *more* likely to view the Recording's assertions of pedophilia as opinion, rather than fact.

15

publication, no matter how the circumstances or audience change by the time of republication.

*Steinhilber* is instructive. There, the court concluded that statements made about a plaintiff during an acrimonious labor dispute would have been understood as a "tasteless effort to lampoon plaintiff for her activities as a 'scab.'" 501 N.E.2d at 556. That conclusion makes sense: the audience—union members and associates—would have the relevant labor-dispute context and view the dispute accordingly. *See id.* at 555-56. But if the same allegations were republished almost a year later to a ***worldwide audience*** of Super Bowl viewers unfamiliar with the underlying labor dispute, the two "contexts" undoubtedly would be different.

### 4. UMG Embraces The District Court's De Facto Categorical Rule that Rap Diss Tracks Can Never Be Actionable.

Although UMG purports to disclaim a categorical rule that statements in diss tracks cannot be defamatory, *see* RB-23-26, in UMG's view, "[a] rap diss track signals—if not shouts—opinion not fact." RB-21. But not all listeners—especially of republished versions—would recognize it as part of that forum. Regardless, forum is not dispositive; even in informal fora, statements need to be assessed on a case-by-case basis, *see* OB-42 (citing cases).[8] Perhaps statements in rap diss tracks

---

[8] A holding that listeners cannot understand rap diss tracks to assert facts is inconsistent with the reality that rap lyrics are considered as evidence in criminal cases. OB-43. UMG's and *amici*'s personal, nit-picking responses, *see* RB-25-26; Dkt. No. 66 at 21-22, miss Drake's point: if criminal juries can use rap lyrics to

may only be actionable infrequently, but this case is one of those rare exceptions. The Recording's lyrics, the realistic Image, and the accompanying Video falsely indict Drake, stating he is a "certified pedophile[]." *See Coleman*, 158 F.4th at 142, 145 ("concrete" and "specific" accusations of sexual misconduct more likely to be actionable). This message reached broad audiences and garnered serious reactions, including threats and an attempt on Drake's life. If the Recording cannot support a defamation claim, nothing in this forum ever will.

Both UMG and *amici* suggest that the rap diss track forum must be treated with kid gloves and that ruling for Drake (who *is a rapper*) poses a threat to the future of rap. *See* RB-2; *see generally* Dkt. No. 47 at 17-18. This fearmongering is baseless: many facets of defamation law and the First Amendment adequately protect artistic expression. For example, as a public-figure plaintiff, Drake must show actual malice—that UMG acted with knowledge of falsity or a reckless disregard of the truth, which is not at issue here. *See Palin v. N.Y. Times Co.*, 113 F.4th 245, 258 (2d Cir. 2024). That this case involves rap does not give UMG a free pass for defamation.

UMG's newfound anything-goes-in-music-no-matter-what approach is also inconsistent with its own practices. Its standard recording contract "includes a

---

determine that (e.g.) the person rapping actually committed the crime mentioned in a song, then surely reasonable listeners can likewise understand rap lyrics as asserting facts.

provision which permits UMG [to] eliminate material which, in UMG's judgment, constitutes defamation or libel." JA-38 ¶ 50. It is only now, when this reality collides with its commercial bottom-line, that UMG pretends all rap is shielded from defamation liability.

## II. DRAKE ADEQUATELY PLEADED THAT THE DEFAMATORY STATEMENTS CONSTITUTE MIXED OPINION.

Alternatively, Drake has stated a defamation claim based on mixed opinion—a "statement of opinion [that] implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it." *Stega v. N.Y. Downtown Hosp.*, 107 N.E.3d 543, 553 (N.Y. 2018) (alteration in original). "What differentiates an actionable mixed opinion from a privileged, pure opinion is 'the implication that the speaker knows certain facts, unknown to [the] audience, which support [the speaker's] opinion and are detrimental to the person' being discussed." *Davis*, 22 N.E.3d at 1004 (alterations in original).

Drake pointed to two lyrics in the Recording—"Say Drake, I *hear* you like 'em young" and "Rabbit hole is still deep, I can go further, I promise," JA-40-42, ¶¶ 60, 63; JA-423—that, at minimum, "*could* be viewed by a reasonable [listener] as containing the implication that [Lamar] knows certain facts, unknown to [the]

18

audience" supporting the pedophilia allegations.[9] *Zervos v. Trump*, 94 N.Y.S.3d 75, 89 (N.Y. App. Div. 2018) (emphasis added); *see, e.g.*, *Turret Labs USA, Inc. v. CargoSprint, LLC*, 2021 WL 535217, at *7 (E.D.N.Y. Feb. 12, 2021). Drake also explained that (1) other songs *in the pleadings* suggested that Lamar had undisclosed information about Drake, *see* OB-46, and (2) real listeners had interpreted the Recording's lyrics as implying undisclosed information, *see* JA-47 ¶ 76.

In a footnote, UMG baldly asserts that the "rabbit hole" lyric cannot be understood to imply undisclosed facts. *See* RB-37 n.12. Despite UMG's inappropriately placing the burden on Drake to put forth an alternative understanding of the lyrics of "Taylor Made Freestyle," *supra* at 10, UMG makes no effort to propose an alternative interpretation, let alone show Drake's allegations—which must be credited—are *unreasonable*.

Instead, UMG rehashes its "context" argument to claim that the lyrics could not be reasonably understood to imply undisclosed facts because they were part of a rap battle. RB-37-38. UMG's cases support the non-controversial proposition that when the overall context indicates viewers would not take statements seriously, that bears on the mixed-opinion inquiry. *See LaNasa v. Steine*, 2025 WL 893456, at *3 (2d Cir. Mar. 24, 2025); *Woodbridge Structured Funding, LLC v. Pissed Consumer*,

---

[9] At argument, the Court recognized this. *See* JA-469 ("There's some ambiguity there, but on a motion to dismiss, I have to read the ambiguity potentially in favor of the plaintiff").

6 N.Y.S.3d 2, 3 (N.Y. App. Div. 2015). But here, the context does not so indicate, especially given the repeated republications of the Recording. *Supra* at 11-16. And in any event, the statements here are more facially suggestive of reliance on undisclosed facts than those in *LaNasa* and *Woodbridge*.

UMG further argues against undisclosed facts because the allegations "implicate[] controversies that are widely known or reported," namely "rumors about Drake's relationships with minors." RB-39-40. Even if credited, that argument is self-defeating. If a reasonable listener were aware of existing rumors, she would be *more* likely to understand statements that an industry insider has "heard" information and "can go deeper" as suggesting supportive-but-undisclosed information.

UMG's argument fails for other reasons. *First*, the Amended Complaint does not plead anything about the existence of purported rumors, *see* JA-473, let alone that they are "widely known or reported." Nor could their existence be judicially noticed: the existence and widespread nature of a rumor is plainly "subject to reasonable dispute." *Kaggen v. IRS*, 71 F.3d 1018, 1019-20 (2d Cir. 1995). It is likewise insufficient that rumors were mentioned in judicially-noticed articles. RB-40. The Court could not take the articles' statements about rumors "for the truth of the matters asserted." *Roth*, 489 F.3d at 509; *see Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008).

20

*Second*, UMG (again) asks this Court to make a factual finding—these rumors exist and are "widely known or reported"—without giving Drake the opportunity to submit contrary evidence. RB-39. That is (again) improper. *See Roth*, 489 F.3d at 509; *Foreman*, 19 F.4th at 106-07.

*Third*, UMG's cases are inapposite. Each concerns statements regarding well-known, undeniable factual events—not rumors. *See Cooper*, 2023 WL 3882977, at *4 (statement about event in Central Park "would be understood by the reasonable reader as being based on the publicly available video of the incident"); *Gisel v. Clear Channels Commnc'ns, Inc.*, 942 N.Y.S.2d 751, 752-53 (N.Y. App. Div. 2012) (concluding, on summary judgment, that statements about whether shooting was accidental were based on widespread news coverage); *Torain v. Liu*, 2007 WL 2331073, at *3 (S.D.N.Y. Aug. 16, 2007) (statements did not imply undisclosed information when defendant was commenting on plaintiffs' prior remarks that received "extensive media coverage").

## III. THE DISTRICT COURT ERRED BY DISMISSING DRAKE'S HARASSMENT CLAIM.

The District Court dismissed Drake's harassment claim because N.Y. Penal Law Section 240.26 does not create a private right of action. In doing so, the Court countermanded Second Circuit authority, *see Galella v. Onassis*, 487 F.2d 986, 994 n.11 (1973), picked the wrong side of split New York decisions, and reached a conclusion at odds with New York's lenient and permissive private-right-of-action

test.  *See* OB-47-51.  UMG's response misrepresents the law and forgets contrary authority.  And UMG's perfunctory alternative arguments fail.

## A.     A Private Right of Action for Harassment Exists.

UMG's primary argument against recognizing a private right of action here is that such actions are barred *whenever* a statute provides for criminal enforcement. *See* RB-57-58.  That is incorrect: the *Sheehy*/*Hamme*r test exists to determine whether a *penal* statute implies a private right of action.  *Hammer v. Am. Kennel Club*, 1 N.Y.3d 294, 299 (N.Y. 2003).  UMG simply ignores New York cases recognizing private rights of action for myriad statutes prescribing criminal punishments.  *See* OB-51.

UMG next contends (RB-58) that because the Legislature enacted private rights of action for "the adjacent Penal Law harassment provision," Section 240.25, there can be no implied private right of action in Section 240.26.  But UMG's cited provisions create specific civil remedies, including enhanced punishments, for Section 240.25 harassment *based on discrimination*.  *See* N.Y. Civ. Rights Law §§ 40-c (outlawing certain discrimination/harassment); 40-d (monetary penalties for Section 40-c violations); 79-n (cause of action and remedies for race/national-origin harassment).  Nothing suggests that by providing special remedies for one type of particularly harmful conduct, the Legislature intended to foreclose general civil remedies for all harassment.  Indeed, courts have repeatedly found *implied* private

22

rights of action under Section 240.25. *See Prignoli v. City of N.Y.*, 1996 WL 340001, at *6 (S.D.N.Y. June 19, 1996); *True v. N.Y. State Dep't of Correctional Servs.*, 613 F. Supp. 27, 33 (W.D.N.Y. 1984); *Spock v. United States*, 464 F. Supp. 510, 516 (S.D.N.Y. 1978).

UMG fails to address Drake's authorities. Drake cited *eight* cases finding private rights of action for harassment and two others supporting his interpretation of *Galella*. *See* Dkt. Nos. 35 at 49; 39 at 6-7; OB-48-50. UMG only mentions these authorities in a footnote, suggesting they are tainted because they rely on *Galella*, which UMG incorrectly dismisses as outdated dicta. RB-61 n.23.

UMG further misrepresents its authorities. UMG asserts that "uniform" New York appellate precedent "rejects a private right of action for § 240.26." RB-59. But UMG largely ignores a contrary appellate decision, *Long v. Beneficial Fin. Co.*, 330 N.Y.S.2d 664 (N.Y. App. Div. 1972), and two of its three cases—*Ralin v. City of New York*, 844 N.Y.S.2d 83, 84 (N.Y. App. Div. 2007), and *Hartman v. 536/540 E. 4th St. Equities*, 797 N.Y.S. 2d 73, 74 (N.Y. App. Div. 2005)—hold only that there is no independent harassment tort; they *do not even mention* Section 240.26 or the private-right-of-action doctrine. Despite Drake pointing out this *exact same error*, Dkt. No. 39 at 3, UMG cannot explain how cases never citing Section 240.26 can "reject[] a private right of action" under it. RB-59.

23

### B. UMG's Alternative Arguments Fail.

UMG halfheartedly suggests that this Court could affirm the dismissal of Drake's harassment claim on grounds not previously considered. This Court should follow the "distinctly preferred practice" of remanding. *Schonfeld v. Hilliard*, 218 F.3d 164, 184 (2d Cir. 2000). UMG's back-up arguments nonetheless fail.

*First*, Drake adequately alleged that UMG acted "with intent to harass, annoy, or alarm." N.Y. Penal Law 240.26. "'[I]ssues of intent and motive are typically factual inquiries that should not be decided on a motion to dismiss "unless the nonmovant has failed to allege any evidence … that the defendants acted with scienter.'" *CFTC v. TFS-ICAP, LLC*, 432 F. Supp. 3d 320, 325 (S.D.N.Y. 2020). "[I]ntent may, and in most instances must, be established by inferences drawn from the surrounding circumstances." *Dhir v. Winslow*, 205 N.Y.S.3d 595, 598 (N.Y. App. Div. 2024). Drake pleaded both that UMG had an incentive to devalue his music, JA-107 ¶ 213, and that UMG continued to publish and promote material *accusing Drake of sexually abusing children* even after Drake informed it of the allegations' falsity and the violent assault. *See* JA-105-07, 111-12, 114-15 ¶¶ 208-12, 225-26, 237-38. Those intent allegations suffice at this stage.

*Second*, Drake pleaded that UMG acted with "no legitimate purpose." N.Y. Penal Law 240.26(3). There is no "legitimate purpose" in baselessly hurling pedophilia accusations—especially after UMG learned of the violent consequences.

24

*See* JA-111-12, 114-¶¶ 225-26, 237-38.  UMG relies on its "financial" motive, RB-62, but its sole cited case, *People v. Stuart*, 797 N.E.2d 28, 41 (N.Y. 2003), does not hold that a partial financial motivation shields otherwise illegitimate conduct from harassment liability.  To the contrary, that a defendant also stood to benefit (financially or otherwise) does not imbue harassing conduct with a legitimate purpose.  *See, e.g.*, *People v. Richmond Cap. Grp. LLC*, 80 Misc.3d 1213(A), at *8, 16 (N.Y. Sup. Ct. 2023) ("no legitimate purpose" where defendant acted "only to collect on his illicit loans and with the intent to harass").[10]

*Third*, Drake alleged that UMG "engage[d] in a course of conduct or repeatedly commit[ted] [qualifying] acts." N.Y. Penal Law 240.26(3).  This element imposes a minimal burden: "[a]lthough one isolated incident is insufficient to establish [] a course of conduct …, a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose can support such a finding."  *Dhir*, 205 N.Y.S.3d at 598.  UMG suggests that the harassment claim violates the First Amendment because the Recording is "pure speech." *See* RB-62.  But the case it cites—*People v. Marquan M.*, 19 N.E.3d 480, 488 n.4 (N.Y.

---

[10] *Cf. People v. Pham*, 987 N.Y.S.2d 687, 689 (N.Y. App. Div. 2014) (under similar statute, no "purpose of legitimate communication" in contacting individual where defendant was acting to discourage cooperation with law enforcement); *People v. Coveney*, 50 Misc.3d 1, 7 (N.Y. App. Term 2015) (under stalking statute, no "legitimate purpose" in defendant repeatedly calling employer despite motivation to re-obtain job).

2014)—involves *government* regulation of speech via criminal prosecution, not a private civil claim. Regardless, Drake's claim is based not on pure speech, but on UMG's conduct in publishing, vigorously promoting, and republishing the Recording. *See* JA-19-21 ¶¶ 9-10.

## IV. THE DISTRICT COURT ERRED IN DISMISSING THE DECEPTIVE BUSINESS PRACTICES CLAIM.

Finally, this Court should reverse the dismissal of Drake's claim that UMG violated N.Y. General Business Law Section 349.

### A. Drake Has Pleaded Sufficient Facts Supporting a Covert Scheme.

UMG argues that Drake failed to allege the existence of a covert scheme because Drake relies on allegations made "on information and belief" and "predicated on a handful of (largely anonymized) online posts." RB-63. Again, UMG misstates both the allegations in the Amended Complaint and the law.[11]

On the allegations, Drake pleaded numerous facts suggesting that UMG used a covert scheme to boost the Recording's popularity, only some of which were upon information and belief. Allegations included (1) on information and belief, UMG used bots to spread the Recording on Spotify; (2) botted streams are a serious

---

[11] UMG observes that the Court cited *Twombly* and *Arista Records*. RB-64-65. True, but the Court misapplied them, incorrectly requiring Drake to show that it was "highly plausible" UMG had used unlawful business tactics. OB-54 (citing SPA-36). UMG does not defend that standard, which plainly exceeds *Twombly*'s plausibility standard. *See Twombly v. Bell Atl. Co.*, 550 U.S. 544, 555-56 (2007); *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119-20 (2d Cir. 2010).

problem; (3) Budden indicated that Lamar used bots to boost the Recording's popularity;[12] (4) a social media user posted a video demonstrating how to use a bot streamer and explained that UMG and Lamar had used that tool to boost the Recording's popularity; (5) social media users implicated UMG in "paid promotion" of the Recording; (6) on information and belief, UMG provided financial incentives to streaming platforms; (7) third parties documented streaming irregularities that boosted access to the Recording; (8) on information and belief, UMG took part in pay-for-play; and (9) UMG has previously paid millions in a settlement after a pay-for-play investigation, supporting an inference of pay-for-play here. *See* JA-90-96 ¶¶ 172-86.

On the law, UMG takes issue with Drake's argument that a plaintiff may plead facts on information and belief "where the facts are peculiarly within the possession of the defendant, *or* where the belief is based on factual information that makes the inference of culpability plausible." OB-53 (quoting *Arista Records*, 604 F.3d at 120) (emphasis added). But UMG's cited cases suggest, at most, that information-and-belief pleading is insufficient when plaintiffs provide *no supporting facts whatsoever*. *See Amigo Shuttle Inc. v. Port Auth. of N.Y. & N.J.*, 2025 WL 2618862,

---

[12] UMG argues that Drake cannot rely on Lamar's conduct to support its deceptive-business-practices claim against UMG. RB-63-64. But Drake pleaded that UMG's unlawful conduct was carried out "directly or indirectly through its agents" and that UMG "conspired" to artificially inflate the Recording's popularity. JA-90 ¶ 173.

at *2 (2d Cir. Sept. 11, 2025) ("nothing more than conjecture and speculation"); *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 226 (2d Cir. 2017) ("no allegations of fact" that would support allegations); *Yamashita v. Scholastic, Inc.*, 936 F.3d 98, 105, 107 (2d Cir. 2019) ("entirely generic allegations of breach" without even "a modicum" of facts). None do what UMG asks: weigh the credibility of a plaintiff's allegations; decide that those relying on online sources are too "unreliable" to count; and then disregard the well-pleaded facts, rather than construing them in the plaintiff's favor. *See, e.g.*, *Carruthers v. Colton*, 153 F.4th 169, 190 (2d Cir. 2025) (court erred because it "engaged in an impermissible credibility determination at the motion to dismiss stage"); *Palin v. N.Y. Times Co.*, 940 F.3d 804, 812 (2d Cir. 2019) (court erred because it "relied on credibility determinations not permissible at any stage before trial").

### B.     Drake Has Alleged Consumer-Oriented Conduct.

Drake alleged "that the acts or practices"—using deceptive methods to artificially boost the Recording's popularity—"have a broad[] impact on consumers at large." *Oswego Laborers' Local 214 v. Marine Midland Bank*, 647 N.E.2d 741, 744 (N.Y. 1995). Music consumers expect that recommendations from music service providers are based on a legitimate rationale, not the record label's backroom transactions. *See* JA-93-94, 112-13, 118 ¶¶ 181, 229, 259-60.

UMG contends that the "conduct must 'result in a *transaction* in which the consumer was harmed.'" RB-67. Again, UMG fails to mention Drake's cited authorities *holding the opposite*: "While the typical case under section 349 generally involves claims arising directly out of a commercial transaction between a plaintiff consumer and a defendant seller, neither the text of the statute nor the case law establishes this requirement." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 630-31 (S.D.N.Y. 2001); *see* OB-58. UMG's own authority is inapposite. *Goshen v. Mutual Life Insurance Company of New York*, 98 N.Y.2d 314, 324-26 (N.Y. 2002), used the term "transaction" in describing the statute but focused on *where* the deception took place—it did not set forth (or even discuss) the need for a pecuniary transaction. In *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 898 (N.Y. 1999), plaintiffs failed to allege that the deception caused *any* impact on consumers, financial or otherwise. Regardless, Drake has shown impacted transactions, as consumers *pay* for music streaming services. OB-57-58.

### C. UMG's Alternative Argument Fails.

Finally, UMG urges this Court to affirm on (another) alternative ground: Drake was not injured by the deception. RB-68-69. This Court should instead remand. *Schonfeld*, 218 F.3d at 184. Nonetheless, this argument fails. Drake alleges that he was harmed as an artist (i.e., a competitor to Lamar) because UMG falsely inflating the Recording's popularity—and, especially, redirecting users from

29

Drake's songs toward the Recording—cost him the opportunity for his songs to be streamed and gain royalties. *See* JA-112-13, 118-19 ¶¶ 229, 262-63. This is akin to competitor injuries New York courts have recognized. *See N. State Autobahn, Inc. v. Progressive Ins. Grp.*, 953 N.Y.S.2d 96, 99, 105 (N.Y. App. Div. 2012); *Casper Sleep, Inc. v. Mitcham*, 2016 WL 7188788, at *2 (S.D.N.Y. Nov. 17, 2016). And *contra* UMG, this injury is neither derivative nor indirect. *Cf. City of N.Y. v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 838-39 (N.Y. 2009) (municipality could not recover based on lost tax income from cigarettes falsely marketed as tax-free to consumers); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA, Inc.*, 818 N.E.2d 1140, 1144-45 (N.Y. 2004) (insurer could not recover costs incurred in providing coverage to smokers who faced increased smoking-related medical costs from defendants' deceptive advertising about cigarettes' danger).

UMG's passing assertion that any harm is "speculative," RB-69, fails because Drake pleaded that users were *diverted* from his songs toward the Recording. That is precisely the type of harm found to be sufficient at the summary-judgment stage in *North State Autobahn*. Surely, then, it is enough to state a claim.

## **CONCLUSION**

This Court should reverse the dismissal of the Amended Complaint.

Dated: April 17, 2026

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP

/s/ *Michael J. Gottlieb*
Michael J. Gottlieb
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067
mgottlieb@willkie.com
(310) 855-3111

Erica L. Ross
Anna M. Gotfryd
1875 K Street NW
Washington, D.C. 20006
eross@willkie.com
agotfryd@willkie.com

Brady M. Sullivan
787 Seventh Avenue
New York, New York 10019
bsullivan@willkie.com

*Counsel for Appellant Aubrey Drake Graham*

31

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

Pursuant to Fed. R. App. P. 32(g)(1), I certify the following:

1.      This document complies with the type-volume limitation of Local Rule 32.1(a)(4)(B) because, including words manually counted in images and excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this document contains 6,999 words.

2.      This document complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this document has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: April 17, 2026

_/s/ Michael J. Gottlieb_
Michael J. Gottlieb
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067

_Counsel for Appellant Aubrey Drake Graham_

- 32 -