# 25-2758

## In the United States Court of Appeals
## for the Second Circuit

———————

AUBREY DRAKE GRAHAM,

*Plaintiff-Appellant,*

*v.*

UMG RECORDINGS, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court for the
Southern District of New York (Vargas, J.)

### *AMICI CURIAE* BRIEF OF THE FLOYD ABRAMS INSTITUTE FOR FREEDOM OF EXPRESSION AND PROFESSOR LYRISSA LIDSKY IN SUPPORT OF APPELLEE AND AFFIRMANCE

John Langford
  *Counsel of Record*
David A. Schulz
Hannah Berkman, *student*
Melanie Geller, *student*
Raymond Perez, *student*
Tess Solomon, *student*
MEDIA FREEDOM &
INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
(203) 432-2366
john.langford@ylsclinics.org

*Counsel for Amici Curiae*

May 6, 2026 (originally filed April 3, 2026)

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus* the Floyd Abrams Institute for Freedom of Expression has no parent corporation and no corporation owns 10% or more of any of the amici's stock.*

*Amicus* Lyrissa Lidsky is an individual.

Dated: May 6, 2026                                  /s/ *John Langford*
                                                    John Langford

---

* No party's counsel authored this brief in whole or in part; neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than the *amici curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief. All parties consented to the filing of this brief.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT..........................I

TABLE OF CONTENTS ....................................................................II

TABLE OF AUTHORITIES ........................................................... IV

INTEREST OF *AMICI CURIAE* .................................................. 1

SUMMARY OF ARGUMENT....................................................... 3

ARGUMENT................................................................................. 7

I.    CONSENT IS AN ABSOLUTE DEFENSE TO DEFAMATION, AND FOR GOOD REASON ............................... 7

II.   THE RECORD ESTABLISHES THAT DRAKE CONSENTED TO THE ALLEGEDLY DEFAMATORY STATEMENTS................................................................... 12

    A.    Under New York Law, Consent Lies Where A Plaintiff Invites Statements with a High Degree of Certainty That They Will Be Defamatory ........................................... 12

    B.    Facts Within the Scope of the Pleading Demonstrate that Drake Consented to the Defamatory Statements He Now Challenges .................................................... 17

    C.    This Court Should Reject Drake's Effort to Avoid the Consent Problem at the Heart of this Case......................... 21

III.  THE COURT MAY DISMISS THIS CASE AT THE PLEADING STAGE ON GROUNDS OF CONSENT .................. 25

    A.    New York Courts Recognize the Propriety of Dismissal at the Pleadings Stage When Consent Clearly Forecloses Liability.............................................................. 26

ii

B.     Dismissing Cases of Obvious Consent Is Important to Prevent Chilling Protected Speech ....................................... 27

CONCLUSION ..................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Anand v. Kapoor,*
   942 N.E.2d 295 (N.Y. 2010) ................................................................. 9

*Armstrong v. Simon & Schuster, Inc.,*
   649 N.E.2d 825 (N.Y. 1995) ................................................................ 28

*Baker v. Lafayette Coll.,*
   504 A.2d 247 (Pa. 1986) ...................................................................... 14

*Biro v. Conde Nast,*
   883 F. Supp. 2d 441 (S.D.N.Y. 2012) .................................................. 29

*Biro v. Conde Nast,*
   963 F. Supp. 2d 255 (S.D.N.Y. 2013) .................................................. 29

*Brian v. Richardson,*
   660 N.E.2d 1126 (1995) ........................................................................ 9

*Brooks v. AAA Cooper Transp.,*
   781 F. Supp. 2d 472 (S.D. Tex. 2011)................................................... 23

*Button v. Doherty,*
   No. 24-CV-5026 (JPC) (KHP), 2025 WL 2846927
   (S.D.N.Y. July 30, 2025) ..................................................................... 28

*Carroll v. Trump,*
   680 F. Supp. 3d 491 (S.D.N.Y. 2023) ............................... 13, 15, 16, 21

*Cox v. Nasche,*
   70 F.3d 1030  (9th Cir. 1995) ............................................................. 22

*DeLuca v. Reader,*
   323 A.2d 309 (Pa. Sup. Ct. 1974) ....................................................... 14

*Dfinity Found. v. New York Times Co.*,
 702 F. Supp. 3d 167 (S.D.N.Y. 2023) ................................................ 30

*Dickson v. Slezak*,
 902 N.Y.S.2d 206 (App. Div. 2010) ...............................................*passim*

*Dixon v. von Blanckensee*,
 994 F.3d 95 (2d Cir. 2021) ................................................................ 27

*Exxon Mobil Corp. v. Rincones*,
 520 S.W.3d 572 (Tex. 2017) ............................................................... 8

*Gertz v. Robert Welch, Inc.*,
 418 U.S. 323 (1974) .............................................................. 11, 12, 28

*Handlin v. Burkhart*,
 632 N.Y.S.2d 608 (1995) .................................................................. 20

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
 491 U.S. 657 (1989) .......................................................................... 28

*Hatfill v. New York Times Co.*,
 427 F.3d 253 (4th Cir. 2005) ........................................................... 29

*Hellesen v. Knaus Truck Lines, Inc.*,
 370 S.W.2d 341 (Mo. 1963) ................................................................ 8

*Hirschfeld v. Institutional Inv.*,
 688 N.Y.S.2d 31 (App. Div. 1999) ................................................... 14

*Immuno AG. v. Moor-Jankowski*,
 567 N.E.2d 1270 (N.Y. 1991) ..................................................... 29, 30

*Joftes v. Kaufman*,
 324 F. Supp. 660 (D.D.C. 1971) ...................................................... 14

*Karaduman v. Newsday, Inc.*,
 416 N.E.2d 557 (N.Y. 1980) ............................................................. 29

*Katleski v. Cazenovia Golf Club, Inc.,*
   271 N.E.3d 681 (N.Y. 2025)................................................................. 9

*LeBreton v. Weiss,*
   680 N.Y.S.2d 532 (App. Div. 1998) ..............................................*passim*

*Litman v. Massachusetts Mut. Life Ins. Co.,*
   739 F.2d 1549 (11th Cir. 1984) ......................................................... 8

*Long v. Quorum Health Res., L.L.C.,*
   590 F. App'x 103 (2d Cir. 2015)......................................................... 8

*Mandelblatt v. Perelman,*
   683 F. Supp. 379 (S.D.N.Y. 1988) .............................................. 22, 25

*McDermott v. Hughley,*
   561 A.2d 1038 (Md. 1989)................................................................. 8

*Mims v. Metro. Life Ins. Co.,*
   200 F.2d 800 (5th Cir. 1952) ............................................................ 8

*Nelson v. Whitten,*
   272 F. 135 (E.D.N.Y. 1921)............................................................. 23

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964).......................................................... 11, 12, 27

*O'Brien v. Cunard S.S. Co. Ltd.,*
   28 N.E. 266 (Mass. 1891)................................................................ 23

*Park Knoll Assocs. v. Schmidt,*
   59 N.Y.2d 205 (1983) ....................................................................... 7

*Park v. Lewis,*
   528 N.Y.S.2d 250 (App. Div. 1988) ......................................... 15, 16, 20

*Royer v. Steinberg,*
   153 Cal. Rptr. 499 (Ct. App. 1979)..................................................... 8

*Savage v. NYP Holdings, Inc.*,
No. 24 CIV. 3278 (NRB), 2025 WL 2687992
(S.D.N.Y. Sep. 19, 2025) ....................................................... 30

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
612 F. Supp. 3d 115 (E.D.N.Y. 2020) ................................. 14

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
779 F.3d 191 (2d Cir. 2015) ................................ 7, 13, 14, 16

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
909 F.3d 519 (2d Cir. 2018) ................................................ 21

*Smith v. Holley*,
827 S.W.2d 433 (Tex. App. San Antonio, 1992) ................ 23

*SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*,
No. 21 CIV. 2857 (AT), 2022 WL 493600
(S.D.N.Y. Feb. 17, 2022) ..................................................... 30

*Teichner v. Bellan*,
181 N.Y.S.2d 842 (App. Div. 1959) ....................... 7, 8, 13, 15

*Teneriello v. Travelers Cos.*,
641 N.Y.S.2d 482 (App. Div. 1996) ................................... 14

*Turano v. Bd. of Educ. of Island Trees Union Free Sch. Dist.*,
434 F. Supp. 1063 (E.D.N.Y. 1977) .............................. 14, 21

*Turcotte v. Fell*,
502 N.E.2d 964 (App. Div. 1986) ....................................... 23

*Washington Post Co. v. Keogh*,
365 F.2d 965 (D.C. Cir. 1966) ............................................ 29

*Wells v. Belstrat Hotel Corp.*,
208 N.Y.S. 625 (App. Div. 1925) .......................................... 7

vii

*Ziemkiewicz v. R+L Carriers,*
    996 F. Supp. 2d 378 (D. Md. 2014) ...................................................... 21


**Treatises**

Restatement (First) of Torts § 583 (A.L.I. 1938) ........................... 7, 8, 13

Restatement (Second) of Torts § 583 (A.L.I. 1977) ................... 7, 8, 13, 16

Restatement (Second) of Torts § 584 (A.L.I. 1977) ........................... 7, 13

Restatement (Second) of Torts § 892 (A.L.I. 1977) ................................ 13

Restatement (Second) of Torts § 892A (A.L.I. 1977) ............................... 9

*Sack on Defamation: Libel, Slander, and Related Problems*
    § 8:2.8 Consent; "Invited Defamation" (5th ed. 2017)..................... 8, 26


**Other Authorities**

Br. of Scholars Charis Kubrin *et al.* as *Amici Curiae,*
    *Graham v. UMG Recordings, Inc.*, 806 F. Supp. 3d 454
    (S.D.N.Y. 2025) (No. 1:25-cv-0399), ECF No. 52 ................. 4, 10, 12, 17

*Clout*, Merriam-Webster Dictionary, https://www.merriam-
    webster.com/dictionary/clout (last visited April 2, 2026) ................... 10

Elizabeth Dilts Marshall, *How Much Money Did the Kendrick
    Lamar-Drake Diss Songs Generate?*, Billboard (Dec. 12,
    2024) .............................................................................................. 10

Jack M. Balkin, *Cultural Democracy and the First
    Amendment*, 110 Nw. U. L. Rev. 153 (2016) ....................................... 2

Laura A. Heymann, *The Law of Reputation and the Interest of
    the Audience*, 52 B.C. L. Rev. 1341 (2011) ........................................... 9

## INTEREST OF *AMICI CURIAE*

*Amici Curiae* are the Floyd Abrams Institute for Freedom of Expression at Yale Law School and Professor Lyrissa Lidsky.

**The Abrams Institute** is an organization dedicated to promoting freedom of speech and freedom of the press.

**Professor Lidsky** is the Raymond & Miriam Ehrlich Chair in U.S. Constitutional Law at the University of Florida's Levin College of Law.[1] She is one of the country's leading defamation scholars. Her research focuses on the intersection of the First Amendment and tort law, with an emphasis on defamation and free speech issues in social media. Professor Lidsky is a co-reporter for the in-progress *Restatement (Third) of Torts: Defamation and Privacy* and has co-authored a leading media law casebook and a First Amendment casebook, among other scholarship.

Together, *amici* have a significant interest in preserving the essential safeguards for free expression in every forum—whether in the pages of a newspaper or the lyrics of a rap battle.

---

[1] Professor Lidsky's institutional affiliation is included for purposes of identification only.

*Amici* agree that the court below correctly dismissed the defamation claim. Should this Court disagree with that court's rationale, this case presents the Court with an opportunity to reaffirm a foundational principle of defamation law: consent is a complete defense, and one who consents to defamation cannot later seek redress in court. Defamation is an important dignitary tort, protecting reputational interests that underwrite every decent system of ordered liberty. Stretched too far, however, defamation liability threatens to stifle public discourse that promotes democratic culture and secures political democracy.[2] While the First Amendment is the first guardian against

---

[2] For a discussion on the First Amendment's protection of cultural democracy, see Jack M. Balkin, *Cultural Democracy and the First Amendment*, 110 Nw. U. L. Rev. 153 (2016). As Professor Balkin explains, the

> constitutional protection of art, including instrumental music, conceptual art, and popular art, is especially easy to justify. Art is the most powerful medium of communication about our values, emotions, and opinions, because it can appeal immediately to people and it can create an emotional, as well as an intellectual, connection to others. Protecting freedom to participate in the formation of public opinion and to engage in cultural expression legitimates the state in much the same way that protecting other important rights—like the right against unreasonable

2

overzealous application of defamation law, common-law privileges are the oldest. The consent defense continues to play a limited but critical role in safeguarding fora for artistic expression, as this case illustrates.

*Amici* submit this brief to draw the Court's attention to the expressive rights at stake in this case and to explain how the law has long protected expression that comes at the explicit invitation of another.

## SUMMARY OF ARGUMENT

Suppose a self-assured boxer challenges the world champion to a prize fight, is knocked out on live television, and, with bruised ego and body, files a lawsuit for battery. That lawsuit would fail at the outset for a simple but important reason: the challenger consented to the fight, and consent is a classic defense to an intentional tort.

Defamation is also an intentional tort, and defamation claims are likewise foreclosed by consent.

Consider this case. In 2024, two platinum rap artists, Aubrey Drake Graham (Drake) and Kendrick Lamar (Lamar), engaged in a widely

---

searches and seizures—legitimates the state. It is an aspect of what it means to live in a free society.

*Id.* at 1071.

publicized rap battle. *See* JA 506. Rap battles are a half-century-old tradition within the rap genre in which artists trade increasingly incendiary insults in a succession of "diss tracks."[3] Drake and Lamar traded nearly a dozen such tracks, each of which was streamed tens of millions of times, building on a preexisting feud between the two artists. JA 104 n.280. Each artist's lyrics took aim at the other's physical attributes, careers, personal lives, and reputations, and each artist made money by participating. *See* JA 508–14.

Lamar won in the court of public opinion. His final song, "Not Like Us," is the most popular track of the battle, won "Record of the Year" at the 2025 Grammy Awards, and was subsequently the centerpiece of Lamar's 2025 Super Bowl halftime show—reportedly the most watched half-time show ever. *See* JA 514 (collecting citations to the Amended Complaint).

Having lost in that forum, Drake turned to another. He commenced this lawsuit against UMG Recordings, Inc. (UMG), the record company

---

[3] *See* Brief of Scholars Charis Kubrin *et al.* as *Amici Curiae* in Support of Defendant's Motion to Dismiss, *Graham v. UMG Recordings, Inc.*, 806 F. Supp. 3d 454 (S.D.N.Y. 2025) (No. 1:25-cv-0399), ECF No. 52 [hereinafter Rap Scholars *Amici* Br.]; *see also* JA 360–66 (same).

that represents both Drake and Lamar, alleging that "Not Like Us" contains defamatory statements. Specifically, he targets the lyrics calling Drake a "certified pedophile[]" and stating, "I hear you like 'em young." *See* JA 512–13. The lower court granted UMG's motion to dismiss, finding that the statements constitute protected opinion under New York law. *See* JA 507. On appeal, the parties centrally contest whether Lamar's lyrics, in the context of a rap battle, constitute assertions of fact or nonactionable opinion. *See* Appellant Br. 44–46; *see also* Appellee Br. 16–41.

There is another way to resolve Drake's defamation claim. Even assuming Lamar's lyrics were statements of fact, Drake consented to those statements, barring the present action. Under New York law and the majority rule across the country, consent to defamation is an absolute defense. While some consent defenses can require factual development, this case involves one that is dispositive at the pleading stage. On the record before this Court, Drake explicitly invited Lamar's specific accusations.

Lamar released "Not Like Us" in response to several tracks by Drake, including "Taylor Made Freestyle." *See* JA 510–12. In that song,

released on April 19, 2024, Drake urged Lamar to continue the rap battle, calling on him to issue another diss track.[4] Key here, Drake specifically encouraged Lamar to "talk about him[—i.e., Drake—]likin' young girls," and urged Lamar to respond quickly because people were "waitin' on [him]."[5] Lamar responded just days later with "Not Like Us," on May 4, 2024, including his accusations about Drake being a "certified pedophile[]" and liking "'em young." *See* JA 40–42. Lest there be any doubt that Drake anticipated that Lamar would make these precise claims, Drake's final contribution to the rap battle confirmed: "Speakin' of anything with a child, let's get to that now / This Epstein angle was the shit I expected." JA 256.

---

[4] The lyrics include: "Since 'Like That,' [referencing a song by Lamar] your tone changed a little, you not as enthused / How are you not in the booth? It feel like you kinda removed / You tryna let this shit die down, nah, nah, nah / Not this time, n****, you followin' through / I guess you need another week to figure out how to improve / What the fuck is taking so long? We waitin' on you." JA 146–47, 510, 524. Notably, Drake released "Taylor Made Freestyle" shortly after releasing another diss track directed at Lamar, called "Push Ups," without waiting for Lamar's response. Drake thus stoked the feud and called on Lamar to continue the battle. *See* JA 146.

[5] The full lyrics are: "talk about [Drake] likin' young girls, that's a gift from me / Heard it on the Budden Podcast, it's gotta be true." JA 146–47, 510, 524.

Because consent is an absolute defense to defamation, this Court may affirm the district court's grant of UMG's motion to dismiss on this alternative ground.

## ARGUMENT

## I. CONSENT IS AN ABSOLUTE DEFENSE TO DEFAMATION, AND FOR GOOD REASON

In New York, a plaintiff's consent to defamation has long been a "complete defense" to a defamation claim. *Dickson v. Slezak*, 902 N.Y.S.2d 206, 208 (App. Div. 2010); *LeBreton v. Weiss*, 680 N.Y.S.2d 532, 532 (App. Div. 1998); *see Wells v. Belstrat Hotel Corp.*, 208 N.Y.S. 625, 627–28 (App. Div. 1925); *see also Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015) (quoting Restatement (Second) of Torts § 583 (A.L.I. 1977)). Indeed, New York courts have embraced section 583 of the *Restatement (Second) of Torts. See Teichner v. Bellan*, 181 N.Y.S.2d 842, 846 (App. Div. 1959) (citing Restatement (First) of Torts § 583 (A.L.I. 1938)); *see also Park Knoll Assocs. v. Schmidt*, 59 N.Y.2d 205, 209 (1983) (citing Restatement (Second) of Torts § 583 (A.L.I. 1977)); *see generally Sleepy's*, 779 F.3d at 190. Section 583 provides: "[T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his action for

7

defamation." Restatement (Second) of Torts § 583 (A.L.I. 1977); *see LeBreton*, 680 N.Y.S.2d at 532. As reflected by its inclusion in the *Restatement (Second) of Torts*, the absolute defense of consent is not a quirk of New York law; it is the majority rule.[6] *See Sack on Defamation: Libel, Slander, and Related Problems* § 8:2.8 Consent; "Invited Defamation" (5th ed. 2017) [hereinafter Sack on Defamation] ("It is axiomatic that 'invited defamation,' or the issuance of a defamatory statement wherein the injured party precipitated the statement's release, is not actionable." (quoting *Litman v. Mass. Mut. Life Ins. Co.*, 739 F.2d 1549, 1560 (11th Cir. 1984))).

Courts recognize the consent defense because it would be unjust to allow recovery for plaintiffs who "impliedly agree[] to assume the risk of a defamatory communication." *Teichner v. Bellan*, 7 A.D.2d 247, 251 (App. Div. 1959) (citing Restatement (First) of Torts § 583 cmt. d (A.L.I.

---

[6] *See, e.g.*, *Mims v. Metro. Life Ins. Co.*, 200 F.2d 800, 802 (5th Cir. 1952) (Alabama); *Royer v. Steinberg*, 153 Cal. Rptr. 499, 499 (Ct. App. 1979); *McDermott v. Hughley*, 561 A.2d 1038, 1046 (Md. 1989); *Hellesen v. Knaus Truck Lines, Inc.*, 370 S.W.2d 341, 345 (Mo. 1963); *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 582 (Tex. 2017); *Long v. Quorum Health Res., L.L.C.*, 590 F. App'x 103, 104 (2d Cir. 2015) (Vermont). *See generally* Sack on Defamation § 8:2.8 & nn.285, 290, 292 (collecting cases).

1938)). That injustice is recognized throughout tort law: "No wrong is done to . . . . the plaintiff [who] has consented to acts intended to invade his interests." Restatement (Second) of Torts § 892A cmt. a (A.L.I. 1977). The rule recognizes a plaintiff's autonomy, or choice, to forgo legal protection of the interests a tort protects. In battery, for example, that interest is the plaintiff's bodily integrity—and so, courts sensibly hold that a battery claim does not lie in, say, a sporting event in which the plaintiff voluntarily participated. *See, e.g.*, *Katleski v. Cazenovia Golf Club, Inc.,* 271 N.E.3d 681, 685 (N.Y. 2025); *Anand v. Kapoor*, 942 N.E.2d 295, 296 (N.Y. 2010).

In defamation claims, the plaintiff's reputation is the protected interest. And reputation is developed relationally: it is a product of communication with an audience, within a particular social setting, under conventions the parties themselves have helped invoke. *See* Laura A. Heymann, *The Law of Reputation and the Interest of the Audience*, 52 B.C. L. Rev. 1341, 1349 (2011). Accordingly, defamation addresses a social injury whose existence arises based on context. *Brian v. Richardson*, 660 N.E.2d 1126, 1130 (N.Y. 1995) (defining defamation

9

based on "larger context" of the statement, including "nature of the particular forum"). The forum matters.

When a person voluntarily chooses to enter a forum of public exchange dedicated to attacking an opponent's reputation and defined by provocation, accusation, hyperbole, insult, and rebuttal,[7] they cannot later strip that setting of its ordinary incidents and recast the resulting speech as if it were delivered in some wholly different forum. Otherwise, a person could knowingly and voluntarily enter into an exchange of florid insults, accrue the benefits of insulting their opponent,[8] invite pointed

---

[7] *See* Rap Scholars *Amici* Br. at 5–11 (describing rap feuds as part of "established tradition" involving "outrageous hyperbole," "exaggeration," and "insult").

[8] As Drake has recognized, rap feuds frequently lead to the accumulation of "clout"—i.e., influence—within the rap community. *See Clout*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/clout (last visited April 2, 2026). In "The Heart Part 6," he raps, addressing Lamar, "Album droppin' soon, no wonder you turn / to a clout chaser 'stead of doin' hard labor." JA 357. Clout often translates into sales. Indeed, as of December 2024, two of Drake's songs from the rap battle with Lamar—"Family Matters" and "Push Ups"— had generated nearly $2 million in revenue. *See* Elizabeth Dilts Marshall, *How Much Money Did the Kendrick Lamar-Drake Diss Songs Generate?*, Billboard (Dec. 12, 2024), https://www.billboard.com/pro/ kendrick-lamar-drake-diss-tracks-how-much-money-generate.

10

response on the very subjects placed in dispute, and then run to the courts once the response cuts too deep.

Were the law different, one can imagine a roast emcee sued for libel by the roastee, a wrestling heel hauled into court by the face over a promotional video, or, as here, a diss track treated like a credit report by a willing opponent, simply because the barbs landed as intended. It would allow a plaintiff like Drake to define the forum at the outset, then redefine it on the way out. The tort of defamation—already powerful when wielded recklessly, *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)—cannot fairly be extended to such gameplay.

For similar reasons, First Amendment doctrine has long recognized that the "first remedy" of those who thrust themselves into public controversies should be self-help rather than defamation actions. Even forums that are home to "vehement, caustic, and sometimes unpleasantly sharp" speech are protected by the First Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). That protection applies with extra force when a plaintiff has "thrust" himself "to the forefront" of a particular controversy, thereby "invit[ing] attention and comment." *Gertz*, 418 U.S. at 345. In those circumstances, the "first remedy . . . is

11

self-help." *Id.* at 344. Indeed, the remedy of counter-speech is *expected* in a rap battle. *See* Rap Scholars *Amici* Br. at 7–11.

Without that recognition of autonomy, the framework collapses. If participants in a rap battle could be punished for the ordinary incidents of the art form, they might predictably refuse to engage in the "uninhibited, robust, and wide-open" back-and-forth that the parties sought to create. *Sullivan*, 376 U.S. at 270. That dynamic would harm not just the chilled interlocutor but also the consenting plaintiff, as it would deprive him of the very audience and engagement he sought to command. Even more fundamentally, holding otherwise would suffocate the very expression required for these artistic forums to exist in the first place.

## II. THE RECORD ESTABLISHES THAT DRAKE CONSENTED TO THE ALLEGEDLY DEFAMATORY STATEMENTS

The operative pleading makes clear that Drake consented to the statements he now challenges, foreclosing his suit under black-letter law.

### A. Under New York Law, Consent Lies Where a Plaintiff Invites Statements with a High Degree of Certainty That They Will Be Defamatory

Under New York law, consent to defamation may either be expressly given or implied by the circumstances. New York courts

generally apply the principles announced in the Second Restatement to determine what constitutes consent to defamation. *See LeBreton v. Weiss*, 680 N.Y.S.2d 532, 532 (App. Div. 1998) (citing Restatement (Second) of Torts §§ 583, 584 cmt. d (A.L.I. 1977)); *see also Teichner v. Bellan*, 181 N.Y.S.2d 842, 846 (App. Div. 1959) (citing Restatement (First) of Torts § 583 (A.L.I. 1938)); *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199–200 (2d Cir. 2015) (describing this trend and collecting cases); *Carroll v. Trump*, 680 F. Supp. 3d 491, 514 (S.D.N.Y. 2023) (describing this trend). Under those principles, "conduct that gives apparent consent is sufficient to bar recovery." Restatement (Second) of Torts § 583 cmt. c (A.L.I. 1977). Apparent consent can arise from "words or other conduct . . . reasonably to be interpreted as expressions of consent," as determined by context. *Id.*; *see also id.* § 892 cmt. b (explaining that consent may be manifested "directly . . . by words or acts," but it "need not" always be "manifested by . . . affirmative action," and may even be "manifested by silence or inaction"); *id.* § 583 cmt. b (explaining that the general rules on consent in section 892 apply to the defamation context).

13

Express consent arises when a plaintiff, either through their words or writing, explicitly permits the defendant to publish defamatory statements.[9] Most cases of consent to defamation, however, are cases of implied consent. Implied consent may be found when a plaintiff "intentional[ly] elicit[s]" a statement with a degree of certainty that it will be defamatory. *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 612 F. Supp. 3d 115, 125 (E.D.N.Y. 2020) (quoting *Sleepy's*, 779 F.3d at 199). When "a plaintiff has instigated the making and publication of a statement which he later alleges to be defamatory[,] he should not be heard to complain." *Turano v. Bd. of Educ. of Island Trees Union Free Sch. Dist. No. 26*, 434 F. Supp. 1063, 1069 (E.D.N.Y. 1977); *see also, e.g.*, *Teneriello v. Travelers Cos.*, 641 N.Y.S.2d 482, 483 (App. Div. 1996) (finding that a "plaintiff is deemed to have consented [to allegedly

---

[9] For example, express consent often bars defamation claims in employment disputes where an employee-plaintiff has agreed to a contract or union-membership terms permitting or requiring the employer to disclose or otherwise publish the reasons for the employee's termination, even if such reasons may be defamatory. *See, e.g.*, *Baker v. Lafayette Coll.*, 504 A.2d 247, 249 (Pa. Super. Ct. 1986); *Joftes v. Kaufman*, 324 F. Supp. 660, 662–63 (D.D.C. 1971); *Hirschfeld v. Institutional Inv., Inc.*, 688 N.Y.S.2d 31, 32 (App. Div. 1999) (finding that a plaintiff who sent a letter requesting reasons for her termination had consented to any defamatory statements published in the response).

14

defamatory statements] because the documents were provided at her request").

Frequently, cases of implied consent involve a plaintiff who, already suspecting defamation, hires private investigators to confirm their suspicion by eliciting the allegedly defamatory remarks. *See, e.g.*, *Dickson v. Slezak*, 902 N.Y.S.2d 206, 207 (App. Div. 2010); *Park v. Lewis*, 528 N.Y.S.2d 250, 251 (App. Div. 1988); *see also LeBreton*, 680 N.Y.S.2d at 532 (plaintiff soliciting defamatory statements "through his agents"). In such cases, courts regularly hold that the plaintiffs in effect impliedly consented to any defamation because they had reason to know they were very likely to elicit defamatory statements. *See, e.g.*, *Park*, 528 N.Y.S.2d at 251; *Dickson*, 902 N.Y.S.2d at 208–09; *LeBreton*, 680 N.Y.S.2d at 532.

Conversely, courts are reluctant to find implied consent where a plaintiff has "no reason to anticipate" that their actions might "provoke a defamatory response," *Teichner*, 181 N.Y.S.2d at 846–47, or where all that exists is a generalized concern that a defendant might criticize the plaintiff. For example, sending a letter to a defendant requesting payment of a bill would not constitute consent to a defamatory response. *Id*. at 845–47. To take another example, when E. Jean Carroll accused

15

Donald Trump of sexual assault, the court denied Mr. Trump summary judgment on grounds of consent. *Carroll*, 680 F. Supp. 3d at 515–16. It did so, in part, because "Ms. Carroll's generalized concern that she might be subject to the same attacks that other women . . . have experienced after coming forward with their accusations against Mr. Trump d[id] not demonstrate her awareness of and agreement to the possibility that Mr. Trump might defame her." *Id.* at 515. In addition, there was no evidence to suggest she had reason to "know the type or content of a public statement, if any, Mr. Trump might make in response to her accusation, let alone that she agreed to it." *Id.* at 515–16.

New York's appellate courts differ on how certain a plaintiff must be, when eliciting a defendant's response, that the response will be defamatory. *See Sleepy's LLC*, 779 F.3d at 199–200. Some appellate divisions, for example, have required a plaintiff to have "a high degree of certainty," and "*every reason to anticipate*," that the defendant would respond with defamatory remarks. *Id.* (citing *Dickson*, 902 N.Y.S.2d at 208). Other appellate divisions employ a less burdensome test, aligned with the Second Restatement, that merely requires the plaintiff to have "*reason to anticipate*" that the response "*might*" be defamatory. *Id.*

16

(quoting *Park*, 528 N.Y.S.2d at 251); *see generally* Restatement (Second) of Torts § 583 cmt. d (A.L.I. 1977) ("It is not necessary that the other know that the matter to the publication of which he consents is defamatory in character. It is enough that . . . he has reason to know that it may be defamatory.").

This distinction is of no consequence here, where the elicitation and consent to the specific statements is abundantly clear. Drake had every reason to anticipate that Lamar would respond with the specific statements he alleges to be defamatory and subsequently confirmed that Lamar's statements were exactly what he "expected." JA 256.

B. **Facts Within the Scope of the Pleading Demonstrate that Drake Consented to the Defamatory Statements He Now Challenges**

Rap battles, by their very nature, may convey some degree of implied consent to defamation. Just as a football match could not occur without players assuming the risk of tackle-related injuries, a rap battle could not occur without some assumed risk by the participants that, in the course of their exchange, they will face "insults," "outrageous hyperbole," and "exaggerations" that damage their reputation in potentially defamatory ways. *See* Rap Scholars *Amici* Br., *supra*, at 5–6.

17

In this rap battle in particular, the back and forth was explicit; Drake and Lamar intentionally stoked and escalated the conflict, explicitly calling on each other to keep the feud going.[10]

But this court need not decide whether participation in rap battles generally, or even this rap battle in particular, implies consent to any and all defamation in the course of the exchange. It can resolve this case on the much narrower ground that, at minimum, Drake invited Lamar to publish the specific statements he now alleges to be defamatory. Accordingly, it is immaterial which standard this Court applies—the more burdensome test requiring that the plaintiff have a "high degree of certainty" or the less stringent one requiring that the plaintiff have "reason to believe" a response would be defamatory, for the more stringent test is met here.

---

[10] In "Push Ups," officially released on April 19, 2024, Drake responds to Lamar's song "Like That," which had more generally insulted Drake, among other rappers, and notes that his feud with Lamar has "been brewin' in a pot, now I'm heatin' up." JA 233; *see* JA 510. Soon after, he released "Taylor Made Freestyle," in which he asks specifically why Lamar has not responded yet: "You asked for the smoke, now it seem you too busy for the smoke / I won't lie, the people confused / Now you 'bout to give this shit another week?" JA 235; *see* JA 510. Lamar's responses indicate the same. In "Euphoria," for example, from April 30, he raps, "If you take it there, I'm takin' it further / Psst, that's something you don't wanna do." JA 246; *see* JA 511.

18

Drake directly and clearly invited Lamar to publish a song accusing him of liking young girls. In "Taylor Made Freestyle," Drake invited Lamar to "talk about [Drake] likin' young girls," raising the issue of pedophilia for the first time. JA 235. He urged Lamar to respond, taunting, "I guess you need another week to figure out how to improve / What the fuck is taking so long? We waitin' on you." JA 236.[11] Lamar accepted his direct invitation, publishing "Not Like Us," which contains the allegedly defamatory statements at the heart of this lawsuit: "Say, Drake, I hear you like 'em young / You better not ever go to cell block one"; "Just make sure you hide your lil' sister from him"; "Certified Lover Boy? Certified pedophiles . . . Tryna strike a chord and it's probably A-Minor." JA 122. Lest there be any doubt that Drake elicited Lamar's response with virtual certainty that it would be defamatory, Drake confirmed in "The Heart Part 6," released on May 5, 2024, that "This Epstein angle was the shit I expected." JA 256, 513.

It is difficult to imagine a clearer call-and-response. Indeed, Drake's solicitation to Lamar presents a clearer instance of consent than in many

---

[11] As the district court explained, Drake's lyric "clearly prods Lamar to discuss preexisting rumors about Drake's interest in minors." JA 533; *see also id.* 533 n.5.

19

previous cases. For one, instead of using private investigators or other third parties, Drake directly communicated his invitation to Lamar through an internationally broadcast song. JA 235. And perhaps more importantly, Drake's invitation was far more specific than most, if not all, of the private-investigator cases. Most of those plaintiffs had a strong suspicion that the defendant was defaming them but merely elicited general comments about the plaintiff. *See, e.g.*, *Park*, 528 N.Y.S.2d at 250; *Dickson*, 902 N.Y.S.2d at 208. Here, Drake called on Lamar to make the specific defamatory accusations he now challenges in court. Not only did Drake have a high degree of certainty that the ensuing response could be defamatory in a forum that trades in insults, but he confirmed that he anticipated the *specific* statements over which he now presses suit.

Moreover, just as the plaintiff's name in *Dickson* entered the conversation only because investigators raised it, accusations of Drake liking young girls entered the rap battle only after Drake's invitation. *See Dickson*, 902 N.Y.S.2d at 208 ("Furthermore, plaintiff's name did not become part of any conversation with defendants unless and until Hills inquired about plaintiff's ethics and business methods. Only then did defendants make any comment with regard to plaintiff."). Drake cannot

20

invite Lamar to talk about him liking young girls, knowing Lamar will accuse him of pedophilia, and "be heard to complain of the resulting injury." *Ziemkiewicz v. R+L Carriers*, 996 F. Supp. 2d 378, 398 (D. Md. 2014); *see Turano*, 434 F. Supp. at 1069 (same).

Unlike in cases in which a plaintiff's solicitation and anticipation of defendant's remarks is too general to constitute specific consent, *see Carroll*, 680 F. Supp. 3d at 515, no such ambiguity exists here. There can be no doubt that Drake was "virtually certain" that his solicitation in "Taylor Made Freestyle" "would elicit allegedly slanderous statements." *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 529 (2d Cir. 2018). Drake's solicitation was perfectly clear, and the ensuing response was exactly what he anticipated. In a case as clear as this, this Court should hold the plaintiff to have consented.

## C.    This Court Should Reject Drake's Effort to Avoid the Consent Problem at the Heart of this Case

Drake appears to be litigating this case with an eye toward evading the consent problem at its center.

For example, Drake nowhere mentions "Taylor Made Freestyle" in the complaint and contends that "[t]his lawsuit is *not* about the artist who created 'Not Like Us.' It is, instead, entirely about UMG, the music

21

company that decided to publish, promote, exploit, and monetize allegations that it understood were not only false, but dangerous." JA 19. Specifically, Drake takes issue with "UMG's deliberate efforts" to "spread the Recording . . . as widely as possible." JA 19–20; *see, e.g.*, JA 22 (describing "UMG's campaign" to spread the allegedly defamatory song as "well beyond the traditional music company playbook").

To the extent Drake means to argue that *even if* he consented to Lamar's lyrics, UMG's promotion of Lamar's song exceeds the scope of that consent, the argument is a nonstarter. To be sure, courts often do evaluate whether the extent of the resulting defamation was reasonably foreseeable to the plaintiff and thus within the scope of his consent. *See, e.g.*, *Mandelblatt v. Perelman*, 683 F. Supp. 379, 384 (S.D.N.Y. 1988) (noting that "a communication may exceed the scope of the consent"); *see also Cox v. Nasche*, 70 F.3d 1030, 1031 n.2 (9th Cir. 1995) (noting that consent to defamation only affords protection where "the publication is within the scope of the consent"). The scope of consent is not unlimited—it ends where reasonable foreseeability ends. For example, a plaintiff who requests a letter of recommendation from a defendant could not be reasonably understood to have "invite[d] the defendant to make public

22

anything false and defamatory." *Mandelblatt*, 683 F. Supp. at 384 (quoting *Nelson v. Whitten*, 272 F. 135, 136 (E.D.N.Y. 1921)).

But in tort law, the scope of consent is based on an objective analysis rather than the plaintiff's subjective beliefs, and its scope extends to that which the plaintiff could *reasonably* have foreseen. *See, e.g., O'Brien v. Cunard S.S. Co.*, 28 N.E. 266, 266 (Mass. 1891) (explaining that findings of consent depend on "[v]iewing . . . conduct in the light of the surrounding circumstances," not based on plaintiff's subjective intent); *see also Turcotte v. Fell*, 502 N.E.2d 964, 968 (N.Y. 1986) ("As a general rule, participants properly may be held to have consented, by their participation, to those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation."). Thus, courts often consider what scope is "reasonable in light of the language or circumstances that created" the consent. *Brooks v. AAA Cooper Transp.*, 781 F. Supp. 2d 472, 485 (S.D. Tex. 2011) (quoting *Smith v. Holley*, 827 S.W.2d 433, 439 (Tex. App. 1992)).

This case does not implicate the difficult questions of reasonable foreseeability that may sometimes complicate scope-of-consent analyses. Drake urged Lamar to accuse him of liking young girls and to do so in a

23

diss track in a rap battle in which every track garnered millions of streams. *See* JA 104; *see also* JA 235–36, 526. It is not as though Drake privately encouraged Lamar to make this accusation, and then Lamar broadcast it to millions of people. Both parties in this saga were knowingly publishing their songs to an international audience. *See* JA 31–32 (noting that Drake is an "[i]nternationally [r]ecognized . . . [m]ultitalented [r]ap [s]uperstar," "one of the world's best-selling music artists of all time," and a "celebrity with global name recognition"). That Drake could not foresee the virality of a diss track levying the specific allegation he explicitly invited strains credibility.

Drake's amended complaint makes much of UMG's efforts to publish and promote Lamar's song, suggesting this ancillary work somehow amounted to a transformational expansion of the original work. *See* JA 68–104. Yet nothing Drake accuses UMG of doing appears to diverge from what even a layperson—let alone a platinum artist with years of experience in the music industry—would expect a record company to do.

Nor did Lamar or UMG ever apparently embark on an effort to defame Drake outside the forum of the rap battle itself. *See Dickson*, 902

24

N.Y.S.2d at 208–09 ("Notably, there is no proof of publication of defamatory statements by these defendants to any other persons."). Apart from performing the song and publishing and promoting the record and its cover, there are no allegations that Lamar or UMG staff ever republished the allegedly defamatory statements themselves in any other forum. *See* JA 68–104. Instead, Drake complains that UMG touted the song's success and facilitated its dissemination.

The scope of a plaintiff's consent may, in some fact-intensive cases, present a question for the jury. *See, e.g.*, *Mandelblatt*, 683 F. Supp. at 383 (noting that "the scope of the consent, if ambiguous, is for the jury to determine"). But this is not one of those cases. By urging Lamar to respond in a diss track and specifically inviting Lamar to put allegedly defamatory lyrics in that diss track, Drake cannot now escape the applicability of a consent defense by suing the record company that published that track and challenging a scale-of-dissemination he had every reason to anticipate.

## III. THE COURT MAY DISMISS THIS CASE AT THE PLEADING STAGE ON GROUNDS OF CONSENT

This Court can and should take account of Drake's consent to any allegedly defamatory statements at this stage of litigation to prevent

lengthy proceedings and unnecessary discovery, preserve the resources of this Court, and prevent the risk of a significant chilling effect for UMG.

### A. New York Courts Recognize the Propriety of Dismissal at the Pleadings Stage When Consent Clearly Forecloses Liability

Consent is an affirmative defense and, because the existence and scope of consent may be disputable, discovery is often necessary to resolve a consent defense. *See* Sack on Defamation § 8:2.8. Where, however, "allegations establish as a matter of law that plaintiff consented to the publication of the alleged defamatory statements . . . , the complaint fails to state a cause of action," because consent constitutes a complete defense to an action for defamation. *LeBreton v. Weiss*, 680 N.Y.S.2d 532, 532 (App. Div. 1998) (citations omitted).

While Drake studiously avoids so much as mentioning "Taylor Made Freestyle" in his amended complaint, the lower court correctly took judicial notice of "the songs released as part of Drake and Kendrick Lamar's rap battle" below, noting that "[t]he dates on which these songs

were released and the lyrics of these songs are not reasonably subject to dispute."[12] JA 508.

In this case, the judicial record clearly establishes as a matter of law that Drake consented to any defamatory statements regarding his associations with young girls. *See supra* Section II.B. As such, Drake fails to state a cause of action, and this Court should affirm the district court and dismiss.

## B. Dismissing Cases of Obvious Consent Is Important to Prevent Chilling Protected Speech

Defamation cases adjudicated throughout the United States, in both state and federal court, are resolved "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The Supreme

---

[12] While Graham contests this eminently reasonable decision on appeal, his arguments are unconvincing, and the lyrics are properly part of the record on appeal. *See Dixon v. Von Blanckensee*, 994 F.3d 95, 101–02 (2d Cir. 2021) ("When ruling on a Rule 12(b)(6) motion, we may also consider matters of which a court may take judicial notice." (internal quotation marks omitted)).

27

Court has impressed upon courts time and again that "[o]ur profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of 'breathing space' so that protected speech is not discouraged." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974)).

This basic, core commitment to robust public debate has led New York courts to embrace the significant value of dismissing defamation cases early in the litigation process. *See Button v. Doherty*, No. 24-CV-5026 (JPC) (KHP), 2025 WL 2846927, at *14 (S.D.N.Y. July 30, 2025) ("New York courts encourage the resolution of defamation claims at the pleading stage." (internal quotation marks omitted)), *report and recommendation adopted*, No. 24 CIV. 5026 (JPC) (KHP), 2025 WL 2776069 (S.D.N.Y. Sep. 30, 2025). The Court of Appeals has explained that resolving claims on the pleadings "has particular value, where appropriate, in libel cases, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." *Armstrong v. Simon & Schuster, Inc.*, 649 N.E.2d 825, 828 (N.Y. 1995); *see also Immuno AG. v. Moor-Jankowski*, 567

28

N.E.2d 1270, 1282 (N.Y. 1991) (reaffirming New York courts' "regard for the particular value of summary judgment, where appropriate, in libel cases" due to "[t]he chilling effect of protracted litigation"). Indeed, "[t]he threat of being put to the defense of a lawsuit" of unmeritorious defamation claims "may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself." *Karaduman v. Newsday, Inc.*, 416 N.E.2d 557, 563 (N.Y. 1980) (quoting *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966), *cert. denied*, 385 U.S. 1011 (1967)).[13]

---

[13] Federal courts presented with New York defamation claims weigh the same factors—the costs of protracted litigation and the resulting chill on speech—in their dismissal determinations. As explained in *Biro v. Conde Nast*, "in defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015). The judge articulated this point more fully in an earlier decision: "Even if liability is defeated down the road, the damage has been done. The defendant . . . may well possess the resources necessary for protracted litigation, but . . . [t]he prospect of legal bills, court appearances, and settlement conferences means that all but the most fearless will pull their punches . . . ." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 457 n.5 (S.D.N.Y. 2012) (quoting *Hatfill v. New York Times Co.*, 427 F.3d 253, 255 (4th Cir. 2005) (Wilkinson, J., dissenting)). Federal cases regularly invoke the "particular value" of resolving defamation claims at the pleading stage, per *Armstrong*, 649 N.E.2d at 828. *See, e.g.*, *Dfinity Found. v. New York Times Co.*, 702 F. Supp. 3d 167, 173 (S.D.N.Y. 2023) (dismissing

The same principles apply here. A strategic plaintiff cannot avoid an obvious consent problem by simply declining to allege the public, indisputable fact of their consent. In this case, allowing Drake to put UMG through protracted discovery where dismissal is appropriate on the facts before this Court would lead to unnecessary costs for both parties and expend the courts' valuable resources.

The Court here should also take account of the fact that New York courts have long recognized that the state has a particular interest in robust public discourse, including and especially within the arts. *See Immuno AG.*, 567 N.E.2d at 1277 ("This State, a cultural center for the Nation, has long provided a hospitable climate for the free exchange of ideas."). Allowing a case like this to proceed would have significant implications for ideas exchanged through art, including rap battles. *See* Rap Scholars *Amici* Br. at 5 (explaining that rap battles "have been

---

defamation claims on a motion to dismiss and noting the value, per *Armstrong*, of doing so), *aff'd*, No. 23-7838-CV, 2024 WL 3565762 (2d Cir. July 29, 2024); *SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*, No. 21 CIV. 2857 (AT), 2022 WL 493600, at *4 (S.D.N.Y. Feb. 17, 2022) (same); *Savage v. NYP Holdings, Inc.*, No. 24 CIV. 3278 (NRB), 2025 WL 2687992, at *5 (S.D.N.Y. Sep. 19, 2025) (same).

30

integral to rap music since the art form's inception in the 1970s, drawing on a long tradition in African American culture").

\* \* \*

Should the Court disagree with the district court that Lamar's statements are nonactionable opinion, this Court can and should affirm the district court's dismissal on grounds of consent now. Dismissal on the pleadings is appropriate in cases, like this, of obvious consent because not dismissing such cases carries outsized risk of chilling protected expression.

## CONCLUSION

For the reasons above, this Court should affirm.

Dated: May 6, 2026 (originally filed April 3, 2026)

Respectfully Submitted,

/s/ John Langford
John Langford
   *Counsel of Record*
David A. Schulz
Hannah Berkman, *student*
Melanie Geller, *student*
Raymond Perez, *student*
Tess Solomon, *student*
MEDIA FREEDOM & INFORMATION
   ACCESS CLINIC

YALE LAW SCHOOL[*]
127 Wall Street
New Haven, CT 06511
(203) 432-2366
john.langford@ylsclinics.org

*Counsel Amici Curiae the Floyd Abrams Institute for Freedom of Expression and Professor Lyrissa Lidsky*

---

[*] The views expressed herein do not purport to represent the institutional views of Yale Law School, if any.

32

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 6,573 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: May 6, 2026

/s/ *John Langford*
John Langford

## CERTIFICATE OF SERVICE

I certify that on May 6, 2026, I electronically filed the foregoing Notice with the United States Court of Appeals for the Second Circuit, using the appellate CM/ECF system. All parties are registered CM/ECF users, and service upon them will be accomplished by the appellate CM/ECF system.

Date: May 6, 2026

*/s/ John Langford*
John Langford